**15-25-00021-CV**

ACCEPTED
15-25-00021-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
2/28/2025 8:28 PM
CHRISTOPHER A. PRINE
CLERK

No. _____

In the Fifteenth Court of Appeals
Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
2/28/2025 8:28:00 PM
CHRISTOPHER A. PRINE
Clerk

PFIZER INC. and TRIS PHARMA, INC.,
Petitioners/Defendants,

v.

The STATE OF TEXAS and TARIK AHMED,
Respondents/Plaintiffs.

Permissive appeal from the 71st Judicial District Court, Harrison County, Texas

# Petition for Permission to Appeal
# by Pfizer Inc. and Tris Pharma, Inc.

Edward D. Burbach (No. 03355250)
Stacy R. Obenhaus (No. 15161570)
600 Congress, Suite 2900
Austin, Texas 78701
eburbach@foley.com
sobenhaus@foley.com
Tel: 512.542.7070

Samantha Barrett Badlam (Pro hac pending)
Stefan P. Schropp (Pro hac pending)
2099 Pennsylvania Ave., N.W.
Washington, D.C. 20006-6807
samantha.badlam@ropesgray.com
stefan.schropp@ropesgray.com
Tel: 202.508.4734

George Valton ("Val") Jones (No. 10888050)
109 West Austin St.
Marshall, Texas 75670-3340
val@valjoneslaw.com
Tel: 903.927.2220

*Counsel for Pfizer Inc.*

Harry "Gil" Gillam, Jr. (No. 07921800)
Tom Gorham (No. 24012715)
303 S. Washington Ave.
Marshall, Texas 75670
gil@gillamsmithlaw.com
tom@gillamsmithlaw.com
Tel: 903.934.8450

William E. Lawler III (Pro hac pending)
1825 Eye St. N.W.
Washington, D.C. 20006-5403
william.lawler@blankrome.com
Tel: 215.569.5449

*Counsel for Tris Pharma Inc.*

**Information Required by Tex. R. App. P. 28.3(e)(1) and 25.1(d)**

As required by Tex. R. App. P. 28.3(e)(1), Petitioners provide the following information in keeping with Tex. R. App. P. 25.1(d):

1.      Trial court, style, and case number:

- 71st Judicial District Court, Harrison County

- *State of Texas ex rel. Tarik Ahmed v. Pfizer Inc., Tris Pharma, Inc., and Ketan Mehta*

- Cause No. 23-1031

2.      Petitioners wish to appeal the orders signed on January 29, 2025.

They are attached as **Appendix A**.  Petitioners include two of the parties:

- Joint Petitioner Pfizer Inc. ("Pfizer"), defendant below.

- Joint Petitioner Tris Pharma, Inc. ("Tris"), defendant below.

3.      This appeal is to the Fifteenth Court of Appeals.

4.      This petition is filed under Tex. Civ. Prac. & Rem. Code § 51.014(d).

The appeal will be accelerated and is not a parental termination or child protection case.

# TABLE OF CONTENTS

ISSUE PRESENTED..................................................................................................6

INTRODUCTION .....................................................................................................6

STATEMENT OF FACTS AND PROCEDURAL HISTORY ...............................9

    A.    Pfizer and Tris Filed Rule 91a Motions to Dismiss the Petition...........9

    B.    After the Supreme Court of Texas Decided *Malouf*, Pfizer and Tris Sought Reconsideration ..............................................................12

    C.    Pfizer and Tris Sought Certification of an Immediate Appeal of the Ruling ..............................................................................................13

ARGUMENT ..........................................................................................................14

I.    WHETHER SECTION 36.002(7)(C) REQUIRES MATERIALITY IS A CONTROLLING QUESTION OF LAW FOR WHICH THERE EXISTS SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION.................................................................................................15

    A.    This Appeal Presents a Controlling Question of Law........................15

    B.    Substantial Ground for Difference of Opinion Exists on this Question...............................................................................................18

II.    AN IMMEDIATE APPEAL WOULD MATERIALLY ADVANCE THE ULTIMATE TERMINATION OF THE LITIGATION. .....................22

III.    RESOLUTION OF THIS CONTROLLING QUESTION OF LAW WILL SERVE THE PUBLIC INTEREST.................................................25

CONCLUSION .......................................................................................................26

# INDEX OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*A.S. Horner, Inc. v. Navarrette,*
656 S.W.3d 717 (Tex. App.—El Paso 2022, no pet.) ........................................12

*ADT Sec. Servs., Inc. v. Van Peterson Fine Jewelers,*
No. 05-15-00646-CV, 2015 WL 4554519 (Tex. App.—Dallas July
29, 2015, no pet.) ..............................................................................10, 12

*AmeriGas Propane LP v. Aboytes-Muñiz,*
No. 09-18-00122-CV, 2019 WL 2127750 (Tex. App.—Beaumont
May 16, 2019, pet. denied) ...............................................................12

*Gulf Coast Asphalt v. Lloyd,*
457 S.W.3d 539 (Tex. App.—Houston [14th Dist.] 2015, no pet.) .........9, 11, 12

*Malouf v. State ex rel. Ellis,*
694 S.W.3d 712 (Tex. 2024) ...................................................................*passim*

*State ex rel. NPT Assocs. v. Lab'y Corp. of Am. Holdings,*
No. 01-23-00043-CV, 2024 WL 5249087 (Tex. App.—Houston
[1st. Dist.] Dec. 31, 2024, no pet. h.)........................................15, 16, 19

*Oncor Elec. Delivery Co. v. Brockriede,*
No. 02-13 00071-CV, 2013 WL 6564276 (Tex. App.—Fort Worth
Dec. 12, 2013, no pet.)....................................................................12

*Sabre Travel Int'l, Ltd. v. Deutsche Lufthansa AG,*
567 S.W.3d 732 (Tex. 2019) .....................................................17, 18

*United States ex rel. Yu v. Grifols USA, LLC,*
No. 1:17-cv-2226, 2021 WL 5827047 (S.D.N.Y. Dec. 8, 2021),
*aff'd*, 2022 WL 7785044 (2d Cir. Oct. 14, 2022)............................15

**Statutes**

21 U.S.C. § 371 ..............................................................................4, 8, 13

21 U.S.C. § 351 ...........................................................................................4, 13, 15

Tex. Civ. Prac. & Rem. Code § 51.014(d)........................................................9

Tex. Gov't Code § 22.201(p) ...........................................................................16

Tex. Gov't Code § 220(d) ................................................................................16

Tex. Health & Safety Code §§ 431.001-.415 *et seq.* ......................................*passim*

Tex. Health & Safety Code § 431.002(15) ......................................................14

Tex. Health & Safety Code § 431.111(a)(B) ...................................................13

Tex. Health & Safety Code § 431.245(a) .........................................................14

Tex. Health & Safety Code § 483.001 .............................................................14

Tex. Hum. Res. Code § 36.001 ................................................................5, 11, 14

Tex. Hum. Res. Code § 36.002 .................................................................*passim*

Tex. Ins. Code § 1369.301 ...............................................................................14

Tex. Occ. Code § 551.003 ................................................................................14

Tex. Transp. Code § 724.001(6) ......................................................................14

## Other Authorities

21 C.F.R. § 210 ..................................................................................................4

21 C.F.R. § 211 ..................................................................................................4

Senate Comm. on State Affairs, Engrossed Bill Analysis, Tex. H.B.
274, 82d Leg., R.S. (2011)..........................................................................18

Tex. R. Civ. P. 91a .................................................................................4, 5, 6, 7

Tex. S.B. 1045, 88th Leg., R.S. (2023) .............................................................9

## ISSUE PRESENTED

In a recent landmark decision, the Supreme Court of Texas determined that the Texas Medicaid Fraud Prevention Act (the "TMFPA," presently the Texas Health Care Program Fraud Prevention Act) is a "penal statute," and so courts "must strictly construe" ambiguities in the Act in favor of the defendant. *Malouf v. State ex rel. Ellis*, 694 S.W.3d 712 (Tex. 2024). The question presented in this case is whether Section 36.002(7)(C) of the TMFPA, which makes it unlawful to submit payment claims to the State of Texas for products supplied through Medicaid that are "adulterated" (an undefined term), requires that the defendant's conduct be material to the Texas Health and Human Services Commission's decision to reimburse claims.

## INTRODUCTION

This litigation concerns Quillivant XR, a medication that since September 27, 2012, has been subject to uninterrupted approval by the U.S. Food and Drug Administration ("FDA") to treat attention deficit hyperactivity disorder ("ADHD"). Quillivant has been subject to uninterrupted approval since June 2013 by the Texas Health and Human Services Commission ("HHSC") for reimbursement under the Texas Medicaid program.

The plaintiffs in this lawsuit—the State of Texas and Relator Tarik Ahmed—claim that all Quillivant distributed to Texas Medicaid participants between 2013 and 2018 was "adulterated" under the TMFPA due to alleged deficiencies in compliance with FDA's current Good Manufacturing Practice ("cGMP") regulations, promulgated to ensure quality control in drug manufacturing. Plaintiffs now seek hundreds of millions of dollars in penalties based on the theory that reimbursement claims submitted to HHSC were unlawful because of alleged cGMP-related deficiencies.

For context, there are many different cGMP regulations that cover nearly all aspects of drug manufacturing: some govern conduct that could fundamentally affect the performance of a product, whereas others address processes and procedures likely to have minimal impact on the safety or efficacy of a product (*e.g.*, failure to have the required number of signatures on forms per a company operating procedure or to have adequate lighting in all areas). Plaintiffs' position is that *any* violation of a cGMP regulation—regardless of the regulation or the effect of the violation—renders a product *per se* "adulterated" and ineligible for reimbursement by Texas Medicaid. Plaintiffs further maintain that it does not matter whether HHSC knew about these violations but nonetheless continued to reimburse claims for the product, which is exactly what occurred with Quillivant. This interpretation allows the State

7

to exploit the TMFPA to recover enormous penalties—like the hundreds of millions of dollars Plaintiffs are seeking in the instant case—even when a product performed exactly as HHSC expected.

Petitioners, on the other hand, argue that fraud means fraud. In other words, a TMFPA case premised on cGMP violations must involve conduct that is capable of influencing HHSC's decision to reimburse claims for the product—*material* conduct. Petitioners' position is consistent with the Texas legislature's objective in enacting the TMFPA: combatting fraud. It also avoids converting the TMFPA into a strict liability statute, where technical (but *de minimis*) non-compliance with federal regulations could trigger treble damages, civil penalties, injunctive relief, and exclusion from the Medicaid program.

The correct interpretation of TMFPA section 36.002(7)(C) will fundamentally alter the trajectory of this case. If Section 36.002(7)(C) requires materiality, Plaintiffs' claim will fail as currently pleaded —Plaintiffs concede they did not plead materiality for this cause of action. Either way though, answering the question will materially advance the litigation—defining what Plaintiffs must prove, which will shape the discovery, summary judgment, and trial stages of the litigation. Moreover, this Court's decision will profoundly impact future TMFPA cases and the Texas Medicaid program.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

Tris manufactured Quillivant, a unique liquid extended-released ADHD medication, on behalf of Pfizer from May 2012 until September 2018. *See* Second Am. Pet. (Jan. 17, 2025) (the "SAP") ¶ 17. Since June 2013, Quillivant has been accessible to millions of Texans through the Texas Medicaid program, a joint federal-state program that HSSC administers and that covers the costs of medical care for hundreds of thousands of Texas residents. *Id.* ¶¶ 30, 46.

A. Pfizer and Tris Filed Rule 91a Motions to Dismiss the Petition.

On November 8, 2023, Plaintiffs sued Pfizer and Tris alleging they violated the TMFPA—Texas's counterpart to the federal False Claims Act ("FCA"). The petition alleged that Pfizer and Tris violated Section 36.002(7)(C) of the TMFPA, which prohibits knowingly making a claim for "a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate." *See* SAP ¶ 127. The petition asserts other claims against Pfizer (SAP ¶¶ 124-126), but the core allegation is that between 2013 and 2018, purported violations of federal cGMP regulations rendered Quillivant "adulterated" under the TMFPA. *Id.* ¶¶ 12, 127.

The TMFPA does not define the term "adulterated." Plaintiffs instead import the definition of "adulterated" set forth in the federal Food Drug and Cosmetic Act ("FDCA") and its counterpart, the Texas Food, Drug, and Cosmetic Act ("TFDCA").

Under those statutes, a product is considered "adulterated" if it is manufactured in a manner that does not comport with FDA's cGMP regulations. *See* 21 U.S.C. § 371; 21 C.F.R. §§ 210, 211; Tex. Health & Safety Code §§ 431.001-.415. Plaintiffs allege that Petitioners violated these cGMP regulations due to alleged deficiencies related to investigations into dissolution testing results. SAP ¶¶ 53-57, 72, 79-81, 83. Dissolution testing is a quality control test that measures how quickly a drug's active ingredient dissolves to help predict whether the active ingredient will release as expected after administering the medication. *Id.* ¶¶ 50-51. The petition does not allege how the purported investigational deficiencies undermined Quillivant's safety or efficacy or could influence HHSC's decision-making.

On February 5, 2024, Petitioners moved to dismiss the petition pursuant to Texas Rule of Civil Procedure 91a. Petitioners argued that Plaintiffs failed to—and cannot—allege that any purported cGMP violations that allegedly "adulterated" Quillivant *influenced or were capable of influencing* HHSC's decision-making regarding coverage of the drug. *See* Pfizer's Mem. of Law in Support of Mot. to Dismiss Plfs' First Am. Pet. 32-37 (Feb. 5, 2024). In other words, to state a claim under Section 36.002(7)(C), Plaintiffs must allege that the purported violations were "material" to HHSC—*i.e.*, having "a natural tendency to influence or to be capable of influence." Tex. Hum. Res. Code § 36.001(5-a). More specifically, Petitioners

maintained that the TMFPA term "adulterated" was ambiguous and must be read in conjunction with the rest of Section 36.002(7)(C), which describes conduct that is *undoubtedly* material to HHSC's decision-making—conduct rendering a product "debased, mislabeled, or . . . otherwise inappropriate"—because it alters a product's safety or efficacy. *See id.* § 36.002(7)(C). It follows, then, that relying on cGMP violations to establish "adulteration" requires that those violations be capable of influencing HHSC's decision-making. Otherwise, every run-of-the-mill cGMP violation, such as failing to replace a facility's light bulbs in a timely fashion, could render a product "adulterated" and enable the State to weaponize the TMFPA to recover windfall penalties even when a product performed consistently with HHSC's expectations.

This issue was so central to Petitioners' Rule 91a briefs that the very first question the court asked the State during oral argument was "why the State continued to pay if they believed fraud was committed and [why] it remained on the [Texas's Preferred Drug List]." *See* (Tr. 40:8-12, June 10, 2024). The State has repeatedly avoided answering this question. Nevertheless, in orders signed June 12 and 13, 2024, the trial court summarily denied Petitioners' motions to dismiss.

B.  After the Supreme Court of Texas Decided *Malouf*, Pfizer and Tris Sought Reconsideration.

Just two weeks later, the Supreme Court of Texas decided *Malouf v. State ex rel. Ellis*, 694 S.W.3d 712 (Tex. 2024), tipping the balance in favor of defendants when interpreting ambiguities in the TMFPA—such as Section 36.002(7)(C)'s use of the term "adulterated."  Much like this case, *Malouf* involved an attempt to score a windfall recovery based on a purported technical violation of a seemingly ambiguous TMFPA provision.  In *Malouf*, the State, advocating for an unnatural reading of the word "*and*," argued that the defendant violated a TMFPA provision making it unlawful to submit a claim "that fails to indicate the type of license," which the defendant accurately provided, "*and* the identification number" of the individual performing the service, which he did not.  Tex. Hum. Res. Code § 36.002(8) (emphasis added).  The trial court ultimately credited the State's "and-means-or" interpretation and awarded $16.5 million, despite the State conceding that it had received exactly what it paid for: services from a licensed provider.  *Id.* at 717, 721.

The Supreme Court of Texas reversed the ruling and rendered judgment in the defendant's favor, reasoning that because the TMFPA is a penal statute, any ambiguities in the statute's text must be "strictly construed" in favor of the defendant. *Id.* at 721.  The Court emphasized that the TMFPA targets fraud, not technical errors,

12

and that the State's interpretation—failing to include certain information in claims—did not match the seriousness of potential harm to the Texas Medicaid Program. *Id.*

Given *Malouf*'s similarities to the instant case, the decision spurred Petitioners to seek reconsideration of the Rule 91a motions to dismiss. *See* Defs' Joint Mot. for Reconsideration or Clarification and Request for Hearing (July 2, 2024). In this motion, Petitioners emphasized *Malouf*'s directives that: (i) ambiguities in the TMFPA should be "strictly construe[d]" in favor of defendants (here, Petitioners), and (ii) the statute should be construed in accordance with its objective of combatting fraud or leads to absurd results. In an order signed August 12, 2024, the trial court denied the motion.

C.    Pfizer and Tris Sought Certification of an Immediate Appeal of the Ruling.

In response, Petitioners moved to certify for interlocutory appeal the question of whether Section 36.002(7)(C) requires that any claim based on cGMP violations that render a product "adulterated" must allege that the underlying conduct was material to the HHSC's coverage decision. Key to this question is the TMFPA's definition of "adulterated" and whether it encompasses every cGMP violation that can technically adulterate a drug under the FDCA or TFDCA, or whether the term

"adulterated" requires that the cGMP violation be material to HHSC's decision-making.

After initially denying the motion, the trial court reconsidered the issue and amended its orders denying Pfizer's and Tris' motions to dismiss, certifying those orders for interlocutory appeal. App. [A], Amend. Order Denying Pfizer's Mot. to Dismiss at 1; Amend. Order Denying Tris's Mot. to Dismiss at 1 (together, the "Amended Orders"). Shortly before the trial court certified the Amended Orders, Plaintiffs filed a Second Amended Petition that is identical to the First Amended Petition, except for clarifying that Plaintiffs do not seek injunctive relief against Pfizer. Therefore, the controlling question of law before this Court remains unaffected by Plaintiffs' recent filing.

## ARGUMENT

This Court should hear an immediate appeal of the trial court's ruling because (1) "the order to be appealed involves a controlling question of law as to which there is a substantial ground for difference of opinion" and (2) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." Tex. Civ. Prac. & Rem. Code § 51.014(d). "Civil cases of statewide significance" are the core of this Court's jurisdiction, and resolving this controlling question of law will

14

serve the public interest given the impact on the Medicaid program. *See* Tex. S.B. 1045, 88th Leg., R.S. (2023).

## I. WHETHER SECTION 36.002(7)(C) REQUIRES MATERIALITY IS A CONTROLLING QUESTION OF LAW FOR WHICH THERE EXISTS SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION.

### A. This Appeal Presents a Controlling Question of Law.

This appeal raises a controlling question of law, the resolution of which could terminate Plaintiffs' principal claim or, at the very least, determine whether at trial Plaintiffs must prove actual fraud or whether the TMFPA is a strict liability statute. Texas courts will find an issue "controlling" so long as it "deeply affects the ongoing process of litigation" and its resolution "will considerably shorten the time, effort, and expense of fully litigating the case." *See Gulf Coast Asphalt v. Lloyd*, 457 S.W.3d 539, 544-45 (Tex. App.—Houston [14th Dist.] 2015, no pet.). And where "the viability of a claim rests upon the court's determination of a question of law, the question is controlling." *ADT Sec. Servs., Inc. v. Van Peterson Fine Jewelers*, No. 05-15-00646-CV, 2015 WL 4554519, at *2 (Tex. App.—Dallas July 29, 2015, no pet.). Whether Section 36.002(7)(C) requires materiality to prevent "gotcha" cases like the present one is an issue of statutory interpretation, the answer to which would lead this litigation on two profoundly different paths.

Plaintiffs' assert that any alleged technical cGMP violation renders a product "adulterated" under the TMFPA and can lead to liability under the statute. *See* SAP ¶ 20. Plaintiffs contend that it is irrelevant whether those violations affected the product or were capable of influencing HHSC's decision-making. (Tr. 71:17-71:24 June 10, 2024). According to Plaintiffs, if a company suspects it has violated a cGMP regulation related to a product and then makes a claim for payment for that product, it has violated the TMPA, even if HHSC knows about the violation and pays for the product anyway.

The practical impact of this strict liability position is that the State could impose exorbitant penalties for mere foot-faults or technical violations of complex federal regulations—violations that occur daily across the country— even if HHSC *knows* about the cGMP violations but is still satisfied with the product and continues to pay for it. *See* U.S. Food & Drug Admin, Inspection Observations (Jan. 13, 2025) (noting that, in 2024 alone, FDA inspectors issued 561 drug-related Form 483 reports, which identify observed conditions that may violate cGMP regulations). That interpretation contradicts *Malouf*, which emphasized that the TMFPA is *not* intended to punish technical violations but is instead a "powerful tool for targeting *fraud* against the Texas Medicaid program." 694 S.W.3d at 721 (emphasis added).

16

Petitioners, on the other hand, contend that an adulteration case based on cGMP violations requires that the alleged violation be material to HHSC's decision-making. Put differently, for a Section 36.002(7)(C) adulteration claim to be viable, the underlying cGMP violation cannot be an immaterial technical violation; it must have "a natural tendency to influence or be capable of influencing" HHSC's decision-making. *See* Tex. Hum. Res. Code § 36.001(5-a) (defining materiality under the TMFPA). This reading is consistent with the TMFPA's purpose—fraud prevention—and the surrounding language of Section 36.002(7)(C) ("debased," "mislabeled," or "inappropriate"), which seeks to address conduct that fundamentally affects a product's safety and efficacy and is presumptively material to HHSC's reimbursement decisions. *See* Tex. Hum. Res. Code § 36.002(7)(C).

The answer to the question of whether Plaintiffs must plead materiality under Section 36.002(7)(C)—that the alleged cGMP violation that renders the product "adulterated" must be capable of influencing HHSC's reimbursement decision— "deeply affects the ongoing process of litigation." *Gulf Coast Asphalt*, 457 S.W.3d at 544-45. Plaintiffs conceded that they had not pleaded materiality under this provision, meaning that their central cause of action would no longer be viable as pleaded. (Tr. 19:5-9 Jan. 29, 2025). And even if a successful appeal does not result in the dismissal of Plaintiffs' Section 36.002(7)(C) claim, a ruling by this Court will

17

determine whether the TMFPA is a strict liability statute or a fraud prevention tool (as the Texas legislature intended), which impacts every aspect of this litigation. *See Van Peterson Fine Jewelers*, 2015 WL 4554519, at *2; App. A at 2.

B.    Substantial Ground for Difference of Opinion Exists on this Question.

Substantial ground for difference of opinion exists on the interpretation of Section 36.002(7)(C), which impacts the scope of the TMFPA.  This appeal raises a novel question of statutory interpretation concerning an ambiguous term, for which there is no controlling precedent.  *Gulf Coast Asphalt.*, 457 S.W.3d at 545.  Texas appellate courts regularly conclude that substantial ground for disagreement exists in cases involving unresolved questions of statutory interpretation. *See Oncor Elec. Delivery Co. v. Brockriede,* No. 02-13 00071-CV*,* 2013 WL 6564276, at *1 (Tex. App.—Fort Worth Dec. 12, 2013, no pet.) (granting appeal to determine meaning of ambiguous term in statute); *AmeriGas Propane LP v. Aboytes-Muñiz*, No. 09-18-00122-CV, 2019 WL 2127750, at *4-5 (Tex. App.—Beaumont May 16, 2019, pet. denied) (same); *A.S. Horner, Inc. v. Navarrette*, 656 S.W.3d 717, 720 (Tex. App.—El Paso 2022, no pet.).

One interpretation of Section 36.002(7)(C)—which Plaintiffs advocated and the trial court adopted—is that, because this section does not use the word "material," materiality is not required.  *See* App. A at 2.  This oversimplistic interpretation

18

ignores the ordinary meaning of the word "adulterated" and its statutory context. It also ignores *Malouf*, which instructs that ambiguities in the TMFPA must be "strictly construed" in favor of a defendant because the TMFPA is a "penal statute" designed as a "tool for targeting fraud against the Texas Medicaid program." 694 S.W.3d at 721.

*Malouf* is critical not only because it exemplifies a similar "gotcha" attempt by the State to misuse the TMFPA, but also because the term "adulterated" under Section 36.002(7)(C) is ambiguous, thus triggering *Malouf*'s interpretative guidance. Likely recognizing this, Plaintiffs have argued that Section 36.0027(C) is unambiguous and assumed that the FDCA's and TFCDA's definitions of "adulterated" necessarily apply in the TMFPA context. *See* Pls.' Resp. to Defs. Pfizer Inc. and Tris Pharma Inc.'s Joint Mot. to Amend Previous Orders and Certify for Interlocutory Appeal at 4 (Sept. 19, 2024). Those statutes provide that a product is considered adulterated when it is manufactured in a manner that "do[es] not conform" with cGMP regulations, which Plaintiffs in turn use to argue that any cGMP violation can serve as the basis of a TMFPA claim. 21 U.S.C. § 351; Tex. Health & Safety Code § 431.111(a)(B). But there is no language in the TMFPA indicating that the Texas legislature intended to import the definitions of "adulterated" from the FDCA or TFDCA. Had the legislature intended for those

statutes' definitions to apply, it could have explicitly incorporated them as it has done with other statutes. *See, e.g.*, Tex. Transp. Code § 724.001(6) ("'Dangerous drug' has the meaning assigned by Section 483.001, Health and Safety Code."); Tex. Ins. Code § 1369.301 ("In this subchapter, 'prescription drug' has the meaning assigned by Section 551.003, Occupations Code."). Indeed, the legislature took this exact approach with the TFDCA, which incorporates the FDCA's definitions. *See* Tex. Health & Safety Code §§ 431.245(a), 431.002(15). In fact, the TMFPA's definitions incorporate by reference another section of the Texas Health and Safety Code, confirming by omission that the legislature did not intend to adopt those statutes' definitions of "adulterated" for the TMFPA. *See* Tex. Hum. Res. Code § 36.001(1).

Petitioners agree that courts need to look elsewhere for guidance but contend that the legislature intended to adopt the common usage of "adulterated," meaning that the product has "been made weaker or worse in quality" by the defendant's conduct. *Adulterated*, Cambridge English Dictionary (Feb. 22, 2025), https://bit.ly/4gjxy6l. Materiality is inherent in this definition, as conduct that renders a product "weaker or worse in quality" necessarily has "a natural tendency to influence or to be capable of influencing." *See* Tex. Hum. Res. Code § 36.001(5-a) (defining materiality). Therefore, not every cGMP violation can form the basis

of an adulteration claim under Section 36.002(7)(C)—rather, only those that are capable of influencing HHSC's decisions, such as those related to altering a product's safety or efficacy. Petitioners' construction thus closely tracks the rest of Section 36.002(7)(C), which covers products that are "debased," "mislabeled," or rendered "otherwise inappropriate" by the defendant's conduct. *Id.* § 36.002(7)(C). In such cases, the defendant has fundamentally altered the product HHSC chose to reimburse, making the conduct decidedly "material."

Petitioners' interpretation is particularly compelling in light of *Malouf*'s instructions that courts should not construe ambiguities in the statute in a manner that would lead to "absurd results," such as penalizing every reimbursement claim if there has been a cGMP violation, irrespective of its materiality to HHSC. 694 S.W.3d at 718, 721. Indeed, federal courts regularly dismiss claims brought under the TMFPA's federal analogue, the FCA, where a "[r]elator does not sufficiently allege th[at] concealed [c]GMP violations were material." *See United States ex rel. Yu v. Grifols USA, LLC*, No. 1:17-cv-2226, 2021 WL 5827047, at *11 (S.D.N.Y. Dec. 8, 2021), *aff'd*, 2022 WL 7785044 (2d Cir. Oct. 14, 2022).

Finally, recent conflicting decisions by the First Court of Appeals and a Texas district court—regarding whether a different TMFPA provision, which also does not reference the word "material," nevertheless has a materiality component—reinforce

that there is substantial ground for disagreement over whether section 36.002(7)(C) requires materiality. That court of appeals decision— *State ex rel. NPT Assocs. v. Lab'y Corp. of Am. Holdings*, No. 01-23-00043-CV, 2024 WL 5249087 (Tex. App.—Houston [1st. Dist.] Dec. 31, 2024, no pet. h.) ("*Labcorp*")—is another quintessential "gotcha" case: the defendant disclosed its allegedly fraudulent billing practices to the State of Texas seven years before the State brought its TMFPA suit. Despite this disclosure, the State continued to reimburse claims without complaint and then intervened to seek seeking millions of dollars in penalties for those billing practices. *Id.* at *21-22. The trial court implied a requirement of materiality as to a different TMFPA section prohibiting "knowingly concealing or failing to disclose information" that "permits" the defendant to receive an unauthorized benefit. While the First Court of Appeals reversed the trial court, this Court, is now the proper venue for resolving the issue on a statewide basis. *See* Tex. Gov't Code §§ 22.201(p), 220(d).

## II.   AN IMMEDIATE APPEAL WOULD MATERIALLY ADVANCE THE ULTIMATE TERMINATION OF THE LITIGATION.

An immediate appeal on the scope of Section 36.002(7)(C) will materially advance the ultimate termination of this litigation by either: (i) resulting in the dismissal of Plaintiffs' Section 36.002(7)(C) claim or (ii) at minimum, substantially

altering the issues in this litigation. To start, the *only* claim asserted against Tris is a violation of Section 36.0002(7)(C), and thus, an immediate appeal may result in the termination of this case against Tris. But even if it does not, Texas law is clear: to materially advance the ultimate termination of the litigation, an appeal need not be capable of resolving the entire case. *Sabre Travel Int'l, Ltd. v. Deutsche Lufthansa AG*, 567 S.W.3d 732, 736 (Tex. 2019). Rather, the standard is met when the appeal would resolve "controlling, uncertain issues of law that are important to the outcome of the litigation," including by narrowing the issues or causes of action in dispute at trial. *Id.*

As the trial court emphasized in certifying Petitioners' interlocutory appeal, "Plaintiffs' Section 36.002(7)(C) adulteration claim is the threshold allegation of wrongdoing in this action." *See* App. A at 2. Therefore, if materiality is required under Section 36.002(7)(C), Plaintiffs must plead it, which they have acknowledged that they failed to do. *See* Mot. to Certify Hr'g Tr. 19:5-9. And without a viable adulteration claim, Plaintiffs' claims against Pfizer for purportedly making false statements and failing to disclose information about Quillivant's "adulterated" status will fail, as there is no basis for holding that Pfizer needed to update HHSC about conduct that was incapable of influencing HHSC's decision-making. In other words,

23

Plaintiffs' Section 36.002(7)(C) claim is the bedrock of their suit—if it crumbles, all other causes of action collapse with it.

But regardless of whether any of the causes of action are terminated by this appeal, the resolution of this critical question will fundamentally impact the issues or causes of action in dispute at trial. *Travel*, 567 S.W.3d at 736. Its resolution will determine the scope of discovery, the applicable standard on summary judgment, the operative jury instructions, the possibility (or likelihood) of a pretrial resolution of this matter or post-judgment appeal. *See* App. A at 2 (emphasis added) (stating that an "an immediate appeal . . . *at the very least, is substantially likely to narrow the issues, claims, and causes of action in dispute and subject to trial*").

The Court need only look to *Malouf* to see what happens when the State is allowed to advance an untenable reading of the TMFPA. There, the case took *eight years* to reach the Supreme Court, which then agreed with what the defendant had argued all along. *See* 694 S.W.3d at 721. Immediate appellate resolution of the materiality question—however this Court answers it—will therefore promote judicial economy and expedite the resolution of the case, the very reason the Texas legislature enacted the permissive interlocutory appeals statute. *See* Senate Comm. on State Affairs, Engrossed Bill Analysis, Tex. H.B. 274, 82d Leg., R.S. (2011).

## III. RESOLUTION OF THIS CONTROLLING QUESTION OF LAW WILL SERVE THE PUBLIC INTEREST.

The Supreme Court of Texas urges the appellate courts to "accept permissive interlocutory appeals and address the merits of the legal issues certified" when, as here, doing so would promote efficiency and serve the public interest. *Travel*, 567 S.W.3d at 733.

In this case, this Court's ruling on the materiality question under Section 36.002(7)(C) will serve the public interest. The ruling would provide critical guidance to pharmaceutical manufacturers about: (i) what reporting requirements apply in the context of an alleged or suspected cGMP violation (i.e., whether companies must notify HHSC of every suspected cGMP violation), (ii) whether claims for reimbursement can be made following issuance of an FDA Form 483, and (iii) whether companies should exit the Texas Medicaid program because they risk that the State will weaponize suspected cGMP violations to recover millions of dollars. If businesses remove much-needed products from the Texas Medicaid program due to liability risks, Texas's most vulnerable segment would bear the brunt of the impact: the hundreds of thousands of citizens who depend on Texas Medicaid for affordable medications.

Additionally, the appeal will permit this Court to weigh in on the State's continued use of the TMFPA to bring "gotcha cases," an increasingly common practice as demonstrated by *Malouf* and *Labcorp* and one that the Supreme Court of Texas has condemned.

## CONCLUSION

This Court should grant leave to appeal the trial court's ruling and address the merits of the TMFPA issue presented herein.

Date: February 28, 2025

**FOLEY & LARDNER LLP**
By:*/s/ Edward D. Burbach*
Edward D. ("Ed") Burbach
Texas State Bar No. 03355250
Stacy R. Obenhaus
Texas State Bar No. 15161570
600 Congress Avenue, Suite 2900
Austin, Texas 78701
eburbach@foley.com
sobenhaus@foley.com
(512) 542-7070

**ROPES & GRAY LLP**
Samantha Barrett Badlam
(application for *pro hoc* admission pending)
Stefan P. Schropp
(application for *pro hoc* admission pending)
2099 Pennsylvania Ave., N.W.
Washington, DC 20006-6807
samantha.badlam@ropesgray.com

Respectfully submitted,

**GILLAM & SMITH LLP**
By:*/s/ Harry L. Gillam, Jr.*
Harry "Gil" Gillam, Jr.
Texas State Bar. No. 07921800
Tom Gorham
Texas State Bar. No. 24012715
303 S. Washington Ave.
Marshall, Texas 75670
gil@gillamsmithlaw.com
tom@gillamsmithlaw.com
(903) 934-8450

**BLANK ROME LLP**
William E. Lawler III
(application for *pro hoc* admission pending)
1825 Eye Street NW
Washington, D.C. 20006
william.lawler@blankrome.com

26

stefan.schropp@ropesgray.com
(202) 508-4734

**THE VAL JONES LAW FIRM**
George Valton ("Val") Jones
Texas State Bar No. 10888050
109 West Austin St.
Marshall, TX 75670-3340
val@valjoneslaw.com
(903) 927-2220

*Counsel for Pfizer Inc.*

(202) 420-2249

*Counsel for Tris Pharma, Inc.*

**CERTIFICATE OF COMPLIANCE**

I certify that according to the word count of the computer program used to prepare this document, this document contains 4,233 words, not counting the parts of the document excluded under TRAP 9.4(i).

*/s/ Edward D. Burbach*
Edward D. Burbach

## CERTIFICATE OF SERVICE

I certify that a copy of this document was served by delivery to counsel below by email and through the electronic case manager on February 28, 2025:

**COUNSEL FOR THE STATE OF TEXAS**
Jonathan Bonilla
Jordan Underhill
Vivian Egbu
Brittany Peters
Office of the Attorney General, Civil
Medicaid Fraud Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
jonathan.bonilla@oag.texas.gov
jordan.underhill@oag.texas.gov
vivian.egbu@oag.texas.gov
brittany.Peters@oag.texas.gov
(512) 475-4169

**BROWN, LLC**
Jason T. Brown
jtb@jtblawgroup.com
Patrick S. Almonrode
patalmonrode@jtblawgroup.com
111 Town Square Place, Suite 400
Jersey City, NJ 07310
(877) 561-0000

**POTTER MINTON, P.C.**
Michael E. Jones
mikejhones@potterminton.com
E. Glenn Thames, Jr.
glennthames@potterminton.com
102 North College, Suite 900
Tyler, TX 75702
(903) 597-8311

*/s/ Edward D. Burbach*
Edward D. Burbach

**APPENDIX A**

Amended Orders

TRAP 28.3(e)(2)(A)

Filed 1/29/2025 10:48 PM
Sherry Griffis
District Clerk
Harrison County, Texas

Marcia Bayer
Deputy

**CAUSE NO. 23-1031**

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | IN THE DISTRICT COURT |
| *ex rel.* TARIK AHMED | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 71st JUDICIAL DISTRICT |
| | § | |
| PFIZER INC., TRIS PHARMA, INC., | § | |
| and KETAN MEHTA, | § | |
| | § | |
| Defendants. | § | HARRISON COUNTY, TEXAS |

## AMENDED ORDER DENYING DEFENDANT PFIZER INC.'S MOTION TO DISMISS AND CERTIFYING FOR INTERLOCUTORY APPEAL

On this date came to be reconsidered Defendant Pfizer Inc.'s Motion to Dismiss Plaintiffs' First Amended Petition, which was initially denied on June 13, 2024. After having reconsidered the Motion, as well as all papers, pleadings, arguments of counsel, and other materials presented, this Court orders that Pfizer's Motion to Dismiss is DENIED in its entirety. The Court further finds as follows:

i. Plaintiffs assert four causes of action against Defendant Pfizer Inc. ("Pfizer"), including a claim under Section 36.002(7)(C) of the Texas Human Resources Code.

ii. Pfizer moved to dismiss Plaintiffs' First Amended Petition based on, among other things, Plaintiffs' failure to plead materiality under Section 36.002(7)(C).

iii. Because Section 36.002(7)(C) does not contain the word "material," an alleged violation thereunder does not require a showing of materiality.

iv. Whether Section 36.002(7)(C) of the Texas Human Resource Code requires a showing of materiality presents a controlling question of law as to which there is a substantial ground for difference of opinion.

v.       An immediate appeal of this question may materially advance the ultimate termination of this litigation. Plaintiffs' Section 36.002(7)(C) adulteration claim is the threshold allegation of wrongdoing in this action and, therefore, an immediate appeal to determine whether that adulteration requires materiality is critical to the case and Pfizer's liability for all causes of action and, at the very least, is substantially likely to narrow the issues, claims, and causes of action in dispute and subject to trial.

IT IS THEREFORE ORDERED that, pursuant to Texas Civil Practice and Remedies Code Section 51.014(d) and Texas Rule of Civil Procedure 168, the Court PERMITS immediate appeal to the Fifteenth Court of Appeals the question of whether a cause of action arising under Texas Human Resources Code Section 36.002(7)(C) requires a showing of materiality.

IT IS SO ORDERED.

SIGNED this ___29___ day of __Jan__, 2025

_____

Hon. Brad Morin
Judge Presiding

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Paul Lang on behalf of George Jones
Bar No. 10888050
paul.lang@ropesgray.com
Envelope ID: 96653679
Filing Code Description: ORDER
Filing Description: Amended Order Denying Defendant Pfizer Inc.'s Motion to Dismiss and Certifying Interlocutory Appeal
Status as of 1/29/2025 10:51 AM CST

Associated Case Party: THE STATE OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Rhonda Rodriguez | | rhonda.rodriguez@oag.texas.gov | 1/27/2025 4:35:31 PM | SENT |
| Jonathan D.Bonilla | | Jonathan.Bonilla@oag.texas.gov | 1/27/2025 4:35:31 PM | SENT |
| Jordan Underhill | | Jordan.Underhill@oag.texas.gov | 1/27/2025 4:35:31 PM | SENT |
| Brittany Peters | | Brittany.Peters@oag.texas.gov | 1/27/2025 4:35:31 PM | SENT |
| Vivian Egbu | | vivian.egbu@oag.texas.gov | 1/27/2025 4:35:31 PM | SENT |

Associated Case Party: TARIK AHMED

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason T.Brown | | jtb@jtblawgroup.com | 1/27/2025 4:35:31 PM | SENT |
| Patrick S.Almonrode | | patalmonrode@jtblawgroup.com | 1/27/2025 4:35:31 PM | SENT |
| Michael E.Jones | | mikejones@potterminton.com | 1/27/2025 4:35:31 PM | SENT |
| E. GlennThames | | glennthames@potterminton.com | 1/27/2025 4:35:31 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jessica Weltge | | jessica.weltge@oag.tx.gov | 1/27/2025 4:35:31 PM | SENT |
| Diana Arias | | diana@gillamsmithlaw.com | 1/27/2025 4:35:31 PM | SENT |
| Olivia Arias | | olivia@gillamsmithlaw.com | 1/27/2025 4:35:31 PM | SENT |
| Rosa Ferguson | | rosa@gillamsmithlaw.com | 1/27/2025 4:35:31 PM | SENT |
| Stefan Schropp | | Stefan.Schropp@ropesgray.com | 1/27/2025 4:35:31 PM | SENT |
| Deanna Foster | | Deanna.Foster@ropesgray.com | 1/27/2025 4:35:31 PM | SENT |
| Samantha Barrett | | Samantha.Badlam@ropesgray.com | 1/27/2025 4:35:31 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Paul Lang on behalf of George Jones
Bar No. 10888050
paul.lang@ropesgray.com
Envelope ID: 96653679
Filing Code Description: ORDER
Filing Description: Amended Order Denying Defendant Pfizer Inc.'s Motion to Dismiss and Certifying Interlocutory Appeal
Status as of 1/29/2025 10:51 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Samantha Barrett | | Samantha.Badlam@ropesgray.com | 1/27/2025 4:35:31 PM | SENT |
| Ed Burbach | | eburbach@foley.com | 1/27/2025 4:35:31 PM | SENT |
| Val Jones | | val@valjoneslaw.com | 1/27/2025 4:35:31 PM | SENT |
| McKellar Karr | | mckellar@gillamsmithlaw.com | 1/27/2025 4:35:31 PM | SENT |
| Docket Clerk | | DocketClerk_DC@ballardspahr.com | 1/27/2025 4:35:31 PM | ERROR |
| Litigation Administrative | | LitigationLegalAdministrativeAssistantsDC@ballardspahr.com | 1/27/2025 4:35:31 PM | SENT |
| Lit Docket MCO | | LitDocketInformationGovernance@ropesgray.com | 1/27/2025 4:35:31 PM | SENT |

Associated Case Party: PFIZER INC.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Edward Burbach | 3355250 | eburbach@foley.com | 1/27/2025 4:35:31 PM | SENT |
| Veronica Salinas | | vsalinas@foley.com | 1/27/2025 4:35:31 PM | SENT |
| Pfizer Case Team | | QXRTXQuiTamAssociates&Paralegals@ropesgray.com | 1/27/2025 4:35:31 PM | ERROR |
| Pfizer Team | | QXRTXQuiTamAssociates&Paralegals@ropesgray.com | 1/27/2025 4:35:31 PM | ERROR |

Associated Case Party: TRIS PHARMA, INC.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Harry L.Gillam | | gil@gillamsmithlaw.com | 1/27/2025 4:35:31 PM | SENT |
| Tom Gorham | | tom@gillamsmithlaw.com | 1/27/2025 4:35:31 PM | SENT |
| Barrett ReidHowell | | barrett.howell@blankrome.com | 1/27/2025 4:35:31 PM | SENT |
| John F.Hundley | | hundleyj@ballardspahr.com | 1/27/2025 4:35:31 PM | SENT |
| Christopher Hatfield | | hatfieldc@ballardspahr.com | 1/27/2025 4:35:31 PM | SENT |
| William E.Lawler, III | | william.lawler@blankrome.com | 1/27/2025 4:35:31 PM | SENT |

**Automated Certificate of eService**
This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Paul Lang on behalf of George Jones
Bar No. 10888050
paul.lang@ropesgray.com
Envelope ID: 96653679
Filing Code Description: ORDER
Filing Description: Amended Order Denying Defendant Pfizer Inc.'s Motion
to Dismiss and Certifying Interlocutory Appeal
Status as of 1/29/2025 10:51 AM CST

Associated Case Party: KETAN MEHTA

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Harry L.Gillam | | gil@gillamsmithlaw.com | 1/27/2025 4:35:31 PM | SENT |
| Tom Gorham | | tom@gillamsmithlaw.com | 1/27/2025 4:35:31 PM | SENT |
| Barrett ReidHowell | | barrett.howell@blankrome.com | 1/27/2025 4:35:31 PM | SENT |
| John F.Hundley | | hundleyj@ballardspahr.com | 1/27/2025 4:35:31 PM | SENT |
| Christopher Hatfield | | hatfieldc@ballardspahr.com | 1/27/2025 4:35:31 PM | SENT |

Filed 1/29/2025 10:48 AM
Sherry Griffis
District Clerk
Harrison County, Texas

Marcia Bayer
Deputy

CAUSE NO. 23-1031

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | IN THE DISTRICT COURT |
| *ex rel.* TARIK AHMED | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | 71ST JUDICIAL DISTRICT |
| | § | |
| PFIZER, INC., TRIS PHARMA, INC., | § | |
| and KETAN MEHTA, | § | |
| | § | |
| **Defendants.** | § | HARRISON COUNTY, TEXAS |

## AMENDED ORDER DENYING TRIS PHARMA, INC.'S MOTION TO DISMISS AND CERTIFYING FOR INTERLOCUTORY APPEAL

CAME ON THIS DAY to be heard in the above-numbered and styled cause *Defendant Tris Pharma, Inc.'s Motion to Dismiss* and Plaintiffs' *Response*. The Court, having considered said Motion, rules that:

Plaintiffs assert a single cause of action against Defendant Tris Pharma, Inc. under Texas Human Resource Code Section 36.002(7)(C);

Defendant Tris Pharma, Inc. moved to dismiss Plaintiffs' First Amended Petition based on, among other things, Plaintiffs' failure to plead materiality;

Because Section 36.002(7)(C) of the Texas Human Resource Code does not contain the word "material," an alleged violation thereunder does not require a showing of materiality;

Whether Section 36.002(7)(C) of the Texas Human Resource Code requires a showing of materiality presents a controlling question of law as to which there is a substantial ground for difference of opinion; and

An Appellate Court's resolution of this controlling question of law may materially advance the ultimate termination of this litigation, as

---

**AMENDED ORDER DENYING TRIS PHARMA, INC.'S MOTION TO DISMISS AND CERTIFYING FOR INTERLOCUTORY APPEAL – CAUSE NO. 23-1031**

it would be dispositive as to the single cause of action alleged against Tris Pharma, Inc.

IT IS THEREFORE ORDERED that Defendant's Motion to Dismiss is DENIED in its entirety AND this Order may be immediately appealed to the Fifteenth Court of Appeals, which has exclusive intermediate appellate jurisdiction over this matter.

IT IS SO ORDERED.


DATED: _____Jan 29_____, 2025


_____
JUDGE PRESIDING

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Harry Gillam, Jr.
Bar No. 7921800
gil@gillamsmithlaw.com
Envelope ID: 96623776
Filing Code Description: ORDER
Filing Description: AMENDED ORDER DENYING TRIS PHARMA, INC.S MOTION TO DISMISS AND CERTIFYING FOR INTERLOCUTORY APPEAL
Status as of 1/29/2025 10:49 AM CST

Associated Case Party: THE STATE OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Rhonda Rodriguez | | rhonda.rodriguez@oag.texas.gov | 1/27/2025 11:26:32 AM | SENT |
| Jonathan D.Bonilla | | Jonathan.Bonilla@oag.texas.gov | 1/27/2025 11:26:32 AM | SENT |
| Jordan Underhill | | Jordan.Underhill@oag.texas.gov | 1/27/2025 11:26:32 AM | SENT |
| Brittany Peters | | Brittany.Peters@oag.texas.gov | 1/27/2025 11:26:32 AM | SENT |
| Vivian Egbu | | vivian.egbu@oag.texas.gov | 1/27/2025 11:26:32 AM | SENT |

Associated Case Party: TARIK AHMED

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jason T.Brown | | jtb@jtblawgroup.com | 1/27/2025 11:26:32 AM | SENT |
| Patrick S.Almonrode | | patalmonrode@jtblawgroup.com | 1/27/2025 11:26:32 AM | SENT |
| Michael E.Jones | | mikejones@potterminton.com | 1/27/2025 11:26:32 AM | SENT |
| E. GlennThames | | glennthames@potterminton.com | 1/27/2025 11:26:32 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jessica Weltge | | jessica.weltge@oag.tx.gov | 1/27/2025 11:26:32 AM | SENT |
| Diana Arias | | diana@gillamsmithlaw.com | 1/27/2025 11:26:32 AM | SENT |
| Olivia Arias | | olivia@gillamsmithlaw.com | 1/27/2025 11:26:32 AM | SENT |
| Rosa Ferguson | | rosa@gillamsmithlaw.com | 1/27/2025 11:26:32 AM | SENT |
| Stefan Schropp | | Stefan.Schropp@ropesgray.com | 1/27/2025 11:26:32 AM | SENT |
| Deanna Foster | | Deanna.Foster@ropesgray.com | 1/27/2025 11:26:32 AM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Harry Gillam, Jr.
Bar No. 7921800
gil@gillamsmithlaw.com
Envelope ID: 96623776
Filing Code Description: ORDER
Filing Description: AMENDED ORDER DENYING TRIS PHARMA, INC.S MOTION TO DISMISS AND CERTIFYING FOR INTERLOCUTORY APPEAL
Status as of 1/29/2025 10:49 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Deanna Foster | | Deanna.Foster@ropesgray.com | 1/27/2025 11:26:32 AM | SENT |
| Samantha Barrett | | Samantha.Badlam@ropesgray.com | 1/27/2025 11:26:32 AM | SENT |
| Ed Burbach | | eburbach@foley.com | 1/27/2025 11:26:32 AM | SENT |
| Val Jones | | val@valjoneslaw.com | 1/27/2025 11:26:32 AM | SENT |
| McKellar Karr | | mckellar@gillamsmithlaw.com | 1/27/2025 11:26:32 AM | SENT |
| Docket Clerk | | DocketClerk_DC@ballardspahr.com | 1/27/2025 11:26:32 AM | ERROR |
| Litigation Administrative | | LitigationLegalAdministrativeAssistantsDC@ballardspahr.com | 1/27/2025 11:26:32 AM | SENT |
| Lit Docket MCO | | LitDocketInformationGovernance@ropesgray.com | 1/27/2025 11:26:32 AM | SENT |

Associated Case Party: PFIZER INC.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Edward Burbach | 3355250 | eburbach@foley.com | 1/27/2025 11:26:32 AM | SENT |
| Veronica Salinas | | vsalinas@foley.com | 1/27/2025 11:26:32 AM | SENT |
| Pfizer Case Team | | QXRTXQuiTamAssociates&Paralegals@ropesgray.com | 1/27/2025 11:26:32 AM | ERROR |
| Pfizer Team | | QXRTXQuiTamAssociates&Paralegals@ropesgray.com | 1/27/2025 11:26:32 AM | ERROR |

Associated Case Party: TRIS PHARMA, INC.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Harry L.Gillam | | gil@gillamsmithlaw.com | 1/27/2025 11:26:32 AM | SENT |
| Tom Gorham | | tom@gillamsmithlaw.com | 1/27/2025 11:26:32 AM | SENT |
| Barrett ReidHowell | | barrett.howell@blankrome.com | 1/27/2025 11:26:32 AM | SENT |
| John F.Hundley | | hundleyj@ballardspahr.com | 1/27/2025 11:26:32 AM | SENT |
| Christopher Hatfield | | hatfieldc@ballardspahr.com | 1/27/2025 11:26:32 AM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Harry Gillam, Jr.
Bar No. 7921800
gil@gillamsmithlaw.com
Envelope ID: 96623776
Filing Code Description: ORDER
Filing Description: AMENDED ORDER DENYING TRIS PHARMA, INC.S MOTION TO DISMISS AND CERTIFYING FOR INTERLOCUTORY APPEAL
Status as of 1/29/2025 10:49 AM CST

Associated Case Party: TRIS PHARMA, INC.

| Christopher Hatfield | | hatfieldc@ballardspahr.com | 1/27/2025 11:26:32 AM | SENT |
|---|---|---|---|---|
| William E.Lawler, III | | william.lawler@blankrome.com | 1/27/2025 11:26:32 AM | SENT |

Associated Case Party: KETAN MEHTA

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Harry L.Gillam | | gil@gillamsmithlaw.com | 1/27/2025 11:26:32 AM | SENT |
| Tom Gorham | | tom@gillamsmithlaw.com | 1/27/2025 11:26:32 AM | SENT |
| Barrett ReidHowell | | barrett.howell@blankrome.com | 1/27/2025 11:26:32 AM | SENT |
| John F.Hundley | | hundleyj@ballardspahr.com | 1/27/2025 11:26:32 AM | SENT |
| Christopher Hatfield | | hatfieldc@ballardspahr.com | 1/27/2025 11:26:32 AM | SENT |

**APPENDIX B**

Relevant Court Filings – Second Amended Petition

TRAP 28.3(e)(2)(B)

Filed 1/17/2025 10:47 AM
Sherry Griffis
District Clerk
Harrison County, Texas

Lori Hightower
Deputy

**CAUSE NO. 23-1031**

| | | |
|---|---|---|
| **THE STATE OF TEXAS,** | § | **IN THE DISTRICT COURT** |
| *ex rel.* **TARIK AHMED** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **71st JUDICIAL DISTRICT** |
| | § | |
| **PFIZER INC., TRIS PHARMA, INC.,** | § | |
| **and KETAN MEHTA,** | § | |
| | § | |
| | § | |
| *Defendants.* | § | **HARRISON COUNTY, TEXAS** |

**PLAINTIFFS' SECOND AMENDED PETITION**

The State of Texas, by and through the Attorney General of Texas, Ken Paxton, (the State) and Private Person Plaintiff/Relator Tarik Ahmed (Relator) bring this law enforcement action pursuant to the Texas Medicaid Fraud Prevention Act (TMFPA), TEX. HUM. RES. CODE Chapter 36.[1] Plaintiffs, the State and Relator, file this Second Amended Petition (Petition) and would respectfully show the Court as follows:

**I.       DISCOVERY CONTROL PLAN**

1.       Discovery is intended to be conducted under Level 3 of Rule 190, Texas Rules of Civil Procedure.

**II.       PRELIMINARY STATEMENT AND NATURE OF THIS ACTION**

2.       This is a law enforcement action under the TMFPA to recover taxpayer dollars spent as a result of fraudulent conduct committed by Pfizer Inc. (Pfizer), Tris Pharma, Inc. (Tris),

---

[1] On September 1, 2023, TEX. HUM. RES. CODE Ch. 36 was expanded to include state health care programs beyond the Medicaid program. In this action, however, most of the conduct at issue pre-dates September 1, 2023, and Plaintiffs seek only remedies with respect to the Medicaid program. Accordingly, Plaintiffs refer to the pre-September 2023 version of TEX. HUM. RES. CODE Ch. 36.

and Tris CEO Ketan Mehta (Mehta). Specifically, these Defendants knowingly distributed a powerful pediatric attention-deficit/hyperactivity disorder (ADHD) medication, Quillivant XR (Quillivant), to patients throughout Texas, despite knowing Quillivant was adulterated due to deficient manufacturing practices. This illegal conduct caused Quillivant to be in violation of federal and state law, and rendered false Pfizer's sworn certification of compliance to Texas Medicaid, which is required for drugs to be eligible for reimbursement under the Texas Medicaid program. Defendants additionally misrepresented and concealed Quillivant's status as an adulterated drug when providing public testimony before Texas Medicaid decision-makers. As a result, Pfizer and Tris obtained the benefit of virtually unfettered Medicaid reimbursements for Quillivant on the basis of fraudulent and unlawful misrepresentations and concealments, thereby violating the TMFPA.

### III. THE PARTIES

#### A. Plaintiffs

3. Plaintiffs are the State of Texas, by and through the Attorney General of Texas, Ken Paxton, and Relator Tarik Ahmed (collectively, Plaintiffs).

4. Relator Tarik Ahmed is a citizen of the United States and a resident of New Jersey. From 2013 until approximately June 2017, Relator was employed by Defendant Tris as Head of Technology. During his time at Tris, Relator also served as the Head of the IT Steering Committee, and was a member of the Executive Committee, Quality Committee, and Commercial Committee. Through his employment at Tris, Relator gained a wealth of direct and independent knowledge of the substandard manufacturing practices implemented by the Defendants.

## B. Defendants

5. Defendant PFIZER is a corporation organized under the laws of Delaware, with its principal office and place of business located at 1209 Orange Street, in the City of Wilmington, Delaware. Pfizer marketed and distributed Quillivant in Texas. Pfizer conducts business in Texas. At the time of filing, its registered agent for service of process is CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201.

6. Defendant TRIS is a corporation organized under the laws of New Jersey and has its principal place of business in New Jersey, at 2031 U.S. Highway 130, Monmouth Junction, New Jersey 08852. Tris manufactured Quillivant, which it marketed and distributed in Texas. Tris conducts business in Texas. At the time of filing, its registered agent for service of process is CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

7. Defendant MEHTA is the founder and Chief Executive Officer of Tris. Mehta may be served with process at his home address: 42 Elm Road, Princeton, New Jersey 08540. Mehta has direct knowledge of and directly participated in substantially all of the fraudulent conduct alleged herein.

## IV. JURISDICTION AND VENUE

8. This Court has jurisdiction of this action pursuant to TEX. HUM. RES. CODE § 36.101. Jurisdiction is further proper because the amounts sought from each Defendant exceed the minimum jurisdictional limits of this Court.

9. Since at least 2011, the State of Texas has licensed Defendants Pfizer and Tris to sell and distribute their drugs throughout Texas. This Court has jurisdiction over these Defendants because they purposefully availed themselves of the benefits, privileges, and responsibilities of

doing business in Texas; subjected themselves to Texas law, including the TMFPA; and then committed unlawful acts, in whole or in part, in Texas.

10. This Court has personal jurisdiction over Defendant Mehta, a non-resident of Texas, because from 2011 to the present, he has purposefully availed himself of the privileges and benefits of conducting business in Texas. Defendant Mehta, either personally or by his direction of others: 1) caused Quillivant to be marketed, sold, and/or distributed to Texas customers, including Texas Medicaid providers; 2) caused Quillivant to be included in the Texas Medicaid formulary; and 3) applied for and obtained from the State of Texas a license for Tris to sell and distribute its drugs in Texas. Defendant Mehta's purposeful availment of the privileges and benefits of conducting business in Texas and committing unlawful acts in violation of the TMFPA create sufficient minimum contacts with Texas to give this Court personal jurisdiction over him.

11. Venue is proper in Harrison County, Texas and this judicial district pursuant to TEX. HUM. RES. CODE § 36.052(d), as Plaintiffs' causes of action are based upon alleged violations of the TMFPA which occurred, in part, in Harrison County.

12. More specifically, Defendant Pfizer knowingly promoted Quillivant to Medicaid providers in Harrison County, and knowingly distributed Quillivant to pharmacies participating in the Medicaid program in Harrison County, ultimately leading to its use by Harrison County Medicaid patients, during which time Quillivant was adulterated as a result of the conduct of Defendants Tris and Defendant Mehta.

## V. BACKGROUND

### A. ADHD and Quillivant XR

13. ADHD is a chronic and debilitating condition affecting millions of children in the

United States.[2] As a neurodevelopmental disorder, ADHD can cause persistent problems such as difficulty sustaining attention, hyperactivity, and impulsive behavior.[3] Typically diagnosed in school-aged children, it can cause struggles with low self-esteem, troubled relationships, and poor performance in school.[4]

14. There is no cure for ADHD. Rather, the goal of pharmacological treatment is to manage the symptoms that would otherwise be present.[5] The most commonly prescribed medications used to help improve the signs and symptoms of ADHD are methylphenidates and amphetamines.[6] These medications form the foundation of the multibillion-dollar ADHD pharmaceutical industry.

15. Quillivant is an extended-release oral suspension methylphenidate indicated for the treatment of ADHD in children. It is a Schedule II Controlled Dangerous Substance and is required by the Federal Food and Drug Administration ("FDA") to display a "Black Box Warning"— FDA's strictest labeling requirement—for abuse and dependence. The drug is provided to pharmacies as a powder, and pharmacists reconstitute the drug by combining the powder with water and then shaking the medication by hand. Caregivers are then instructed to shake the reconstituted medicine prior to administering each dose.

16. Though Quillivant is approved by the FDA as acceptably safe and effective for

---

[2] American Psychiatric Association, *What is ADHD*, available at https://www.psychiatry.org/patients-families/adhd/what-is-adhd (last visited Nov. 8, 2023).

[3] Mayo Clinic Patient Care & Health Information, *Attention-deficit/hyperactivity disorder (ADHD) in children*, available at https://www.mayoclinic.org/diseases-conditions/adhd/symptoms-causes/syc-20350889 (last visited Nov. 8, 2023).

[4] *Id.*

[5] American Psychiatric Association, *What is ADHD*, available at https://www.psychiatry.org/patients-families/adhd/what-is-adhd#section_5 (last visited Nov. 8, 2023).

[6] *Id.*

ADHD when taken as directed, it still has risks associated with normal use. According to the FDA, the most common adverse reactions include insomnia, nausea, vomiting, anxiety, and tachycardia. There is also a chance for patients to experience severe side effects, including serious cardiovascular reactions (which can cause sudden death), psychiatric adverse reactions (including mania), and long-term suppression of growth. Additionally, when Quillivant is not taken at the correct dose, patients could experience an overdose requiring emergency medical intervention.

17.     Quillivant was developed and owned by Nextwave Pharmaceuticals, Inc. (Nextwave). Tris held a 5% ownership portion of Nextwave and owned intellectual property that was part of Quillivant's development. Nextwave submitted the New Drug Application (NDA) to the FDA for Quillivant. After Pfizer acquired Nextwave in May 2012, Pfizer contracted with Tris (through its wholly owned subsidiary, Nextwave) for Tris to manufacture Quillivant on Pfizer's behalf. Pfizer, through Nextwave, agreed to compensate Tris for meeting certain milestones, including product approval, as well as paying Tris a 25% royalty on net sales of Quillivant. The FDA approved Quillivant's New Drug Application (NDA) on September 27, 2012, allowing it to be prescribed within the United States.

## B.     The Federal Food, Drug, and Cosmetic Act and Current Good Manufacturing Practices

### 1.     The FDA's Role in Regulating Prescription Drug Quality

18.     In the United States, the sale and promotion of prescription drugs is regulated by the U.S. Food and Drug Administration, pursuant to the authority granted by the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 *et seq*. Under the FDCA, new drugs cannot be marketed in the United States unless the sponsor of the drug demonstrates to the FDA "substantial evidence that the drug will have the effect it purports or is represented to have under

the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof."[7] The drug's sponsor must also show by substantial evidence that the drug is safe for the conditions of use "prescribed, recommended, or suggested in the proposed labeling."[8] Approval of the drug by the FDA is the final step in a multi-year process consisting of clinical studies and testing.

19. To determine whether a drug is "safe and effective," the FDA relies on information provided by a drug's manufacturer; it does not conduct any clinical investigations itself. Applications for FDA approval of pharmaceutical products—NDAs—must include "full reports of investigations which have been made to show whether or not such drug is safe for use and whether or not such drug is effective in use."[9]

## 2. FDA Regulations Prohibit the Adulteration of Prescription Drugs

20. Under the FDCA, it is illegal to adulterate a drug, or to introduce into interstate commerce any drug that is adulterated.[10] A drug becomes adulterated if "the methods used in, or the facilities or controls used for, its manufacture . . . do not conform to or are not operated or administered in conformity with current good manufacturing practice."[11] The purpose of conforming to Current Good Manufacturing Practice (CGMP) is to assure that a drug "meets the requirements … as to safety and has the identity and strength, and meets the quality and purity characteristics" that it is claimed to have.[12] CGMP regulations act as a floor, establishing a minimum set of standards that must be observed by manufacturers to ensure that drug products

---

[7] 21 U.S.C. § 355(d)(5). "Substantial evidence" as used in this section is defined at 21 U.S.C. § 355(d)(7).
[8] 21 U.S.C. § 355(d)(1).
[9] 21 U.S.C. § 355(b)(1)(A).
[10] 21 U.S.C. §§ 331(a), (b).
[11] 21 U.S.C. § 351(a)(2)(B).
[12] Id.

are made according to their approved specifications.[13] Underscoring the importance of maintaining safety and uniformity in drug manufacturing, courts have broadly interpreted adulteration requirements, noting that "[d]rugs produced in violation of . . . CGMP regulations are deemed to be adulterated without the [FDA] having to show that they are actually contaminated." *John D. Copanos & Sons, Inc. v. Food & Drug Admin.*, 854 F.2d 510, 514 (D.C. Cir. 1988) (citing 21 U.S.C. § 351(a)(2)(B)). Accordingly, it is critical for manufacturers to conform to the safety practices established under CGMP.

21.     The FDA's CGMP regulations are set forth in 21 CFR Part 211.[14] These legally binding regulations require various forms of testing and implementation of related procedures to ensure drugs meet the identity, strength, quality, and purity they purport to represent or possess— in other words, that the drugs being made are exactly the same as when FDA first approved them.[15] Under this regulatory system, a pharmaceutical company must have a "quality control unit" with the "responsibility and authority to approve or reject all components, drug product containers, closures, in-process materials, packaging material, labeling, and drug products," as well as "the authority to review production records to assure that no errors have occurred or, if errors have occurred, that they have been fully investigated."[16] The responsibility for approving or rejecting drug products extends to products "manufactured, processed, packed, or held under contract by another company."[17] Additionally, all "production and control records" must "be reviewed and

---

[13] U.S. Food and Drug Administration, *Facts About the Current Good Manufacturing Practices (CGMP)*, available at https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practices-cgmp (last visited Nov. 8, 2023).

[14] *See Nat'l Ass'n of Pharm. Mfrs. v. Food & Drug Admin.*, 637 F.2d 877, 889 (2d Cir. 1981).

[15] *See e.g.* 21 CFR § 211.100.

[16] 21 CFR § 211.22(a).

[17] *See id.*

approved by the quality control unit to determine compliance with all established, approved written procedures before a batch is released or distributed."[18]

22.    Furthermore, unexplained discrepancies or failures of a batch or its components to meet its specifications must "be thoroughly investigated."[19] The investigation must "extend to other batches of the same drug product and other drug products that may have been associated with the specific failure or discrepancy," and a "written record of the investigation" must be made and must "include the conclusions and followup."[20]

23.    A drug manufacturer must also establish and follow "[w]ritten procedures describing the handling of all written and oral complaints regarding a drug product."[21] These procedures must "include provisions for review by the quality control unit, of any complaint involving the possible failure of a drug product to meet any of its specifications and, for such drug products, a determination as to the need for" a thorough investigation.[22] The procedures must also "include provisions for review to determine whether the complaint represents a serious and unexpected adverse drug experience which is required to be reported to the" FDA.[23]

24.    Through these CGMP regulations, the FDA requires pharmaceutical manufacturers to institute standard processes for evaluating the quality of their products and to thoroughly investigate complaints about their products as well as unexplained discrepancies in product quality. This critical regulatory system protects patients and consumers by establishing

---

[18] 21 CFR § 211.192.

[19] *See id.*

[20] *See id.*

[21] 21 CFR § 211.198.

[22] *See id.*

[23] *See id.*

minimum standards to ensure that the finished drug products taken by patients do not deviate over time, but rather, remain as safe, effective, and uniform as initially approved by the FDA.

## C.     Texas's Role in Regulating Prescription Drugs

25.     In Texas, the sale, promotion, and distribution of prescription drugs is further regulated by the Drugs and Medical Devices Group of the Texas Department of State Health Services, pursuant to the authority granted by the Texas Food, Drug, and Cosmetic Act (TFDCA).[24]

26.     The TFDCA largely mirrors the FDCA. For example, the TFDCA, like the FDCA, prohibits the adulteration of drugs and the introduction of adulterated drugs into commerce.[25] Additionally, TFDCA § 431.112 defines drug adulteration to include the same relevant provisions as the FDCA: a drug is adulterated if "the methods used in, or the facilities or controls used for, its manufacture, . . . do not conform to . . . current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess.[26]

27.     Violations of the TFDCA, including violations of rules adopted under the TFDCA,[27] can result in a written warning, administrative penalties, civil penalties, or criminal penalties.[28]

---

[24] TEX. HEALTH & SAFETY CODE, Ch. 431, *et seq*.
[25] *See* TEX. HEALTH & SAFETY CODE §§ 431.021(a), (b).
[26] TEX. HEALTH & SAFETY CODE § 431.111(a)(2)(B).
[27] TEX. HEALTH & SAFETY CODE § 431.046. *See, e.g.*, 25 TEX. ADMIN. CODE Ch. 229.
[28] *See* TEX. HEALTH & SAFETY CODE §§ 431.061, 431.054, 431.0585, 431.059.

### D. Texas Medicaid

#### 1. Overview

28. The state and federal governments fund health care for the poor and disabled through public health assistance programs. Together, the State of Texas and the federal government fund the Medical Assistance Program in Texas, commonly referred to as Texas Medicaid. Texas Medicaid provides vital health care coverage to Texas's most vulnerable populations.[29] It is a lifeline ensuring that children, pregnant women, elderly adults, and disabled individuals receive the medical care they need.[30]

29. The Texas Health and Human Services Commission (HHSC) administers the Texas Medicaid program and has authority to promulgate rules and other methods of administration governing the program.[31] Texas Medicaid reimburses participating providers for the approved pharmaceuticals they provide to Medicaid recipients. The program strives to provide safe and effective health services to beneficiaries while maximizing the efficient use of taxpayer funds within the Texas Medicaid program.[32] To that end, Texas Medicaid uses various procedures to monitor prescription drug benefits.

#### 2. Texas Medicaid Tools for Managing Appropriate and Cost-Effective Pharmaceutical Therapy

30. The Vendor Drug Program (VDP) within HHSC oversees the outpatient prescription drug portion of the Texas Medicaid program.[33] VDP is also charged with safeguarding

---

[29] *See* TEX. HUM. RES. CODE § 32.001.

[30] *See* 1 TEX. ADMIN. CODE § 358.107; 1 TEX. ADMIN. CODE § 366.307; 1 TEX. ADMIN. CODE § 366.507.

[31] TEX. GOV'T CODE § 531.021.

[32] *See In re Xerox Corp.*, 555 S.W.3d 518, 524 (Tex. 2018).

[33] *See* 1 TEX. ADMIN. CODE § 354.1809, § 354.1891; TEX. GOV'T CODE § 531.069.

against fraud, waste, and abuse within the program.[34] VDP was in operation at all times relevant to this case.

31.     Providers can obtain Medicaid reimbursement through VDP for pharmaceutical products approved for use and reimbursement under this program, and which are listed on the VDP formulary.[35] To have its particular pharmaceutical products listed on the VDP formulary, a drug company or manufacturer must file an application with VDP.[36] Texas Medicaid requires information provided to it by pharmaceutical manufacturers as part of the VDP application process to be complete, truthful, and up-to-date.[37] VDP may return or reject an application on the discovery of "false, erroneous, or incomplete information."[38]

32.     VDP applications require drug manufacturers to report, for each drug submitted, the recommended daily dosages, formulation of the drug, FDA approval letters, and copies of the package inserts and materials for physicians. The VDP application also requires manufacturers to certify that all the information provided with their application is correct and that their drug is not in violation of either state or federal law.

33.     By signing the application, manufacturers accept an ongoing duty to submit notifications of changes pertaining to the information in their application no later than the date such revisions are scheduled to occur, and to submit notifications of any changes pertaining to their product's status, formulation, or availability within fifteen days of such changes occurring. Accordingly, manufacturers owe a continuing duty to Texas Medicaid to supplement information

---

[34] *See* 1 TEX. ADMIN. CODE § 354.1891.

[35] 1 TEX. ADMIN. CODE § 354.1831(a). The VDP formulary is also referred to as the Texas Drug Code Index or TDCI. *See* 1 TEX. ADMIN. CODE § 354.1921.

[36] 1 TEX. ADMIN. CODE § 354.1921(b).

[37] *Id. See also* 1 TEX. ADMIN. CODE § 354.1923(b).

[38] 1 TEX. ADMIN. CODE § 354.1923(b)(1).

PLAINTIFFS' SECOND AMENDED PETITION                                        **PAGE 11**

provided with their VDP application.[39] Moreover, a new VDP application must be submitted each time a drug first becomes available in a new formulation or in different dosages.

34.     Pharmaceutical manufacturers' interactions with Texas Medicaid, and Texas Medicaid's review of drugs placed on its formulary, do not stop with submission of the initial VDP application. Texas Medicaid has an ongoing obligation to manage its drug formulary through Drug Utilization Review (DUR) in accordance with the Omnibus Budget Reconciliation Act of 1990.[40] Pursuant to that obligation, Texas Medicaid created the DUR program to promote optimal and cost-effective pharmaceutical therapy in the Texas Medicaid VDP.[41]

35.     Specifically, the DUR program exists to ensure that prescriptions are appropriate, medically necessary, and are not likely to result in adverse medical outcomes.[42] The program is designed to educate providers and to identify and reduce the frequency of patterns of fraud, abuse, overuse, or inappropriate or medically unnecessary care.[43]

36.     The DUR Board has a number of tools available to it to achieve these goals, including prior authorization, educational letters expressing therapeutic concerns to Texas Medicaid providers, DUR alerts, and clinical edits.[44] If necessary, the DUR Board initiates recommendations that certain drugs be made subject to prior authorization or to restrictions concerning the types of patients (*e.g.*, children, elderly persons, etc.) or the types of conditions for which Medicaid reimbursement is obtainable.[45] As part of this program, the DUR Board monitors

---

[39] *See* 1 TEX. ADMIN. CODE § 354.1921(c)(1).

[40] H.R.5835 - 101st Congress (1989-1990): Omnibus Budget Reconciliation Act of 1990, H.R.5835, 101st Cong. (1990), https://www.congress.gov/bill/101st-congress/house-bill/5835; s*ee also* 1 TEX. ADMIN. CODE § 354.1941.

[41] *See* TEX. GOV'T CODE § 531.0736; *see also* 1 TEX. ADMIN. CODE § 354.1941.

[42] *See* TEX. GOV'T CODE § 531.0736(k).

[43] *See id.*, § 531.0736(b).

[44] *See* TEX. GOV'T CODE § 531.0736(k); *see also* 1 TEX. ADMIN. CODE § 354.1831(b), § 354.1941(a).

[45] *See* 1 TEX. ADMIN. CODE § 354.1831(b), § 354.1941(a).

and analyzes provider-level activity.[46]

37.     The DUR Board is also tasked with developing recommendations for the Texas Medicaid Preferred Drug List (PDL), providing another mechanism for managing Texas Medicaid's expenditures for pharmaceuticals.[47] In making these recommendations, the DUR Board must consider the clinical efficacy, safety, and cost-effectiveness of each drug reviewed.[48] HHSC then decides which drugs are placed on the PDL based on DUR Board recommendations, the cost of competing drugs to the state, clinical considerations, written information offered by manufacturers about their products, and the existence of a supplemental rebate agreement or other program benefits.[49] Drugs that are reviewed but not selected for the PDL require prior authorization.[50]

38.     In carrying out its functions, the DUR Board frequently receives information from drug manufacturers, including Defendants, concerning their drugs.[51] The DUR Board expects— and Texas law requires—all such information to be complete and accurate. The DUR Board cannot effectively make recommendations to manage drug utilization through clinical edits, the PDL, or other interventions where material information has been misrepresented or concealed by a drug company.

39.     The Texas Medicaid program includes not just Medicaid decision-makers such as

---

[46] *See* TEX. GOV'T CODE § 531.0736(g); *see also* 1 TEX. ADMIN. CODE § 354.1941(a).

[47] *See* TEX. GOV'T CODE § 531.0736(b)(1). Previously, the Pharmaceutical and Therapeutics Committee (P&T Committee) made recommendations regarding the PDL. In 2016, however, the P&T Committee and DUR Board combined into a single, expanded, committee known as the DUR Board, which now handles the functions of the two previous committees. S.B. 200, 84th Leg. (Tex. 2015) (enacted).

[48] *See* TEX. GOV'T CODE § 531.0736(h).

[49] 1 TEX. ADMIN. CODE § 354.1924(c).

[50] *See* 1 TEX. ADMIN. CODE § 354.1832(a).

[51] *See* TEX. GOV'T CODE § 531.0736(g).

the VDP and DUR Board, but also Medicaid providers such as pharmacies and physicians that enter into agreements with Texas Medicaid in order to be covered providers.[52] The TMFPA seeks to protect against fraud at all levels of the Texas Medicaid program.[53] Providers cannot fully exercise their professional judgment regarding appropriate patient care for Medicaid beneficiaries when drug companies misrepresent or conceal material information about a drug's status.

## VI.    APPLICABLE TEXAS STATUTORY LAW

40.    Plaintiffs re-allege and reincorporate by reference as set forth herein the allegations contained in Paragraphs 1 through 39 of this Petition.

41.    A person commits an unlawful act as defined under the Texas Medicaid Fraud Prevention Act[54] by, among other things:

A.    Knowingly making or causing to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized. TEX. HUM. RES. CODE § 36.002(1).

B.    Knowingly concealing or failing to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized. TEX. HUM. RES. CODE § 36.002(2).

C.    Knowingly making or causing to be made a false statement or misrepresentation of material fact concerning: information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program. TEX. HUM. RES. CODE § 36.002(4)(B).

D.    Knowingly making or causing to be made a claim under the Medicaid program for . . . a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate. TEX. HUM. RES. CODE § 36.002(7)(C).

---

[52] *See* 1 TEX. ADMIN. CODE § 352.5(a), § 354.1801(g).

[53] *See* TEX. HUM. RES. CODE § 36.001 *et seq.*

[54] As amended on September 1, 2023, the Texas Medicaid Fraud Prevention Act is now the "Texas Health Care Program Fraud Prevention Act" and includes state health care programs beyond the Medicaid program. The substance of the unlawful acts remains unchanged.

42.     Hereinafter, references to conduct as constituting "statutory fraud" mean that the conduct being described was done by Defendants at times when one or more of the statutory provisions set forth in Paragraph 41 applied and was done in ways and through means that satisfy all the required elements of at least one applicable statutory provision.

## VII.     DEFENDANTS' UNLAWFUL ACTS

### A.     Background

43.     Hoping to carve out a share of the multibillion-dollar ADHD medication industry for themselves, Pfizer—a multinational pharmaceutical powerhouse—invested heavily in Quillivant. Pfizer had big ambitions for Quillivant and sought to differentiate it from the competition as the only extended-release oral suspension methylphenidate indicated for the treatment of ADHD in children. To manufacture Quillivant, Pfizer partnered with Tris, a relatively new and growing pharmaceutical company with fewer than 200 employees at the time of Quillivant's approval. For Tris, properly manufacturing Quillivant at the quantities requested by Pfizer would prove to be a significant challenge.

44.     Even prior to FDA approval, Tris struggled to achieve consistency in manufacturing Quillivant, as reflected in Quillivant's failure of mandatory quality control tests. Following one such early failure in August 2011, which resulted in FDA issuing a Form 483 citation,[55] Tris promised to correct the identified deficiencies, including conducting root cause investigations of its manufacturing processes as required by federal CGMP. In the months and

---

[55] "An FDA Form 483 is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts." U.S. Food & Drug Administration, *FDA Form 483 Frequently Asked Questions*, available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions (last visited Nov. 8, 2023).

years that followed, however, Tris concealed subsequent quality control test failures by manipulating the test process itself, in violation of federal and state laws and regulations.

45. At the same time, Tris and Pfizer both recognized that Texas Medicaid business would be crucial for Quillivant's success. To fully exploit the economic potential of Texas Medicaid, Defendants needed Medicaid decision-makers to add Quillivant to the VDP Formulary and the Preferred Drug List. These steps would effectively allow Medicaid providers to prescribe Quillivant to their Medicaid patients and would streamline the prescribing process by eliminating the need for the treating doctor to go through the burdensome process of obtaining prior authorization. Describing Texas as a "populous state with a disproportionately high percentage of children covered by Medicaid," Pfizer projected that Texas sales of Quillivant were expected to increase significantly if Quillivant was added to the PDL.

46. Pfizer successfully campaigned to have Quillivant added to the Texas Medicaid Formulary in June 2013, including by certifying on the VDP Application that Quillivant was not in violation of state or federal law, and agreeing to update VDP of any changes in "formulation, product status price, or availability." From that point forward, Quillivant was listed as being reimbursable under the Texas Medicaid program. Defendants also successfully obtained "preferred" placement on the PDL for Quillivant in 2014, following an initial failed attempt in 2013.

47. Quillivant's status with Texas Medicaid became a selling point, and the Pfizer salesforce actively promoted Quillivant to Texas Medicaid Providers, including pediatricians and pharmacists. Defendants knew that Quillivant's placement on the VDP formulary and the PDL would not only increase Quillivant's utilization amongst children enrolled in Texas Medicaid but

would also increase their market share within the commercial insurance population in Texas by having the State's stamp of approval.

48. Defendants, however, would not fulfill their obligations to Texas Medicaid. Despite engaging in conduct that clearly violated FDCA CGMP regulations; regularly receiving failing test results on required quality control measures; and receiving notices of deficiencies and a warning letter from the FDA, at no point in time did Defendants provide Texas Medicaid or VDP with a relevant product update, as required by their VDP Application certification.

**B. Defendants Modified the Dissolution Test Method to Conceal Manufacturing Defects, in Violation of FDA's CGMP**

49. Almost immediately after it received FDA approval—and prior to Pfizer submitting the VDP application—Quillivant began failing routine quality tests. Under financial pressure to produce large quantities of Quillivant after a lengthy approval process, Tris tried to rapidly increase production without adequate protocols to maintain acceptable quality, leading to defects in the manufacturing process.

50. Beginning at least as early as October 2012, Tris quality control personnel observed that samples of Quillivant tested under FDA-required dissolution specifications were not generating passing results. Dissolution testing is an important quality control tool used to measure whether a drug was properly manufactured, by comparing a simulated release of the drug to a standard set upon the drug's initial approval. This in turn helps to predict whether the drug (as manufactured) will be released as expected in a patient's body—which is critical for ensuring proper and consistent patient dosing.[56] Here, the Quillivant samples formed lumps during

---

[56] U.S. Pharmacopeia, *Dissolution and Drug Release Tests*, available at https://www.usp.org/small-molecules/dissolution (last visited Nov. 8, 2023).

reconstitution.

51. As noted in the October 2012 Deviation Report, the "probable cause" of the out-of-specification result was "related to sample reconstitution/hydration," which refers to the process by which the drug—manufactured by Tris as a powder—is properly mixed with water prior either to being dispensed to a patient or tested in Tris's lab.

52. Rather than seeking to understand why the sample formed lumps during reconstitution, Tris "retrained" its analysts to shake the water/drug mixture longer, as well as to conduct the test only when "foaming is absent from the suspension." Put simply, Tris's meager "retraining" was insufficient to prevent further out-of-specification dissolution test results.

53. Just one month later in November 2012, Quillivant failed dissolution testing due to slower initial dissolution at the 0.5-hour time point. In other words, inadequate amounts of Quillivant were dissolved half an hour after testing began. Once again, Tris blamed the method of mixing the sample instead of conducting a proper manufacturing investigation.

54. In February 2013, Tris issued a Notice of Investigation for Quillivant related to out-of-specification dissolution test results that far exceeded the reference standard at every tested timepoint. Shortly thereafter, Tris Quality Control issued another Notice of Investigation in March 2013, where the analyst noted that the sample's dissolution test results were *below* the minimum standard. This stark contrast in out-of-specification test results should have resulted in Tris investigating and revamping its manufacturing process (and thereby incurring substantial costs) to rectify Quillivant's inconsistency as a finished product. However, that again did not occur.

55. Rather than thoroughly investigating the root cause of Quillivant's failures as required by federal CGMP regulations, Tris—under the direct orders of CEO Mehta—halted

dissolution testing under the existing test method (Method 5) and focused on creating a new test under which its defective product could meet FDA criteria. Tris Quality Control staff implemented the problematic new test (Method 6) on or about July 26, 2013. Alarmingly, the new test method was not representative of real-world usage by patients, and worse, went against the pharmacy reconstitution instructions contained in the FDA-approved label for Quillivant.[57]

56.     Method 5, the dissolution testing method approved by the FDA, required that dissolution testing samples be "well shaken." This aligned with the instructions on Quillivant's FDA-approved label, which instructed pharmacists and caregivers to shake Quillivant for at least 10 seconds during reconstitution and again prior to administration of a dose.

57.     However, under Method 6, after shaking the sample to reconstitute it (all that was required under Method 5), Tris lab personnel were instructed to let the sample sit for 30 minutes; sonicate it for three minutes; and then mix it gently with a spatula or glass rod for an additional minute.[58] Each of these new steps differed from the steps contained in Quillivant's label, which meant that Tris's dissolution testing procedure was no longer measuring dissolution as it would be experienced by patients taking Quillivant.

58.     A sonicator, or ultrasonic bath, works by using sound waves outside the range of human hearing to create millions of microscopic bubbles in a solution that then implode, releasing

---

[57] A drug's "label" or "package insert" is the detailed information sheet that is provided with every prescription drug product. It contains all information that FDA has approved as being necessary for a patient to safely take the drug for an indicated condition. This information includes proper dosing, warning and precautions, and usage instructions.

[58] For further description of accepted dissolution practices, *see* United States Pharmacopeia ("USP") Ch. 711, available at https://www.usp.org/sites/default/files/usp/document/harmonization/gen-method/stage_6_monograph_25_feb_2011.pdf (last visited Nov. 8, 2023). *See also* FDA Guidance for Industry, available at https://www.fda.gov/downloads/drugs/guidances/ucm070239.pdf (last visited Nov. 8, 2023).

enormous amounts of energy.[59] That energy can then be used to dissolve and homogenize liquids.[60] Tris lab personnel were instructed to sonicate Quillivant using a particular ultrasonic bath model for three minutes "at maximum power." Per the specifications sheet for the specified model, it is one of "the most technologically advanced ultrasonic baths available," and maximum power equates to 40 kilohertz, or 40,000 pulses *per second*. The machine retails for well over $1,000. In sharp contrast, Quillivant's label instructed pharmacists to shake the medication bottle "with vigorous back and forth motion for at least 10 seconds to prepare suspension." Similarly, the label instructed caregivers to "vigorously shake bottle for at least 10 seconds" prior to administering a dose of the medication. Thus, sonication plays no part in normal patient or pharmacy usage of Quillivant.

59. Under FDA regulations, "a supplement must be submitted" to the FDA "for any change in the drug substance, drug product, production process, quality controls, equipment, or facilities that has a moderate potential to have an adverse effect on the identity, strength, quality, or potency of the drug" at least 30 days before distribution of drugs made using the changes.[61] This notice is referred to as "CBE-30." Changes requiring a 30-day prior notice include "Relaxation of an acceptance criterion or deletion of a test to comply with an official compendium (USP) that is consistent with FDA statutory or regulatory requirements."[62] In implementing Method 6, Defendants failed to notify FDA by submitting a CBE-30 prior to its use, in violation of FDA regulations.

---

[59] *See* https://www.emerson.com/documents/automation/manual-bransonic-power-supply-en-5410610.pdf (last visited Nov. 8, 2023).

[60] *Id*.

[61] 21 CFR § 314.70(c).

[62] 21 CFR § 314.70(c)(2)(iii).

60.     Even Tris Quality Control personnel realized the absurdity of substituting an expensive machine for 10 seconds of shaking by hand. In response to an internal report purporting to justify the new sonication step, Tris's Senior VP of Quality observed that based on the data he reviewed, there was "absolutely no reason to sonicate" Quillivant samples. Another Quality Control employee noted that "we might be pushing it" to add the sonication step, given that it demonstrably increased the dissolution rate during testing.

61.     The Senior VP of Quality continued to voice his objections in a later email directly to CEO Mehta, where he plainly stated that sonication of samples was "not scientifically sound" due to the impact on the sample results, and that "we can't just keep ignoring these [quality] issues." Nevertheless, Tris, under orders from its CEO Mehta, moved forward using sonication as part of Method 6. This would not be the last method change, as Tris was unable to produce Quillivant that consistently met acceptance criteria even under revised Method 6.

62.     Internally at Tris, employees of the Quality Assurance division understood the sonication step to be affecting Quillivant test results. While investigating a customer complaint in October 2013, one analyst questioned whether the currently employed Method 6 (including sonication) should be used, since "the initial results with [Method 5] are on the higher side of the specification," and noted that testing with sonication could result in a 5-8% increase in the dissolution rate, which would exceed the upper limit.

63.     Through its Contract Operations Quality Assurance Department (COQA), Pfizer was responsible for oversight of Tris manufacturing, including CGMP compliance. Pfizer also had a multidisciplinary team, known as the Audit Quality Response Team (AQRT), tasked with investigating quality control failures.

64.      As early as October 2012, Pfizer was aware that Quillivant was having difficulty meeting its FDA-mandated testing specifications. Pfizer understood that Tris was seeking to change the test method to include sonication at least as early as June 19, 2013. Pfizer did not object to Tris's decision to change the test method, but rather, sought to understand what it would entail for Pfizer in terms of regulatory filings to FDA.

65.      In an email in March 2014, after several lots of Quillivant failed dissolution testing under the new test Method 6 by exceeding the *upper limit* of the specification, one Pfizer External Supply employee noted to another Pfizer employee that sonication "did the trick to address low disso results and then some," showing that Pfizer understood the real reason for sonication was to influence dissolution test results.

66.      Pfizer's Senior Director of COQA noted that test Method 6 did not align with the test method approved by FDA, stating "I read this as they are out of compliance with our [FDA] filing." Unfortunately, this realization did not prompt Pfizer COQA to demand that Tris perform a root cause investigation into Quillivant's dissolution testing failures, nor did it trigger Pfizer's own AQRT to investigate the problem.

67.      Instead, Tris began working up a justification to update the test method once again. In response to seeing the preliminary dissolution report, Tris's Senior VP of Quality remarked, "right now it looks like when the product is slow we sonicate and when it's fast we don't sonicate … we need to take a serious scientific approach to solving this issue." Despite this criticism, Tris continued forward with once again altering the test method.

68.      In a later email in April 2014, a Pfizer External Supply employee characterized the situation involving Quillivant's out-of-specification dissolution results as "pretty serious." The

Pfizer employee further explained that Pfizer COQA had expected Tris to "present data to quantify the impact of [a] sonication step in the dissolution method," but that Tris untimely provided "a statement but no data." He went on to conclude that, as a result, Pfizer could not continue to release Quillivant using the new test method until Tris could justify its use.

69. Roughly a month later, Pfizer's Senior Director of COQA admitted: "I agree [the method] doesn't represent patient usage and am surprised it was [internally] approved…" Despite Pfizer's obvious concerns and skepticism regarding the validity of sonication, Pfizer failed to ensure Tris thoroughly investigated the root cause of Quillivant's quality issues and failed to alert Texas Medicaid to those ongoing problems.

70. Rather than conducting a proper manufacturing investigation, Pfizer and Tris concocted a convenient narrative to explain away the problem. In a May 2014 Field Alert Report (FAR), Pfizer's Senior Director/Team Lead for COQA claimed the root cause of Quillivant's dissolution testing issues was "confirmed to be laboratory error associated with lack of clarity within the analytical method." More specifically, they claimed that an analyst erroneously sonicated Quillivant samples during a later stage of the testing process, "causing an increase in the rate of dissolution" observed at that time point in the testing process.

71. This response to FDA was misleading for two reasons. First, contrary to Defendants' assertion, Method 6 as implemented plainly instructed analysts to sonicate Quillivant samples prior to testing, so there was no method ambiguity. Second, by stating that the analyst sonicated "in error," Defendants concealed the fact that Quillivant samples were being sonicated in order to manipulate dissolution test results to falsely pass quality control.[63]

---

[63] Under the test method approved by FDA—Method 5—sonication is never appropriate.

72.     After submitting the FAR to FDA, Tris worked to revise its dissolution test method from Method 6 to Method 7. During the development of Method 7, Pfizer asked Tris about shipping Quillivant despite the failure to pass dissolution testing. Tris personnel responded that, although they preferred to not do so, they were "trying to keep up with Pfizer's demand" and the decision was up to Pfizer. However, Tris cautioned that the shipment in question would not have a Certificate of Analysis showing Quillivant met its FDA-required specifications.

73.     At that point, Pfizer's Director and Team Lead for COQA replied that with no ability to test and no Certificate of Analysis, Pfizer did "not have any support for any [Quillivant] in distribution," and that the product would either need to be tested and re-released or recalled. Despite this grim assessment, the discussion did not prompt Pfizer to press Tris for a thorough investigation of the underlying cause of the dissolution testing failures that necessitated the creation of a new test method. It also did not trigger an investigation by Pfizer's AQRT.

74.     The new method went into effect in June 2014. Under the Method 7 test, samples used for release testing were sonicated, while samples reconstituted and held for stability testing were not sonicated.

75.     A month after Pfizer expressed alarm about whether there was any support for Quillivant's continued distribution, Pfizer simply accepted that Tris's implementation of the updated test method (Method 7) solved the problem. Minutes from a July 2014 Joint Steering Committee meeting between Tris and Pfizer noted that a "delay in updating the dissolution method . . . resulted in a supply risk," but conveniently explained that, with the new method's approval, the Quillivant supply situation was "[n]o longer an issue."

76.     Importantly, neither Tris nor Pfizer had thoroughly investigated the actual root cause of the quality control failures that prompted the method change in the first place. Both companies knew the continued use of sonication in Method 7 was inconsistent with the test method on file with the FDA; was inconsistent with patient use; was not supported by the appropriate data; and had an impact on the dissolution test results. But Defendants chose to move forward with its use to avoid a potential supply disruption.

77.     At the same time Pfizer and Tris were working to bypass rather than solve known quality issues with Quillivant, Pfizer was petitioning the Texas Medicaid P&T Committee for Quillivant's addition to the Preferred Drug List. The P&T Committee relies on drug manufacturers to provide truthful and complete information about their drug products in order to carry out its duties of recommending preferred drugs based on their efficaciousness, clinical significance, cost effectiveness, and safety.[64] At no point did Pfizer or Tris inform P&T Committee decision-makers that there were ongoing and unresolved quality issues with Quillivant.

78.     Having kept this crucial information from the P&T Committee, Pfizer and Tris succeeded in their efforts to have Quillivant added to the Texas Medicaid Preferred Drug List on July 17, 2014. This removed the need for prior authorizations for Quillivant prescriptions, broadening the drug's market appeal and increasing the likelihood that children on Texas Medicaid would be prescribed Quillivant. Unfortunately for those children, Quillivant also continued to generate out-of-specification dissolution test results due to the unresolved manufacturing issues during this time.

---

[64] Vendor Drug Program, *Preferred Drugs*, available at www.txvendordrug.com/formulary/preferred-drugs (last visited Nov. 8, 2023).

79.     In October 2014, Tris again altered the test method, switching to Method 8. But just a few months later, Quillivant produced more out-of-specification results using the new method.

80.     Even more out-of-specification dissolution testing results were observed in 2015 and 2016, despite testing occurring under revised Methods 8 and 9. In the Deviation Report for one of the 2016 failures, Tris's Senior Compliance Specialist concluded that "the root cause of the subject deviation was related to method," thus continuing Tris's trend of blaming the test method rather than finding the underlying cause for its product's variability.

81.     Following this Report, Tris changed the dissolution test method to Method 10. But rather than adjusting the test method to better resemble real-world usage, Tris continued to increase the extent to which Quillivant samples were manipulated prior to dissolution testing by adding a rest period of six hours after sonication. This extra step was not included in the only dissolution testing method properly reported to the FDA (Method 5) and was not reflective of the patient usage described in the drug's label. No matching six-hour waiting period was added to Quillivant's instructions for pharmacists and caregivers.

82.     Tris observed additional out-of-specification dissolutions results for Quillivant in December 2016. However, this time the failure occurred eight hours after reconstitution—a first for Quillivant. In response, Pfizer notified the FDA through another Field Alert Report. Following additional negotiations with FDA, Pfizer agreed to commit to internally narrowing Quillivant's dissolution test specifications, which upset Tris personnel and caused Tris CEO Mehta to personally complain to Pfizer.

83.     Tris modified the dissolution test method to Method 11 in May 2017. Method 11 still included a sonication step. This test method remained in place until at least January 2018.

84.     During this time, Defendants failed to properly conduct investigations into the root causes of the various dissolution failures, electing instead to continue modifying the dissolution test itself. Both Defendants' changes in the dissolution testing procedure—at the insistence of CEO Mehta—as well as Defendants' failure to investigate the out-of-specification test results constitute ongoing violations of FDA regulations, causing Quillivant to be adulterated in violation of state and federal law, including the TFDCA and FDCA.

C.     **Defendants Failed to Determine the Root Cause of Particle Size Testing Failures, in Violation of FDA CGMP**

85.     Not only was Quillivant routinely failing dissolution testing, but it was also regularly failing particle size testing. By way of background, Quillivant's extended-release technology used a special coating to control the release of Quillivant's active pharmaceutical ingredient—methylphenidate.[65] To manage the release of the active ingredient, Tris applied various thicknesses of the time-release coating to Quillivant's active ingredient particles: the thicker the coating, the longer it takes for the methylphenidate to be released.

86.     Particle size testing was an important tool to measure the ratio of how big the particles of coated methylphenidate present in a sample were, which would directly impact how rapidly the drug would be absorbed within the body. Critically, the FDA required Quillivant to pass particle size testing in addition to dissolution testing.

87.     At least as early as June 2014, Quillivant started generating out-of-specification

---

[65] Tris Pharma, *LiquiXR Technology*, available at https://www.trisadhdhcp.com/liquixr-technology/ (last visited Nov. 8, 2023).

particle size testing results. Quillivant continued to fail particle size tests throughout 2014 and 2015. In an email dated November 12, 2014, Tris's Senior VP of Quality bluntly stated: "for those that were unaware, this is now the 8th [methylphenidate] particle size failure in 5 months. I am absolutely 'pointing the finger' at all of us for doing a less than acceptable job investigating this issue and finding a true root cause."

88.    Quillivant's particle size is a direct function of the manufacturing process, and repeatedly failing to meet particle size specifications was another symptom of Tris's flawed manufacturing process for Quillivant.

89.    But in a familiar move, Tris continued "doing a less than acceptable job" by failing to investigate the root cause of the manufacturing problem. Instead, Tris had the creative idea to remove particle size testing altogether.

90.    In communications with Pfizer, Tris alleged that batches were failing in-process particle size testing but meeting their final dissolution specifications, and that the "inappropriate test" could "potentially impact [Tris's] ability to supply" Quillivant to Pfizer. During this discussion, Tris did not inform Pfizer that Tris continued to use the unapproved dissolution test that improperly manipulated the test samples, thereby making it easier for Quillivant to pass.

91.    Tris needed Pfizer's support to seek FDA approval for the removal of particle size testing, and they complained that Pfizer's regulatory group was moving slowly. Pfizer's Commercial Lead for Quillivant replied that, while they were "also extremely concerned about the upcoming out of stock situation" for Quillivant, there were concerns that particle size "was still out of specification and no root cause [had] been found." They further cautioned that there were "significant implications to . . . Quillivant if this is not fully vetted."

92. On the same day Pfizer shared their concerns with Tris, they also circulated internal emails outlining their apprehension about removing particle size testing. Pfizer's Director of Business Development for the QXR Franchise noted that Pfizer's internal analysis contradicted Tris's position, explaining that Pfizer personnel were "concerned that sufficient data currently [did] not exist to eliminate or widen the in-process specification" for particle size testing.

93. A Pfizer memo attached to an email chain by their Senior Director of Chemistry, Manufacturing, and Controls acknowledged that "[i]ntrinsically, particle size influences [bioavailability] due to differences in surface area," and that, because dissolution testing was "not able to adequately demonstrate clinical performance. . . dissolution testing alone" could not be relied on to justify removal of particle size testing. He further cautioned, "we are not being transparent with the [FDA] as . . . we are deleting this specification for cause. This is an issue from a [C]GMP perspective." He concluded that sufficient data did not exist to eliminate or widen the specifications for particle size testing, and that additional testing would be needed to support Tris's proposed course of action.

94. A month later, after Tris's continued insistence on removing particle size testing based solely on the alleged sufficiency of dissolution testing, Pfizer capitulated. They agreed to support the change request to the FDA, in large part due to Tris's agreement to submit the change as a prior approval supplement (PAS) to Quillivant's NDA that would include information about Quillivant's out-of-specification particle size testing results.

95. But tension still existed regarding how to handle the request. Pfizer personnel wanted to bring in an external consultant to facilitate the process, but Tris CEO Mehta was anxious to move forward and thought the consultant added "unnecessary time and convolution."

96.     In response to pushback from Tris, Pfizer's General Manager for US Brands discussed the problem internally with her colleagues. In an email dated December 2, 2015, she provided the following summary of the situation:

> Regulatory believes that they need to be certain that [Tris'] manufacturing process is fully in control before requesting this of the FDA. We have gotten several lack of effect comments from patients that have been reported to the FDA, as well as we have had a consistency issue with the particle size which has caused a high percentage of batches to be discarded as they didn't meet spec. [T]his is why Tris wants to eliminate the additional standards testing. While these events are not necessarily connected, regulatory must have confidence that they are not. **Tris was not able to establish a root cause for the manufacturing issues** and as a hard-to-make product, the departure of their key manufacturing person seems to have coincided with these issues. Since Tris has not been amenable to a Pfizer review of the data the compromise was to bring in an external/neutral party to enable this confidence level to be reached before requesting something of the FDA.[66]

97.     Despite Pfizer's misgivings, Tris and Pfizer ultimately moved forward with submission of the PAS to FDA, requesting removal of particle size testing on February 17, 2016. Unsurprisingly, the FDA rejected the request. The agency's Complete Response Letter summarized Pfizer's argument as follows: "You claim that dissolution is a precise quality control tool and a more relevant and appropriate test for the assessment of the product performance and evaluation of batch to batch reproducibility compared to the particles size testing." The FDA critiqued this claim, noting that Quillivant's dissolution testing and acceptance criteria—as understood by FDA—were insufficient to replace particle size testing. Importantly, while Quillivant was still regularly failing the dissolution tests even under Tris's increasingly modified and unapproved dissolution methods, Pfizer was making grandiose claims about the alleged reliability and sufficiency of dissolution testing.[67]

---

[66] Emphasis added.

[67] As of 2016, Tris had not identified the root cause of particle size failures, though they had taken steps that they claimed reduced the frequency of such failures.

98. As approved by the FDA, Quillivant had to meet certain particle size standards. Tris recorded numerous out-of-specification results for the mandated particle size test from 2014 to at least 2016, while failing to properly conduct investigations into the root causes of the particle size failures. Defendants' failure to investigate the out-of-specification test results constitutes an ongoing violation of FDA regulations, causing Quillivant to be adulterated in violation of state and federal law, including the TFDCA and FDCA.

**D. Defendants Failed to Properly Investigate Numerous Complaints Regarding Quillivant and Lack of Effect, in Violation of FDA's CGMP**

99. Given the numerous quality control issues plaguing Quillivant between 2013 and 2018, it is unsurprising that a significant number of consumers took the extraordinary step of officially complaining that Quillivant was failing to work as expected. As early as September 2013, Defendants began receiving consumer complaints that Quillivant had a "lack of effect."

100. In December 2014, the FDA issued a Postmarket Drug and Biologic Safety Evaluations report identifying lack of effect for Quillivant as a "new potential issue" the agency was monitoring. The FDA sent another notice regarding lack of effect complaints to Pfizer in April 2015, identifying it as a "potential safety issue." Pfizer forwarded the notice to Tris, along with questions about Tris's procedures for monitoring and investigating product complaints.

101. On May 21, 2015, Tris's Senior Manager of Compliance sent Pfizer a memo addressing the steps Tris had taken to investigate lack of effect complaints concerning Quillivant. Among other things, the memo assured Pfizer that Tris had tested relevant samples for dissolution and the samples had met release specifications. The memo concluded there "were no discrepancies noted in the manufacturing or packaging processes that would have resulted in the report of a lack of effect."

102.     But what the memo failed to acknowledge is that in May 2015, Tris was using dissolution test Method 8, which included sonication and was not approved by the FDA. By using this unapproved test method, Tris was unable to properly investigate whether the previously released product actually met the FDA's finished product specifications.

103.     Even when faced with an influx of actual patient complaints about the drug lacking effect, Tris could not say whether the drug as manufactured was consistent with the drug as approved, because Tris had changed one of the primary methods to verify that fact. Tris continued to use unapproved quality control testing methods despite FDA's warnings regarding patients' lack of effect complaints.

104.     Pfizer was far from blameless in its handling of Quillivant product complaints. In July 2015, the FDA asked Pfizer for specific information related to Quillivant's lack of effect complaints. The FDA's Information Request was eventually shared with Tris's Chief Medical Officer, who emailed Tris CEO Mehta to express her concerns about Pfizer's handling of the situation. Pfizer wanted to argue that the lack of effect complaints largely occurred during the titration phase and were caused by doctors failing to adjust the medication to a fully optimized dose. But according to Tris, the majority of complaints contained no dosage information, with only 21% of the complaints arising during the initial titration period. Tris's Chief Medical Officer worried that "a solution [was] being proposed [by Pfizer] before the problem [was] well understood."

105.     Even Pfizer personnel recognized weaknesses in the position that dose titration was to blame for the uptick in product complaints, as the VP of Safety Surveillance and Risk Management acknowledged, "in the absence of conclusive data it seems we are left with some

'hypothesizing.'" Nevertheless, when Pfizer submitted its response to the FDA's Information Request, its report concluded that "the root cause [was] most likely associated with the titration phase of the dosing regimen." Pfizer additionally placed some blame on the patients and their caregivers, suggesting that they were not properly shaking the product prior to use.[68]

106. While Pfizer's response to the Information Request was sufficient to close that particular inquiry, FDA continued to have concerns regarding Quillivant's efficacy. For instance, in an October 2016 email detailing Tris's discussion with FDA on Quillivant's particle size testing requirement, Tris noted that FDA appeared to have the lack of effect topic on their mind, and that FDA linked it to potential safety issues.

107. Internally, Tris and Pfizer continued to conceal the true scope of lack of effect complaints, and continued to improperly investigate the complaints by using their unapproved dissolution test methods. In early 2017, after Tris obtained out-of-specification dissolution test results for Quillivant, Pfizer compiled a graph summarizing all reported lack of effect complaints for Quillivant. According to this graph, complaints in 2017 had again spiked to some of the highest reported levels.

108. Defendants understood the link between Quillivant's quality control failures and the lack of effect complaints. Yet at no point did Defendants warn Texas Medicaid providers or decision-makers that Quillivant had known manufacturing issues affecting its efficacy. Defendants thereby deprived the Medicaid program of the crucial information it relies on to ensure the safety and quality of care provided to Medicaid beneficiaries. As a result, thousands of Texas children received an adulterated Schedule II Controlled Dangerous Substance.

---

[68] This claim was particularly disingenuous given that Pfizer knew Tris was sonicating Quillivant samples prior to dissolution testing. Sonication mixes the drug far more effectively than shaking per the label instructions.

109. Defendants' inability to properly compare the consistency of the Quillivant batches referenced in the lack of effect claims meant that Defendants were unable to properly investigate the complaints as required by FDA CGMP regulations. Accordingly, Defendants' actions caused Quillivant to be adulterated in violation of state and federal law, including the TFDCA and FDCA.

E.   **FDA Issues Notices of Violations to Tris and Pfizer**

110. By 2017, Quillivant's persistent quality issues triggered an FDA inspection of Tris's manufacturing facilities, beginning in February and extending into March 2017. During that time, Pfizer recalled multiple lots of Quillivant due to dissolution testing failures.

111. After the inspection, the FDA issued Form 483 Inspectional Observations finding, in relevant part, that: 1) the "quality control unit lack[ed] the responsibility and authority to reject all components and drug products"; 2) "Out-of-Specification (OOS) results were obtained for dissolution testing for" multiple lots of Quillivant; 3) the "responsibilities and procedures applicable to the quality control unit [were] not in writing and fully followed"; 4) the "accuracy, sensitivity, specificity[,] and reproducibility of test methods [had] not been established and documented"; and 5) "[e]stablished test procedures and laboratory control mechanisms [were] not followed and documented at the time of performance."

112. Pfizer's Director of Business Development for the QXR Franchise circulated the FDA 483 Inspectional Observations to others in Pfizer senior leadership positions, noting that the report revealed "several systemic issues at Tris." After describing the FDA's findings, he summarized: "In essence, I believe FDA is saying that Tris Quality System [i]s broken." Despite this dire assessment, when Tris recommended that Pfizer place all lots of Quillivant on hold until the issues raised by the FDA could be fully investigated, Pfizer pushed Tris to continue supplying

the marketplace with Quillivant.

113.    The events of early 2017 finally prompted Pfizer to internally examine the workings of its COQA team. In a July 2017 email, Pfizer's Senior Director of Regulatory Affairs admitted that Pfizer had not followed "the normal change control process" for making changes to Quillivant's dissolution testing method. He blamed this failing on the progression of Pfizer's working relationship with Tris, as well as Tris's position regarding the proprietary nature of information concerning Quillivant. He further admitted Pfizer's COQA team had "dropped the ball" when, after requesting that additional testing be performed regarding the introduction of sonication, "nothing materialized."

114.    In October 2017, the FDA sent Tris a Drug Master File (DMF) Deficiency Letter critiquing Tris's repeated revisions to Quillivant's dissolution testing method. The agency explained that the introduction of sonication in Method 6 and its continued use in subsequent test methods was unacceptable. The agency likewise found unacceptable the six-hour sample rest period introduced in Method 10. As a result, the FDA concluded that the only appropriate dissolution testing method for Quillivant was Method 5. The FDA instructed Tris to update Quillivant's DMF accordingly.

115.    Merely a month after receiving such harsh feedback from the FDA on Quillivant, Pfizer had the audacity to provide a presentation to the Texas Medicaid DUR Board in an effort to maintain Quillivant's preferred status on the PDL. Pfizer did so before related safety and efficacy issues were fully understood or investigated, and with full awareness that a Quillivant shortage was imminent.

116.     In fact, Pfizer did not notify Texas Medicaid of Quillivant supply issues until February 2018, when the shortage was already ongoing. Even that communication was exceedingly brief, providing zero explanation or discussion of the ongoing manufacturing and quality control issues causing the shortage. At no point did either Pfizer or Tris disclose to Texas Medicaid the quality or regulatory issues related to Quillivant, or that an alarming number of patients were submitting complaints that the drug was not working as intended.

117.     Meanwhile, Pfizer's internal communications were far more candid. In a March 2018 email exchange discussing Quillivant's dissolution testing issues, Pfizer's COQA Director and Team Lead admitted: "I am getting less and less convinced we actually know how to make this product."

118.     Pfizer's concerns were warranted. On March 26, 2018, the FDA issued a Warning Letter to Tris finding that it failed to conform to CGMP and declaring Quillivant to be adulterated, in violation of the Federal Food Drug and Cosmetic Act. The Warning Letter did not mince words, describing the issues within Tris manufacturing as "significant" violations of CGMP and stating in no uncertain terms that because Tris's "methods, facilities, or controls for manufacturing, processing, packing, or holding [did] not conform to CGMP," Tris's drug products were "adulterated within the meaning of section 50l(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (FD&C Act), 21 U.S.C. 35l(a)(2)(B)."

119.     The Warning Letter went on to explain the specific violations the FDA investigator observed, including that Tris "failed to thoroughly investigate any unexplained discrepancy or failure of a batch or any of its components to meet any of its specifications" as required under 21 CFR § 211.192. Furthermore, the Warning Letter noted that Tris had failed to "adequately

investigate product failures and significant defect complaints"; lacked "thorough investigations into root causes"; and "failed to implement prompt and effective corrective actions and preventive actions (CAPA)."

120. FDA's Warning Letter put Pfizer on notice that it violated federal law requiring compliance with CGMP, and officially put Pfizer and Tris on notice of what was patently obvious from the start: Quillivant was adulterated starting in 2012 and continuing into 2018. Even after receiving this clear and unequivocal assessment, neither Tris nor Pfizer alerted Texas Medicaid decision-makers to the FDA's serious findings on adulteration. In failing to do so, Defendants' ongoing violations of the TMFPA became that much more flagrant.

121. Following the Warning Letter, Defendants made one final attempt at concealing the manufacturing issues with Quillivant by again altering the dissolution test method, this time to include a prolonged period of hydration.[69] However, since FDA had just rebuked Defendants for unilaterally changing the test method, Pfizer decided to submit the proposed change for FDA's approval. Not surprisingly, FDA rejected Pfizer's proposal, noting that it had concerns with Quillivant's reduced dissolution rate, including that Quillivant's performance in patients may be different from the batches used in approval.

122. In the wake of the FDA's Warning Letter and additional criticism from the agency in the ensuing months, Pfizer ultimately chose to divest itself of Quillivant by selling the subsidiary company that owned the drug to Tris. The transfer became effective on September 24, 2018. On November 16, 2018, Tris would finally inform the FDA that it had identified the true root cause of Quillivant's out-of-specification dissolution testing results. After over six years and a multitude of

---

[69] Hydration, in this context, refers to allowing a recently reconstituted sample to sit for a specified period of time prior to testing—in other words, a rest period. The proposed hydration period in this instance was 24 hours.

evasions, Tris finally acknowledged the utterly unsurprising fact that its flawed manufacturing process caused Quillivant's quality issues.

## VIII. CAUSES OF ACTION

123. Plaintiffs re-allege and reincorporate by reference as set forth herein the allegations contained in Paragraphs 1 through 122 of this Petition.

### A. Defendants' Violations of the TMFPA for Which Plaintiffs Seek Civil Remedies and Penalties

124. Defendant Pfizer knowingly made or caused to be made false statements and/or misrepresentations of material facts to Texas Medicaid in applying for Quillivant's inclusion on the VDP formulary. Specifically, Pfizer falsely certified on the VDP application that Quillivant was not in violation of federal and state law, and that it would update Texas Medicaid as to any change in Quillivant's product status. Pfizer's false statements and/or misrepresentations permitted Pfizer to receive benefits under the Medicaid program that were not authorized or that were greater than the benefits authorized, including, but not limited to, inclusion on the VDP formulary, in violation of the TMFPA. TEX. HUM. RES. CODE § 36.002(1).

125. Defendant Pfizer knowingly concealed information from, and/or failed to disclose information to, Texas Medicaid in conjunction with the VDP, DUR, and PDL processes. Specifically, Pfizer failed to disclose Quillivant's known quality issues to VDP, the DUR Board, and the former P&T Committee, including that Quillivant was adulterated. This conduct permitted Pfizer to receive benefits under the Medicaid program that were not authorized or that were greater than the benefits authorized, including, but not limited to, continued inclusion on the formulary and PDL, and virtually unfettered reimbursement of Quillivant, in violation of the TMFPA. TEX. HUM. RES. CODE § 36.002(2).

126.     Defendant Pfizer knowingly made, caused to be made, induced, or sought to induce the making of false statements and/or misrepresentations of material facts concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program, in violation of the TMFPA. Specifically, during the VDP application process, Defendant Pfizer falsely certified that Quillivant was not in violation of federal and state law, and that Pfizer would update Texas Medicaid as to any change in Quillivant's product status, which was a legal requirement for Quillivant to be added to the Texas Medicaid formulary. Despite making this certification, at no point thereafter did Pfizer inform Texas Medicaid about Quillivant becoming adulterated. Pfizer's false certification, which allowed Pfizer to receive the benefit of inclusion on the Medicaid formulary, therefore violated the TMFPA. TEX. HUM. RES. CODE § 36.002(4)(B).

127.     Defendants Tris, Pfizer, and Mehta knowingly made or caused to be made claims under the Medicaid program for a product, Quillivant, that was adulterated. Specifically, Tris, under the direction of CEO Mehta, knowingly adulterated Quillivant and released it to Pfizer with the understanding that Pfizer would promote Quillivant to Texas physicians, including Texas Medicaid physicians, and would distribute Quillivant in Texas, ultimately leading to its use by Texas Medicaid patients. Pfizer, for their part, knew Tris was adulterating Quillivant, yet continued to distribute and to promote it throughout Texas, including promoting Quillivant to Texas Medicaid physicians and decisionmakers. Pfizer also continually undertook efforts to ensure Quillivant was available on the Texas Medicaid formulary and listed as preferred on the Medicaid PDL, despite being adulterated. These efforts by Defendants violated the TMFPA. TEX. HUM. RES. CODE § 36.002(7)(C).

128. As a result of Defendants' conduct, the Texas Medicaid program was prevented from making fully informed and appropriate policy decisions, and from fully utilizing the tools and safeguards available to the program, including the VDP, DUR, and PDL processes, to manage appropriately the reimbursement of Quillivant prescriptions. Defendants' illegal conduct, therefore, resulted in millions of dollars of unauthorized or greater-than-authorized reimbursements for Quillivant by the State of Texas. Defendants' conduct additionally resulted in Defendants receiving the benefit of having Quillivant listed and maintained on the Texas Medicaid formulary during times when the drug was in violation of federal and state law.

129. Under the TMFPA, each Defendant is liable to the State of Texas for the amount of any payments or the value of any monetary or in-kind benefits provided under the Medicaid program, directly or indirectly, as a result of its unlawful acts; two times the amount of those payments or the value of the benefit; pre-judgment interest on the amount of those payments or the value of the benefit; and a civil penalty for each unlawful act committed, in addition to reasonable fees, expenses, and costs of the State of Texas in investigating and obtaining civil remedies in this matter. TEX. HUM. RES. CODE §§ 36.052, 36.007, 36.110(c); TEX. GOV'T CODE § 402.006(c).

130. Plaintiffs invoke in the broadest sense all relief possible at law or in equity under TEX. HUM. RES. CODE § 36.052, whether specified in this pleading or not.

131. The amounts sought from each Defendant are in excess of the minimum jurisdictional limits of this Court.

132. The TMFPA is a statute of absolute liability. There are no statutory, equitable, or common law defenses for any violation of its provisions. Further, Texas jurisprudence provides

that the defenses of estoppel, laches, and limitations are not available against the State of Texas as a Sovereign.[70]

## IX. STATUTORY INJUNCTION UNDER § 36.051 OF THE ACT

133. The Attorney General has good reason to believe that Defendants Tris and Mehta are committing, have committed, or are about to commit unlawful acts as defined by the TMFPA. These illegal acts may be enjoined under § 36.051 of the TMFPA.

## X. JURY DEMAND

134. Plaintiffs respectfully request a trial by jury on all claims pursuant to Texas Rules of Civil Procedure 216.

## XI. PRAYER

135. Plaintiffs ask that judgment be entered upon trial of this case in favor of the State against Defendants to the maximum extent allowed by law.

136. Plaintiffs ask for injunctive relief pursuant to § 36.051 of the TMFPA as to Defendants Tris and Mehta.

137. The State of Texas asks that it recover from Defendants under the TMFPA:

    A.    the amount of any payments or the value of any monetary or in-kind benefits provided under the Medicaid program, directly or indirectly, as a result of Defendants' unlawful acts;

    B.    two times the amount of any payments or the value of any monetary or in-kind benefits provided under the Medicaid program, directly or indirectly, as a result of Defendants' unlawful acts;

    C.    civil penalties in an amount not less than $5,500 or more than $11,000 for each unlawful act committed by Defendants, as adjusted by 31 U.S.C. 3729(a);

---

[70] *State v. Durham*, 860 S.W.2d 63, 67 (Tex. 1993).

D.     prejudgment interest;

E.     expenses, costs, and reasonable attorneys' fees; and

F.     post-judgment interest at the legal rate.

138.     Plaintiffs seek monetary relief in excess of $1,000,000.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**JAMES LLOYD**
Deputy Attorney General for Civil Litigation

**AMY SNOW HILTON**
Chief, Healthcare Program Enforcement Division

*/s/ Jonathan D. Bonilla*
**JONATHAN D. BONILLA**
Healthcare Program Enforcement Division
Assistant Attorney General
Texas State Bar No. 24073939
Jonathan.Bonilla@oag.texas.gov

**JORDAN UNDERHILL**
Assistant Attorney General
Texas State Bar No. 24102586
Jordan.Underhill@oag.texas.gov

**VIVIAN I. EGBU**
Assistant Attorney General
Texas State Bar No. 24079078
Vivian.Egbu@oag.texas.gov

**BRITTANY D. PETERS**
Assistant Attorney General
Texas State Bar No. 24124762
Brittany.Peters@oag.texas.gov

Office of the Attorney General
Healthcare Program Enforcement Division
P.O. Box 12548, Capitol Station 056
Austin, Texas 78711-2548
Telephone: (512) 936-9932
Facsimile: (512) 320-0667

**COUNSEL FOR THE STATE OF TEXAS**

**BROWN, LLC**
**Lead Counsel**

*/s/ Jason T Brown*
Jason T. Brown (*pro hac vice*)
Patrick S. Almonrode (*pro hac vice*)
111 Town Square Place, Suite 400
Jersey City, New Jersey 07310
(877) 561-0000 (office)
(855) 582-5297 (fax)
jtb@jtblawgroup.com
patalmonrode@jtblawgroup.com


**POTTER MINTON**
**A PROFESSIONAL CORPORATION**
**Local Counsel**

Michael E. Jones
E. Glenn Thames, Jr.
102 North College, Suite 900
Tyler, Texas 75702
(903) 597-8311 (office)
(903) 593-0846 (fax)
mikejones@potterminton.com
glennthames@potterminton.com

**COUNSEL FOR RELATOR TARIK AHMED**

**CERTIFICATE OF SERVICE**

By my signature below, I hereby certify that a true and correct copy of the foregoing was served on all counsel of record via electronic mail on January 17, 2025.

**THE VAL JONES LAW FIRM**

George Valton ("Val") Jones
109 West Austin St.
Marshall, TX 75670-3340
(903) 927-2220 (telephone)
val@valjoneslaw.com

**FOLEY & LARDNER LLP**

Edward D. ("Ed") Burbach
600 Congress Avenue, Suite 2900
Austin, Texas 78701
(512) 542-7070 (telephone)
(512) 542-7100 (facsimile)
eburbach@foley.com

**ROPES & GRAY LLP**

Samantha Barrett Badlam
(Admitted *Pro Hac Vice*)
Stefan Schropp
(Admitted *Pro Hac Vice*)
2099 Pennsylvania Ave., N.W.
Washington, DC 20006-6807
(202) 508-4734 (telephone)
samantha.badlam@ropesgray.com
Stefan.Schropp@ropesgray.com

**Attorneys for Defendant Pfizer Inc.**

**GILLAM & SMITH LLP**

Harry "Gil" Gillam, Jr.
Tom Gorham
303 S. Washington Ave.
Marshall, Texas 75670
(903) 934-8450 (telephone)
(903) 934-9257 (facsimile)
gil@gillamsmithlaw.com
tom@gillamsmithlaw.com

**BLANK ROME LLP**

Barrett Reid Howell
300 Crescent Court Suite 200
Dallas, Texas 75201
(972) 850-1476 (telephone)
(972) 850-1451 (facsimile)
barrett.howell@blankrome.com

William E. Lawler III
(admitted pro hac vice)
1825 Eye Street NW
Washington, D.C. 20006
william.lawler@blankrome.com
(202) 420-2249

**Attorneys for Defendant Tris Pharma, Inc.**

/s/ *Jonathan D. Bonilla*
Jonathan D. Bonilla
Assistant Attorney General

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Rhonda Rodriguez on behalf of Jonathan Bonilla
Bar No. 24073939
rhonda.rodriguez@oag.texas.gov
Envelope ID: 96347046
Filing Code Description: Amended Petition
Filing Description: PLAINTIFFS' SECOND AMENDED PETITION
Status as of 1/17/2025 10:56 AM CST

Associated Case Party: PFIZER INC.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Edward Burbach | 3355250 | eburbach@foley.com | 1/17/2025 10:47:18 AM | SENT |
| Veronica Salinas | | vsalinas@foley.com | 1/17/2025 10:47:18 AM | SENT |
| Pfizer Team | | QXRTXQuiTamAssociates&Paralegals@ropesgray.com | 1/17/2025 10:47:18 AM | ERROR |
| Pfizer Case Team | | QXRTXQuiTamAssociates&Paralegals@ropesgray.com | 1/17/2025 10:47:18 AM | ERROR |

Associated Case Party: THE STATE OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Rhonda Rodriguez | | rhonda.rodriguez@oag.texas.gov | 1/17/2025 10:47:18 AM | SENT |
| Jonathan D.Bonilla | | Jonathan.Bonilla@oag.texas.gov | 1/17/2025 10:47:18 AM | SENT |
| Jordan Underhill | | Jordan.Underhill@oag.texas.gov | 1/17/2025 10:47:18 AM | SENT |
| Brittany Peters | | Brittany.Peters@oag.texas.gov | 1/17/2025 10:47:18 AM | SENT |
| Vivian Egbu | | vivian.egbu@oag.texas.gov | 1/17/2025 10:47:18 AM | SENT |

Associated Case Party: TARIK AHMED

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jason T.Brown | | jtb@jtblawgroup.com | 1/17/2025 10:47:18 AM | SENT |
| Patrick S.Almonrode | | patalmonrode@jtblawgroup.com | 1/17/2025 10:47:18 AM | SENT |
| Michael E.Jones | | mikejones@potterminton.com | 1/17/2025 10:47:18 AM | SENT |
| E. GlennThames | | glennthames@potterminton.com | 1/17/2025 10:47:18 AM | SENT |

Case Contacts

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Rhonda Rodriguez on behalf of Jonathan Bonilla
Bar No. 24073939
rhonda.rodriguez@oag.texas.gov
Envelope ID: 96347046
Filing Code Description: Amended Petition
Filing Description: PLAINTIFFS' SECOND AMENDED PETITION
Status as of 1/17/2025 10:56 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Diana Arias | | diana@gillamsmithlaw.com | 1/17/2025 10:47:18 AM | SENT |
| Olivia Arias | | olivia@gillamsmithlaw.com | 1/17/2025 10:47:18 AM | SENT |
| Rosa Ferguson | | rosa@gillamsmithlaw.com | 1/17/2025 10:47:18 AM | SENT |
| Stefan Schropp | | Stefan.Schropp@ropesgray.com | 1/17/2025 10:47:18 AM | SENT |
| Deanna Foster | | Deanna.Foster@ropesgray.com | 1/17/2025 10:47:18 AM | SENT |
| Samantha Barrett | | Samantha.Badlam@ropesgray.com | 1/17/2025 10:47:18 AM | SENT |
| Ed Burbach | | eburbach@foley.com | 1/17/2025 10:47:18 AM | SENT |
| Val Jones | | val@valjoneslaw.com | 1/17/2025 10:47:18 AM | SENT |
| McKellar Karr | | mckellar@gillamsmithlaw.com | 1/17/2025 10:47:18 AM | SENT |
| Lit Docket MCO | | LitDocketInformationGovernance@ropesgray.com | 1/17/2025 10:47:18 AM | SENT |

Associated Case Party: TRIS PHARMA, INC.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| William E.Lawler, III | | william.lawler@blankrome.com | 1/17/2025 10:47:18 AM | SENT |
| Harry L.Gillam | | gil@gillamsmithlaw.com | 1/17/2025 10:47:18 AM | SENT |
| Tom Gorham | | tom@gillamsmithlaw.com | 1/17/2025 10:47:18 AM | SENT |
| Barrett ReidHowell | | barrett.howell@blankrome.com | 1/17/2025 10:47:18 AM | SENT |

Associated Case Party: KETAN MEHTA

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Harry L.Gillam | | gil@gillamsmithlaw.com | 1/17/2025 10:47:18 AM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Rhonda Rodriguez on behalf of Jonathan Bonilla
Bar No. 24073939
rhonda.rodriguez@oag.texas.gov
Envelope ID: 96347046
Filing Code Description: Amended Petition
Filing Description: PLAINTIFFS' SECOND AMENDED PETITION
Status as of 1/17/2025 10:56 AM CST

Associated Case Party: KETAN MEHTA

| Harry L.Gillam | | gil@gillamsmithlaw.com | 1/17/2025 10:47:18 AM | SENT |
|---|---|---|---|---|
| Tom Gorham | | tom@gillamsmithlaw.com | 1/17/2025 10:47:18 AM | SENT |
| Barrett ReidHowell | | barrett.howell@blankrome.com | 1/17/2025 10:47:18 AM | SENT |
| John F.Hundley | | hundleyj@ballardspahr.com | 1/17/2025 10:47:18 AM | SENT |
| Christopher Hatfield | | hatfieldc@ballardspahr.com | 1/17/2025 10:47:18 AM | SENT |

**APPENDIX C**

Relevant Court Filings – Motions to Dismiss and Memorandum of Law

TRAP 28.3(e)(2)(B)

**CAUSE NO. 23-1031**

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | IN THE DISTRICT COURT |
| *ex rel.* TARIK AHMED | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 71st JUDICIAL DISTRICT |
| | § | |
| PFIZER INC., TRIS PHARMA, INC., | § | |
| and KETAN MEHTA, | § | |
| | § | |
| Defendants. | § | HARRISON COUNTY, TEXAS |

## DEFENDANT PFIZER INC.'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED PETITION AND REQUEST FOR HEARING

Defendant Pfizer Inc. ("Pfizer"), by and through its undersigned counsel, and pursuant to Rule 91a of the Texas Rules of Civil Procedure, hereby moves the Court to dismiss the First Amended Petition in the above-captioned matter. Pfizer specifically requests a hearing on this motion.

This motion is supported by Pfizer's Memorandum of Law in Support of Motion to Dismiss Plaintiffs' First Amended Petition submitted herewith, as well as all papers, pleadings, documents, arguments of counsel, and other materials presented before or during the hearing on this motion, and any other evidence and argument the Court may consider.

[*Signature Page Follows*]

February 5, 2024                          Respectfully submitted,


                                    **THE VAL JONES LAW FIRM**
                              By: */s/ Val Jones*
                                    George Valton ("Val") Jones
                                    109 West Austin St.
                                    Marshall, TX  75670-3340
                                    State Bar No. 10888050
                                    val@valjoneslaw.com
                                    (903) 927-2220

                                    **FOLEY & LARDNER LLP**
                                    Edward D. ("Ed") Burbach
                                    State Bar No. 03355250
                                    600 Congress Avenue, Suite 2900
                                    Austin, Texas 78701
                                    eburbach@foley.com
                                    (512) 542-7070 / (512) 542-7100 (fax)

                                    **ROPES & GRAY LLP**
                                    Samantha Barrett Badlam
                                    (admitted *pro hac vice*)
                                    2099 Pennsylvania Ave., N.W.
                                    Washington, DC 20006-6807
                                    samantha.badlam@ropesgray.com
                                    (202) 508-4734

                                    **COUNSEL FOR DEFENDANT PFIZER INC.**

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that a true and correct copy of the foregoing was served on all counsel of record via fileandservetexas.com in accordance with the Texas Rules of Civil Procedure on this 5th day of February, 2024.

Jason T. Brown
111 Town Square Place, Suite 400
Jersey City, NJ 07310
Fax: (855) 582-5297
Email: jtb@jtblawgroup.com

Patrick S. Almonrode
111 Town Square Place, Suite 400
Jersey City, NJ 07310
Fax: (855) 582-5297
Email: patalmonrode@jtblawgroup.com

E. Glenn Thames, Jr.
102 North College, Suite 900
Tyler, TX 75702
Fax: (903) 593-0846
Email: glennthames@potterminton.com

Michael E. Jones
102 North College, Suite 900
Tyler, TX 75702
Fax: (903) 593-0846
Email: mikejones@potterminton.com

Jonathan D. Bonilla
Assistant Attorney General
The State of Texas
Office of the Attorney General
Civil Medicaid Fraud Division
PO Box 12548, Capitol Station
Austin, TX 78711
Fax: (512) 320-0667
Email: Jonathan.Bonilla@oag.texas.gov

Jessica L. Weltge
Assistant Attorney General
The State of Texas
Office of the Attorney General
Civil Medicaid Fraud Division
PO Box 12548, Capitol Station
Austin, TX 78711
Fax: (512) 320-0667
Email: Jessica.Weltge@oag.texas.gov

Jordan Underhill
Assistant Attorney General
The State of Texas
Office of the Attorney General
Civil Medicaid Fraud Division
PO Box 12548, Capitol Station
Austin, TX 78711
Fax: (512) 320-0667
Email: Jordan.Underhill@oag.texas.gov

Barrett Reid Howell
Texas State Bar. No. 24032311
300 Crescent Court
Suite 200
Dallas, TX 75201
Fax: 972.534.1297
barrett.howell@blankrome.com

Harry "Gil" Gillam, Jr.
303 S. Washington Ave.
Marshall, Texas 75670
gil@gillamsmithlaw.com

Tom Gorham
303 S. Washington Ave.
Marshall, Texas 75670
tom@gillamsmithlaw.com

John F. Hundley
1909 K Street, NW, 12th Floor
Washington, DC 20006-1157
Fax: (202) 661-2299
hundleyj@ballardspahr.com

Christopher A. Hatfield
1909 K Street, NW, 12th Floor
Washington, DC 20006-1157
Fax: (202) 661-2299
hatfieldc@ballardspahr.com

*/s/ Val Jones*

George Valton ("Val") Jones

| | | |
|---|---|---|
| THE STATE OF TEXAS,<br>*ex rel.* TARIK AHMED | §<br>§<br>§ | IN THE DISTRICT COURT |
| Plaintiffs, | §<br>§<br>§ | |
| v. | §<br>§ | 71st JUDICIAL DISTRICT |
| PFIZER INC., TRIS PHARMA, INC.,<br>and KETAN MEHTA, | §<br>§<br>§<br>§ | |
| Defendants. | § | HARRISON COUNTY, TEXAS |

## DEFENDANT TRIS PHARMA, INC.'S
## MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED PETITION
## AND NOTICE OF JOINDER IN RULE 91a MOTION TO DISMISS

Defendant Tris Pharma, Inc. ("Tris") moves under Rule 91a of the Texas Rules of Civil Procedure to dismiss Plaintiffs' First Amended Petition (the "Petition") and hereby joins in, adopts, and incorporates by reference pursuant to Rule 58 of the Texas Rules of Civil Procedure the arguments, authorities, and evidence in the Memorandum of Law in Support of Motion to Dismiss Plaintiffs' First Amended Petition (the "Pfizer Memorandum") filed by Defendant Pfizer Inc. ("Pfizer") on February 5, 2024, which are relevant to the sole cause of action asserted against Tris under TEX. HUM. RES. CODE § 36.002(7)(C).

Tris is a privately owned pharmaceutical development company organized under the laws of, and with its principal place of business in, the State of New Jersey. Tris is dedicated to developing and commercializing a suite of prescription medications designed to support patients suffering from attention deficit hyperactivity disorder ("ADHD"). Among the ADHD medications Tris has developed and brought to market is Quillivant XR ("Quillivant").

On September 30, 2020, the State of Texas Office of the Attorney General (the "Attorney General") served Tris with a Civil Investigative Demand ("First CID") for the production of

1

documents and other information pursuant to the Texas Medicaid Fraud Prevention Act ("TMFPA"). Tris cooperated fully with the Attorney General's investigation. Between October 2020 and October 2022, Tris produced approximately 583,566 documents totaling just under 2.9 million pages, as well as a single spreadsheet containing an export of more than 260,000 entries of sales data, to the Attorney General's office. On August 3, 2023, the Attorney General served Tris with another, much narrower Civil Investigative Demand ("Second CID"), pursuant to which Tris produced 62 additional documents totaling 258 pages.

On November 8, 2023, Plaintiffs the State of Texas, by and through the Attorney General of Texas, Ken Paxton ("Texas" or the "State") and Relator Tarik Ahmed ("Relator"), filed under seal the Petition against Defendants Pfizer, Tris, and Ketan Mehta.  In the Petition, Plaintiffs assert four violations of the TMFPA, under TEX. HUM. RES. CODE §§ 36.002(1), (2), (4)(B), and (7)(C). The first three claims are asserted only against Pfizer, with the fourth asserted against all Defendants, alleging that Defendants knowingly made or caused to be made claims under the Texas Medicaid program for an adulterated drug. Tris joins in Pfizer's Motion to Dismiss Plaintiffs' First Amended Petition (the "Pfizer Motion to Dismiss") and the portions of the Pfizer Memorandum pertaining to Plaintiffs' claim under Section 36.002(7)(C), which should be dismissed because Plaintiffs have failed to plead that Quillivant was adulterated under U.S. Food and Drug Administration ("FDA") regulations. Specifically:

1. Plaintiffs have failed to adequately plead that any purported misconduct related to changes to the dissolution testing method for Quillivant violated FDA Current Good Manufacturing Practice ("CGMP") requirements;[1]

---

[1] See Pfizer Memorandum, Argument Section I.A.1.

2

2. Plaintiffs have failed to adequately plead that any conduct related to particle size testing for Quillivant violated FDA CGMP requirements;[2]

3. Plaintiffs' Petition pleads allegations including that Defendants took all required steps under FDA regulations related to "lack-of-effect" complaints that preclude any possibility to allege that Defendants violated FDA CGMP requirements related to those complaints;[3]

4. Even if Quillivant, an undisputedly safe and effective drug, was technically "adulterated" under CGMP requirements—which it was not —Plaintiffs have failed to allege that Texas Medicaid would not have authorized the payment of claims for Quillivant as a result.[4]

WHEREFORE, Defendant Tris Pharma, Inc. respectfully asks the Court to grant this motion to dismiss, grant the Pfizer Motion to Dismiss, and grant Tris such other and further relief, both general and specific, in law or in equity, to which it may show itself justly entitled.

*(Remainder of Page Intentionally Left Blank)*

---

[2] See Pfizer Memorandum, Argument Section I.A.2.
[3] See Pfizer Memorandum, Argument Section I.A.3.
[4] See Pfizer Memorandum, Argument Section I.B.

Dated: February 5, 2024

Respectfully submitted,

**GILLAM & SMITH LLP**

*By:/s/ Harry L. Gillam, Jr.*
    Harry "Gil" Gillam, Jr.
    Texas State Bar. No. 07921800
    Tom Gorham
    Texas State Bar. No. 24012715
    303 S. Washington Ave.
    Marshall, Texas 75670
    gil@gillamsmithlaw.com
    tom@gillamsmithlaw.com
    (903) 934-8450

**BLANK ROME LLP**

*By:/s/ Barrett R. Howell*
    Barrett Reid Howell
    Texas State Bar. No. 24032311
    300 Crescent Court
    Suite 200
    Dallas, TX 75201
    barrett.howell@blankrome.com
    (972) 850-1476

**BALLARD SPAHR LLP**

*By:/s/ John Hundley*
    John F. Hundley
    Virginia Bar No. 36166
    (admitted *pro hac vice*)
    Christopher Hatfield
    Virginia Bar No. 95224
    (admitted *pro hac vice*)
    1909 K Street, NW, 12th Floor
    Washington, DC 20006-1157
    hundleyj@ballardspahr.com
    hatfieldc@ballardspahr.com
    (202) 661-2200 (phone)
    (202) 661-2299 (fax)

**COUNSEL FOR DEFENDANT TRIS PHARMA, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of this Answer was served on the below-listed counsel of record on February 5, 2024.

/s/ Harry L. Gillam, Jr.

**COUNSEL FOR THE STATE OF TEXAS**

Jonathan Bonilla
jonathan.bonilla@oag.texas.gov
Jessica Weltge
jessica.weltge@oag.texas.gov
Jordan Underhill
jordan.underhill@oag.texas.gov

Office of the Attorney General
Civil Medicaid Fraud Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
Telephone: (512) 475-4169
Facsimile: (512) 320-0667

**COUNSEL FOR TARIK AHMED**

Jason T. Brown
jtb@jtblawgroup.com
Patrick S. Almonrode
patalmonrode@jtblawgroup.com

Brown, LLC
111 Town Square Place, Suite 400
Jersey City, NJ 07310
Telephone: (877) 561-0000
Facsimile: (855) 582-5297

Michael E. Jones
mikejhones@potterminton.com
E. Glenn Thames, Jr.
glennthames@potterminton.com

Potter Minton, P.C.
102 North College, Suite 900
Tyler, TX 75702
Telephone: (903) 597-8311
Facsimile: (903) 593-0846

**COUNSEL FOR DEFENDANT PFIZER INC.**

George Valton ("Val") Jones
val@valjoneslaw.com

The Val Jones Law Firm
109 West Austin St.
Marshall, TX 75670-3340
Telephone: (903) 927-2220

5

Edward D. ("Ed") Burbach
eburbach@foley.com

Foley & Lardner LLP
600 Congress Avenue, Suite 2900
Austin, TX 78701
Telephone: (512) 542-7070
Facsimile: (512) 542-7100

Samantha Barrett Badlam
(admitted *pro hac vice*)
Samantha.badlam@ropesgray.com

Ropes & Gray LLP
2099 Pennsylvania Ave., N.W.
Washington, D.C. 20006-6807
Telephone: (202) 508-4734

CAUSE NO. 23-1031

| THE STATE OF TEXAS, | § | IN THE DISTRICT COURT |
| *ex rel.* TARIK AHMED | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 71st JUDICIAL DISTRICT |
| | § | |
| PFIZER INC., TRIS PHARMA, INC., | § | |
| and KETAN MEHTA, | § | |
| | § | |
| Defendants. | § | HARRISON COUNTY, TEXAS |

**DEFENDANT PFIZER INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO DISMISS PLAINTIFFS' FIRST AMENDED PETITION**

# TABLE OF CONTENTS

DEFENDANT PFIZER INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED PETITION ...................................................... 1

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL AND LEGAL BACKGROUND ........................................................................ 4

I.  QUILLIVANT XR ...................................................................................................... 4

   A. FDA's Approval of Quillivant XR ..................................................................... 5

   B. Manufacturing and Testing of Quillivant ......................................................... 8

II.  RELEVANT TEXAS STATUTES AND REGULATORY FRAMEWORK ...................... 11

   A. Texas Medicaid Vendor Drug Program Formulary ............................................. 11

   B. Quillivant's Texas State Medicaid Application .................................................. 13

   C. Texas Medicaid Fraud Enforcement Framework ................................................ 13

PROCEDURAL HISTORY .................................................................................................. 15

ARGUMENT ......................................................................................................................... 15

I.  PLAINTIFFS FAIL TO PLEAD THAT DEFENDANTS CAUSED A CLAIM TO BE MADE FOR AN "ADULTERATED" PRODUCT WITHIN THE MEANING OF SECTION 36.002(7)(C) OF THE TMFPA THAT RESULTED IN UNAUTHORIZED PAYMENTS BY THE STATE OF TEXAS ........................................................... 17

   A. Plaintiffs fail to plead that Defendants were responsible for a claim for "product that has been adulterated" under Section 36.002(7)(c). .................................................... 19

   B. Even if Quillivant had been "adulterated" based on a CGMP violation, reimbursement was still authorized under the TMFPA. ...................................................................... 32

II.  PLAINTIFFS' CAUSES OF ACTION UNDER SECTIONS 36.002(1) AND 36.002(4)(B) REGARDING PFIZER'S ALLEGED FALSE STATEMENTS OR MISREPRESENTATIONS FAIL AS A MATTER OF LAW. ........................................... 37

   A. Plaintiffs fail to allege that Quillivant was adulterated, or otherwise in violation of federal or state law, at the time of Pfizer's VDP application. ............................................. 38

   B. Plaintiffs fail to allege that Pfizer "falsely certified" that it would update Texas Medicaid as to any change in "product status." ...................................................................... 39

III.  PLAINTIFFS FAIL TO PLEAD THAT PFIZER CONCEALED OR FAILED TO DISCLOSE INFORMATION IN VIOLATION OF 36.002(2). ........................................... 42

   A. Plaintiffs cite no legal requirement that obligated Pfizer to disclose information related to post-manufacturing controls as part of the VDP formulary or PDL approval processes. ... 43

   B. Plaintiffs do not allege that any purported issues with post-manufacturing controls impacted the safety or efficacy of Quillivant such that Pfizer was required to disclose this information to the P&T Committee or DUR Board. ........................................................... 45

IV. PLAINTIFFS' ALLEGATIONS FAIL TO SATISFY THE TMFPA'S SCIENTER
REQUIREMENT ........................................................................................................... 46

CONCLUSION.......................................................................................................................... 51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguilar v. Morales*,
545 S.W.3d 670 (Tex. App.—El Paso 2017, pet. denied) ......................................................16

*United States ex rel. Babalola v. Sharma*,
No. H-11-cv-4026, 2013 WL (S.D. Tex. Feb. 1, 2013)............................................................15

*Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*,
595 S.W.3d 651 (Tex. 2020)...................................................................................................17

*Chapman v. Paul R. Wilson, Jr., D.D.S., Inc.*,
826 S.W.2d 214 (Tex. App.—Austin 1992, writ denied) ......................................................48

*City of Dallas v. Sanchez*,
494 S.W.3d 722 (Tex. 2016)...................................................................................................17

*El Paso Hosp. Dist. v. Tex. Health & Hum. Servs. Comm'n*,
247 S.W.3d 709 (Tex. 2008)...................................................................................................12

*GoDaddy.com, LLC v. Toups*,
429 S.W.3d 752 (Tex. App.—Beaumont 2014) .....................................................................17

*United States ex rel. Gudur v. Deloitte Consulting LLP*,
512 F. Supp. 2d 920 (S.D. Tex. 2007) ...................................................................................49

*Guillory v. Seaton, LLC*,
470 S.W.3d 237 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) .................................18

*United States ex rel. Jacobs v. Walgreen Co.*,
No. 21-20463, 2022 WL 613160 (5th Cir. Mar. 2, 2022)......................................................48

*In re Joel Kelley Interests, Inc.*,
No. 5:19-cv-559, 2019 WL 2521725 (Tex. App.—Dallas 2019, no pet.) ..............................17

*John D. Copanos & Sons, Inc. v. FDA*,
854 F.2d 510 (D.C. Cir. 1988) .........................................................................................23, 31

*Knudsen v. Sprint Commc'ns. Co.*,
No. C13-04476, 2016 WL 4548924 (N.D. Cal. Sept. 1, 2016) ..............................................36

*Malouf v. State*,
656 S.W.3d 402 (Tex. App.—El Paso 2022, pet. filed) .............................................34, 48, 51

*United States ex rel. McBride v. Halliburton Co.*,
848 F.3d 1027 (D.C. Cir. 2017) .......................................................................................36

*United States ex rel. Rost v. Pfizer, Inc.*,
446 F. Supp. 2d 6 (D. Mass. 2006) ..................................................................................15

*United States ex rel. Rostholder v. Omnicare, Inc.*,
745 F.3d 694 (4th Cir. 2014) ...........................................................................................36

*Salazar v. HEB Grocery Co.*,
No. 4:16-cv-734, 2018 WL 1610942 (Tex. App.—San Antonio 2018, pet.
denied, cert. denied) ........................................................................................................16

*United States ex rel. Scharff v. Camelot Counseling*,
No. 13-cv-3791, 2016 WL 5416494 (S.D.N.Y. Sept. 28, 2016) .............................................36

*United States ex rel. Schimelpfenig v. Dr. Reddy's Lab'ys Ltd.*,
No. 11-cv-4607, 2017 WL 1133956 (E.D. Pa. Mar. 27, 2017) .......................................36, 38

*United States ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 739 (2023).................................................................................................48, 51

*State of Texas ex. rel. Tarik Ahmed v. Pfizer Inc.*,
No. 23-1031 (Tex. Dist. Ct. (Harrison Cnty.) Feb. 5, 2024)....................................................16

*Tarrant Cty. v. Bonner*,
574 S.W.3d 893 (Tex. 2019).......................................................................................48, 51

*Texas v. Caremark, Inc.*,
584 F.3d 655 (5th Cir. 2009) ...........................................................................................15

*United States v. Dental Health Programs Inc.*,
No. 3:18-cv-463, 2021 WL 3213709 (N.D. Tex. July 29, 2021).................................... *passim*

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016)......................................................................................... *passim*

*Vasquez v. Legend Nat. Gas III, LP*,
492 S.W.3d 448 (Tex. App. 2016)....................................................................................17

*Waldmann v. Fulp*,
259 F. Supp. 3d 579 (S.D. Tex. 2016) ..............................................................................15

*Wilder v. Va. Hosp. Ass'n*,
    496 U.S. 498 (1990)...................................................................................................12

*United States ex rel. Williams v. McKesson Corp.*,
    No. 3:12-cv-371, 2014 WL 3353247 (N.D. Tex. July 9, 2014)...............................15

*United States ex rel. Yu v. Grifols USA, LLC*,
    No. 1:17-cv-2226, 2021 WL 5827047 (S.D.N.Y. Dec. 8, 2021), *aff'd*, No. 22-
    107, 2022 WL 7785044 (2d Cir. Oct. 14, 2022)................................................34, 35

*Zheng v. Vacation Network, Inc.*,
    468 S.W.3d 180 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) ...................16

**Statutes**

21 U.S.C. §§ 301–2404 *et seq.*.............................................................................................6

21 U.S.C. § 351.....................................................................................................................18

21 U.S.C. § 355.......................................................................................................................6

21 U.S.C. § 371(h).................................................................................................................6

21 U.S.C. § 393(b).................................................................................................................6

42 U.S.C. §§ 1396–1396(w) *et seq.* ...................................................................................12

Tex. Gov't Code § 531.0736(g)...........................................................................................13

Tex. Health & Safety Code Ann. § 1.001 ...........................................................................14

Tex. Hum. Res. Code § 36.001(7-a)(D)...............................................................................46

Tex. Hum. Res. Code § 36.002(1) ...........................................................................14, 18, 38

Tex. Hum. Res. Code § 36.002(2) ................................................................................ *passim*

Tex. Hum. Res. Code § 36.002(4)(B)......................................................................14, 18, 38

Tex. Hum. Res. Code § 36.002(7)(C)............................................................15, 18, 20, 34

Tex. Hum. Res. Code § 36.0011(a) .........................................................................48, 49, 52

**Other Authorities**

21 C.F.R. § 211.160................................................................................................................23

21 C.F.R. § 211.165 .................................................................................................8

21 C.F.R. § 211.192 ...............................................................................................30

21 C.F.R. § 211.198 ..........................................................................................31, 32

21 C.F.R. § 314.50 .............................................................................................6, 25

21 C.F.R. § 314.70 .....................................................................................24, 25, 26

21 C.F.R. § 314.420 ...............................................................................................7

21 C.F.R. §§ 820.1–820.5 ......................................................................................29

65 Fed. Reg. 83,041 (Dec. 29, 2000) .....................................................................29

1 Tex. Admin. Code § 351.1 ...................................................................................12

1 Tex. Admin. Code § 354.1042 .............................................................................12

1 Tex. Admin. Code § 354.1831 .............................................................................12

1 Tex. Admin. Code § 354.1832 .............................................................................13

1 Tex. Admin. Code § 354.1877 .............................................................................12

1 Tex. Admin. Code § 354.1921 ...............................................................39, 40, 41

1 Tex. Admin. Code § 354.1923 ...............................................................39, 44, 45

1 Tex. Admin. Code § 354.1924 ....................................................................... *passim*

1 Tex. Admin. Code § 354.1941 ......................................................................13, 45

25 Tex. Admin. Code § 229.420 .............................................................................14

Tex. R. Civ. P. 1......................................................................................................16

Tex. R. Civ. P. 45....................................................................................................16

Tex. R. Civ. P. 47....................................................................................................16

Tex. R. Civ. P. 59..............................................................................................13, 14

Tex. R. Civ. P. 91a............................................................................................ *passim*

Umesh V. Bankakar, *Pharmaceutical Dissolution Testing, Bioavailability and Bioequivalence: Science, Applications, and Beyond*, §§ 1.1, 1.6 (2022) ...................................9

## DEFENDANT PFIZER INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED PETITION

Defendant Pfizer Inc. ("Pfizer" or the "Company") respectfully submits this Memorandum of Law in Support of its Motion to Dismiss the First Amended Petition (the "Petition" or the "FAP") filed by plaintiffs the State of Texas ("Texas" or the "State") and Relator Tarik Ahmed ("Relator" and, together with the State, "Plaintiffs") with prejudice pursuant to Texas Rule of Civil Procedure 91a.

## PRELIMINARY STATEMENT

This "gotcha" Petition is heavy on feigned indignation about decade-old conduct that is not even alleged to have jeopardized so much as a single Texan's safety. By contrast, it is exceedingly light on legal authority and factual allegations that would sustain a viable cause of action under the Texas Medicaid Fraud Prevention Act ("TMFPA"). Plaintiffs' mischaracterizations and misdirection can carry them only so far, and the Petition is due to be dismissed under Rule 91a because "the allegations, taken as true, together with inferences reasonably drawn from them do not entitle [Plaintiffs] to the relief sought" and because "no reasonable person could believe the facts pleaded."

Plaintiffs raise allegations regarding one drug, Quillivant XR ("Quillivant"), which at all relevant times was and continues to be a prescription drug approved by the U.S. Food and Drug Administration ("FDA") to treat attention deficit hyperactivity disorder ("ADHD"). Plaintiffs make broad and sweeping allegations that Quillivant distributed in Texas was adulterated due to perceived deficiencies in Defendants' manufacturing practices. While relying liberally on their own post hoc conceptions of what those practices should have been, Plaintiffs wholly neglect to cite to a single statutory or regulatory authority setting forth the required manufacturing practices that Defendants allegedly violated. Plaintiffs then make the leap that, as a result of these alleged

deficiencies, Texas Medicaid would not have authorized payment for any bottle of Quillivant distributed in Texas from 2013 to 2018.

But in making that leap, Plaintiffs fail to grapple with the intractable fact that the assessment that Quillivant was at all times safe and effective for distribution was not *Pfizer's* alone, but also an assessment made by FDA, the country's primary regulator of drug products and an expert authority on which Texas Medicaid and the Texas Attorney General's office correctly and routinely rely. Despite awareness of the relevant facts described in the Petition related to dissolution testing method changes, FDA never revisited Quillivant's approval status and, instead, worked with Pfizer and Defendant Tris Pharma, Inc. ("Tris") to ensure a steady supply of Quillivant was available to patients. The Petition also cannot overcome the incontrovertible fact that the *Texas Medicaid program agrees with Pfizer and FDA*. Indeed, despite the public nature of the conduct underlying the allegations in the Petition, including an FDA-issued Warning Letter to Tris on March 26, 2018 that was widely reported in the press, and a more than three-year investigation by the Attorney General's office, Texas Medicaid *has never* removed Quillivant from the Preferred Drug List ("PDL") since it was officially added in 2014 and has consistently paid for prescriptions of the product.

That this Petition is an action in search of a cause is underscored by the extent to which Plaintiffs misconstrue both governing law and the underlying facts. The Petition reveals fundamental misunderstandings and outright misrepresentations about the laws and regulations governing the manufacture of prescription drug products and the reimbursement process for those medications. Despite possessing more than 2.1 million pages of documents produced by Pfizer, and an untold number from Tris and other sources, the Petition reveals a lack of clarity about the

timeline at issue here and the relevance of dissolution testing for Quillivant, to speak nothing of the other voluminous testing that is conducted on every drug before it reaches a single patient. Despite the Petition's attempts to twist the facts and relevant legal framework to sensationalize this case, the changes to the dissolution testing method that Plaintiffs mistakenly and misleadingly allege caused Quillivant to be adulterated based on violations of Current Good Manufacturing Practice ("CGMP") requirements relate only to the method by which Quillivant samples were *prepared for dissolution testing* in the lab. Plaintiffs cite no CGMP regulation for the proposition that changing an aspect of a dissolution test method, or in particular the sample preparation method, constitutes adulteration. Nor could they, as no such regulation exists. Furthermore, any potential, theoretical impact from sample preparation changes related solely to the ***first dose*** in a bottle that can contain up to 45 doses.[1] Based on Plaintiffs' own admissions, FDA was fully aware of these dissolution testing issues by at least December 2016,[2] yet allowed the product to remain on the market and in fact explicitly exercised discretion to allow its release to patients despite the known issues with dissolution testing.

A careful review of the Petition reveals that it does not adequately state a cause of action—and no amount of re-pleading will fix its inadequacies:

- *First*, Plaintiffs' cause of action premised on Defendants' submission of claims for purportedly adulterated drugs lacks a basis in the law, and this failure to sufficiently plead adulteration dooms Plaintiffs' other causes of actions.[3]

---

[1] U.S. Food & Drug Admin., Quillivant XR (methylphenidate hydrochloride) Label, *Highlights of Prescribing Information* (Sept. 2012), https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/202100lbl.pdf (hereinafter "Quillivant XR Label"). The number of doses in a particular bottle of Quillivant is determined by the amount prescribed per day (which typically ranges from 20 to 60 mgs) and the size of the bottle (which ranges from 300 mgs to 900 mgs). The estimate of up to 45 doses in a bottle is based on the FDA-recommended dose range of 20 mg-60 mg per day.
[2] FAP ¶ 82.
[3] *See infra* Argument, Section I.

- *Second*, Plaintiffs fail to plead that Pfizer made or caused to be made any ***false*** statements, or misrepresentations, to Texas Medicaid.[4]

- *Third*, Plaintiffs fail to allege that Pfizer concealed information that impacted Texas's decision to provide payment under the Medicaid program when Pfizer had no obligation to disclose such information.[5]

- *Fourth*, and finally, Plaintiffs fail to plead that Pfizer "knowingly" made or caused to be made any false claims for reimbursement, or any false statement, misrepresentation, or actionable non-disclosure.[6]

## FACTUAL AND LEGAL BACKGROUND

### I. QUILLIVANT XR

Quillivant is a central nervous system stimulant indicated for the treatment of ADHD, which is approved by FDA for use in adults and children ages 6 years and older.[7] It is the first, once-daily, extended-release liquid medication in the United States for treating ADHD with the active ingredient methylphenidate.[8] Although Quillivant is dispensed as a liquid medicine, the product is shipped as a powder that the pharmacist must "reconstitute" by adding water and vigorously shaking for ten seconds before dispensing to a patient, at which point it forms the Quillivant extended-release oral suspension.[9] The FDA-approved prescribing information for Quillivant recommends that the drug be administered "once daily in the morning" so that it will be effective throughout the day but will not interrupt night-time sleep.[10] The number of doses in

---

[4] *See infra* Argument, Section II.
[5] *See infra* Argument, Section III.
[6] *See infra* Argument, Section IV.
[7] *See* Quillivant XR Label, *supra* note 1.
[8] *Pfizer Announces Availability of Quillivant XR™ (methylphenidate hydrochloride) CII for Extended-Release Oral Suspension in The United States*, Pfizer (Jan. 13, 2013), https://www.pfizer.com/news/press-release/press-release-detail/pfizer_announces_availability_of_quillivant_xr_methylphenidate_hydrochloride_cii_for_extended_release_oral_suspension_in_the_united_states.
[9] *See* Quillivant XR Label, *supra* note 1.
[10] *Id.*

any bottle dispensed depends on the daily dose prescribed for the patient, which usually ranges from 20mg to 60mg, and the size of the bottle of Quillivant that is reconstituted.[11]

Pfizer acquired Quillivant in November 2012 through its acquisition of NextWave Pharmaceuticals, Inc. ("NextWave").[12] NextWave developed Quillivant in collaboration with Tris, which owns the patent for the technology that governs the extended-release characteristic of Quillivant.[13] As part of the NextWave acquisition, Pfizer became party to a pre-existing collaboration agreement between Tris and NextWave under which Tris manufactured Quillivant on behalf of Pfizer and received a 25% royalty on the net sales of the product.[14] Later that same month, Pfizer and Tris entered into a quality agreement that governed the relationship and outlined Tris's manufacturing and regulatory obligations.[15] Pfizer eventually sold NextWave to Tris in September 2018,[16] maintaining limited, ongoing responsibilities for Quillivant during a brief transition period before transferring responsibility for FDA filings and state submissions to Tris upon closing of the deal.[17]

## A. FDA's Approval of Quillivant XR

Congress has vested FDA with responsibility for protecting the public health by ensuring the safety and efficacy of human and animal drugs, among other products.[18] As part of this mission, FDA has responsibility for regulating the manufacturing, marketing, and distribution of such

---

[11] *Id.* Quillivant is available in the following quantities/sizes: bottles of 300mg powder (to prepare 60mL suspension); bottles of 600mg powder (to prepare 120mL suspension); bottles of 750mg powder (to prepare 150mL suspension); and bottles of 900mg powder (to prepare 180mL suspension). *Id.*
[12] FAP ¶ 17.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] FAP ¶ 122. Plaintiffs recognize that Pfizer divested itself of Quillivant effective September 24, 2018 by selling NextWave to Tris. *Id.*
[17] FAP ¶ 122.
[18] 21 U.S.C. § 393(b).

drugs.[19]  FDA fulfills its responsibilities, in part, by enforcing compliance with the Federal Food, Drug, and Cosmetic Act (the "FDCA") and its implementing regulations.[20]  FDA also issues guidance to help regulated entities better understand how FDA views the numerous requirements encompassed under the FDCA and its implementing regulations.[21]

Under the FDCA, a drug manufacturer may market a new drug only after it has filed, and FDA has approved either a New Drug Application ("NDA") or an Abbreviated New Drug Application ("ANDA") demonstrating that the drug is safe and effective for its intended uses.[22] Among many other categories of important information, an NDA must include details about the composition, manufacture, and specifications for a finished drug and its active pharmaceutical ingredient ("API" or "drug substance").[23]  This information must be included in a highly technical section of the NDA referred to as the "chemistry, manufacturing and controls" (or "CMC") section. The required CMC contents are described in 21 C.F.R. § 314.50(d)(1).  The purpose of this CMC section is to enable FDA to evaluate whether the methods proposed for use in manufacturing the drug and the controls proposed for use in maintaining its quality are adequate to preserve the drug's identity, strength, quality, and purity.[24]

A pharmaceutical company that manufactures both the API and the finished drug itself generally will have all this information in its possession and will include it directly in the CMC section of its NDA.[25]  Many manufacturers, however, rely on third parties to manufacture the APIs

---

[19] *Id.*
[20] 21 U.S.C. §§ 301–2404.
[21] *See* 21 U.S.C. § 371(h).
[22] 21 U.S.C. § 355.
[23] *See* 21 C.F.R. § 314.50(d).
[24] *See* U.S. Food & Drug Admin., *New Drug Application (NDA)* (Jan. 21, 2022), https://www.fda.gov/drugs/types-applications/new-drug-application-nda.
[25] *See id.*

or finished products they distribute, and those third parties may treat details about their own manufacturing processes—*i.e.*, the recipes for their drugs or drug ingredients—as confidential.[26] In such circumstances, FDA permits the third-party manufacturer to protect the secrecy of their intellectual property by submitting a Drug Master File ("DMF") that contains information FDA needs about the drug or drug ingredient in order to make a decision on the NDA for the finished drug, which incorporates the DMF by reference.[27]

On July 20, 2010, Tris, the owner of the intellectual property for Quillivant's extended release characteristic, submitted a DMF for Quillivant to FDA (DMF 023870) (the "Quillivant DMF"),[28] and shortly thereafter, on July 29, 2010, NextWave submitted the NDA for Quillivant (NDA 202100), which incorporated by reference the Quillivant DMF.[29] At all times, Tris maintained responsibility for the Quillivant DMF, which contained the detailed manufacturing recipe and process, drug specifications, and testing methods (often referred to as "analytical methods") for Quillivant, including the analytical method for conducting dissolution testing.[30] Although this type of information is ordinarily included in the CMC section of an NDA, Tris considered this information its proprietary trade secret information, and FDA approved Quillivant's NDA in September 2012 largely by relying on the Quillivant DMF for the CMC information. Pfizer never had direct access to the DMF, and the details typically included in the

---

[26] *See* U.S. Food & Drug Admin., *Drug Master Files (DMFs)* (Nov. 3, 2023), https://www.fda.gov/drugs/forms-submission-requirements/drug-master-files-dmfs.
[27] *See* 21 C.F.R. §§ 314.420(a); 314.430(a).
[28] U.S. Food & Drug Admin., *List of Drug Master Files (DMFs)* (2024), https://www.fda.gov/drugs/drug-master-files-dmfs/list-drug-master-files-dmfs.
[29] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Research, *Approval Package for Application Number: 202100orig1s000* at 4 (Sept. 27, 2012), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/202100Orig1s000Approv.pdf.
[30] FAP ¶ 114.

CMC section were incorporated only by reference in the NDA that Pfizer acquired.[31] Quillivant became commercially available in January 2013.

### B.      Manufacturing and Testing of Quillivant

As a quality control measure, a battery of tests is performed on each batch, or lot, of Quillivant manufactured to ensure that it meets the product specifications described in the approved NDA submission.[32] One type of testing conducted is "dissolution testing."[33] Dissolution testing is intended to *"predict"* whether Quillivant's active ingredient, methylphenidate, "will be released as expected in a patient's body."[34]

***Dissolution Testing.*** The process for dissolution testing first involves reconstituting a powder sample of Quillivant from a selected batch, which is the "the process by which the drug . . . . is properly mixed with water prior either to being dispensed to a patient or tested in Tris's lab."[35] After reconstitution, portions of the sample are introduced into dissolution vessels (which are designed to mimic the conditions in the human body), and tested to measure the amount of active ingredient in each vessel at the time points identified in the dissolution testing protocol approved by FDA.[36] A successful test will demonstrate that an average of the individual amounts of active

---

[31] *See* U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Research, Application Number: 202100orig1s000, *Chemistry Review(s)*, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/202100Orig1s000ChemR.pdf (noting in the "Comments and Recommendation Section" that "the NDA appears to be fileable from a CMC perspective. . . . The NDA cross-references two DMFs [redacted] for drug substance and #23870 for drug product[]. As a result, there is very little CMC information submitted in the NDA").

[32] 21 C.F.R.§ 211.165.

[33] FAP ¶ 50.

[34] FAP ¶ 51.

[35] *Id.*

[36] *See* United States Pharmacopeia (USP), Chp. 711, at 14-15, "Procedure" (describing various methods for placing a sample in a dissolution vessel, then withdrawing fluid from the vessel and subjecting it to testing to determine the amount dissolved in the vessel, and noting that generally three time points are tested); *see also* USP Chp. 1092, "The Dissolution Procedure: Development and Validation § 1.3: Choosing a Medium and Volume" ("The media are designed to represent the fed and fasted state in the stomach and small intestine."); Umesh V. Bankakar, *Pharmaceutical Dissolution Testing, Bioavailability and Bioequivalence: Science, Applications, and Beyond*, §§ 1.1, 1.6 (2022) (Dissolution testing is "one of the key tests that can provide valuable information about the functional

- 8 -

ingredient measured in the dissolution vessels at the various time points falls within the ranges in the protocol approved by FDA.[37]

Dissolution testing must be performed both on batches intended for release to the market ("release testing"), and on batches kept by the manufacturer (Tris) to test "long-term stability." Long-term stability batches of the product are held in their original powder form in a stability chamber and then reconstituted at specific time intervals to determine (through the process described above) whether the drug meets its dissolution specifications.[38] Stability testing is designed to ensure that the product will continue to meet its dissolution (and other) specifications throughout its shelf-life, which, for Quillivant, is thirty-six months.[39]

Stability testing for a product that requires reconstitution also includes "in-use" stability testing, which is intended to demonstrate that once the product is reconstituted it will continue to meet its approved specifications, including those for dissolution, for the shelf-life of the reconstituted product.[40] Unlike immediate release and long-term stability testing, in-use stability

---

performance of the product, an insight into the potential in vivo behavior of the product . . . . [T]he primary object of such a test is to closely mimic the physiological environment and the dynamics that the dosage form expects to be exposed following administration to the human.").

[37] *See* USP Chp. 711, Procedure Section, Extended Release Dosage Form, Acceptance Tbl. 2. Chp. 1092, § 5 ("The selection of acceptance criterion/criteria should be consistent with the dissolution data generated from bio/pivotal or clinical batches at the point of release as well as from stability batches. Generally, there is an expectation that acceptable batches will have results that fall within the acceptance criterion/criteria and that all manufactured batches should have similar dissolution behavior . . . .").

[38] *See* U.S. Dep't of Health & Human Servs., *Guidance for Industry: Q1A (R2) Stability Testing of New Drug Substances and Products* (Nov. 2003), https://www.fda.gov/media/71707/download (discussing the various types of testing that should be conducted as part of stability testing, including dissolution testing).

[39] *Id.* ("A systematic approach should be adopted in the presentation and evaluation of the stability information, which should include, as appropriate, results from the physical, chemical, biological, and microbiological tests, including particular attributes of the dosage form (*e.g.*, dissolution rate for solid oral dosage forms)…The purpose of the stability study is to establish… a shelf life and label storage instructions applicable to all future batches of the drug product manufactured and packaged under similar circumstances.") *See also* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/202100Orig1s000MedR.pdf.

[40] *See Guidance for Industry: Q1A*, *supra* note 38 at 10: ("Stability testing of the drug product after constitution or dilution, if applicable, should be conducted to provide information for the labeling on the preparation, storage condition, and in-use period of the constituted or diluted product. This testing should be performed on the constituted or diluted product through the proposed in-use period on primary batches as part of the formal stability studies at

testing is performed on Quillivant that has been reconstituted and maintained in liquid form.[41]  For Quillivant, the product label states that the reconstituted product can be used for up to four months.[42]  Thus, in-use stability tests were conducted on liquid samples of Quillivant that had been kept in a stability chamber post-reconstitution until specified testing time points.

*Sonication.*  In connection with laboratory testing, lab technicians often use a technique called "sonication," which is a process by which low-strength sound waves are passed through a reconstituted liquid, to agitate particles and aid in their dispersal.[43]  In other words, sonication breaks up "clumps" that form when water is added to powder.[44]  Sonication can simulate vigorous shaking by a pharmacist during the reconstitution process.[45]  Beginning in July 2013, Tris used sonication as part of the reconstitution process when preparing samples for dissolution testing on batches intended for release to the market.[46]

*Particle Size Testing*.  In addition to dissolution testing, another component of Quillivant's post-manufacturing controls was particle size testing.[47]  Quillivant's formulation contains millions of microscopic delivery complexes for methylphenidate.[48]  Each complex is covered in a coating

---

initial and final time points, and if full shelf life, long-term data will not be available before submission, at 12 months or the last time point for which data will be available.")

[41] *See* FAP ¶ 51.

[42] Quillivant XR Label *supra*, note 1 ("QUILLIVANT XR is stable for up to 4 months after reconstitution.").

[43] FAP ¶ 58.

[44] *See id.*

[45] *See id.*

[46] FAP ¶ 55.

[47] *See* U.S. Food & Drug Admin., *FDA Guidance: ICH Guidance on Q6A Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances* (Dec. 2000), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/q6a-specifications-test-procedures-and-acceptance-criteria-new-drug-substances-and-new-drug-products ("For some new drug substances intended for use in solid or suspension drug products, particle size can have a significant effect on dissolution rates, bioavailability, and/or stability.  In such instances, testing for particle size distribution should be carried out using an appropriate procedure, and acceptance criteria should be provided.").

[48] Tris Pharma, Inc., *Unique Technology: How Quillivant XR Provides Consistent Medication Release* (2023), https://www.trisadhd.com/quillivant-xr/unique-technology/.

that is designed to control the release of methylphenidate to ensure consistent medication release over time.[49] In short, the thicker the coating, the longer it takes the methylphenidate to release.[50] As part of Quillivant's post-manufacturing controls, particle size testing was performed to measure the size of particles of coated methylphenidate present in a sample, as the particle size may impact how rapidly the patient's body will absorb the drug.[51]

## II. RELEVANT TEXAS STATUTES AND REGULATORY FRAMEWORK

### A. Texas Medicaid Vendor Drug Program Formulary

Created by Title XIX of the Social Security Act, the Texas Medicaid program is a joint federal-state program that pays for the medical care of certain eligible Texas residents.[52] The Texas Health and Human Services Commission ("HHSC") is charged with supervising the administration and operation of the Texas Medicaid program.[53] HHSC has numerous oversight responsibilities, including promulgating rules governing reimbursement for the approved medications provided to Texas Medicaid patients through HHSC's Vendor Drug Program ("VDP") formulary.[54] The VDP formulary is an HHSC-administered program that manages the outpatient prescription drug portion of the Texas Medicaid program.[55]

In order for a pharmaceutical company to have its drug listed on the VDP formulary, and thus be eligible for reimbursement, it must file an application.[56] Included in the application is a

---

[49] FAP ¶ 85.
[50] *Id.*
[51] *See* FAP ¶ 86.
[52] *See* 42 U.S.C. §§ 1396–1396(w); *see also El Paso Hosp. Dist. v. Tex. Health & Hum. Servs. Comm'n*, 247 S.W.3d 709, 711 (Tex. 2008); *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990) (citing 42 U.S.C. § 1396)).
[53] *See* 42 U.S.C. §§ 1396-1396(w); *see also El Paso Hosp. Dist.*, 247 S.W.3d at 711; *Va. Hosp. Ass'n*, 496 U.S. at 502 (citing 42 U.S.C. § 1396)).
[54] 1 Tex. Admin. Code §§ 351.1, 354.1042.
[55] 1 Tex. Admin. Code § 354.1877.
[56] 1 Tex. Admin. Code § 354.1831(a).

multi-part questionnaire requesting, among other things, the recommended daily dosages of the drug, the drug's ingredient list, FDA approval letters, and copies of the package inserts and materials for physicians.[57] The questionnaire *does not* request any information that would be included in the CMC section of the NDA.[58] Nor does it request any information that would be included in the DMF in the case of an NDA, like Quillivant's, that incorporates the DMF by reference for information related to post-manufacturing controls like dissolution testing. HHSC instead defers to FDA's assessment of a product's safety and efficacy, based on the information provided to FDA, and covers only drugs that FDA has approved for distribution.[59]

In addition to the VDP formulary, Texas Medicaid also reviews classes of drugs to decide which brands should be placed on the state's Preferred Drug List.[60] Drugs listed on the PDL are available to Texas Medicaid participants without prior authorization.[61] Texas Medicaid's Drug Utilization Review Board (the "DUR Board") is charged with developing recommendations as to which drugs appear on the PDL.[62] The DUR Board is comprised of healthcare and pharmaceutical experts appointed by HHSC's Executive Commissioner.[63] When evaluating whether to approve a drug for the PDL, the DUR Board will consider the product's efficaciousness, clinical significance,

---

[57] *Texas Vendor Drug Program: Texas Drug Code Index Electronic Certification of Information (eCOI): Agent User Guide*, Conduent (Mar. 3, 2023), https://www.txvendordrug.com/sites/default/files/docs/ecoi-user-guide.pdf.
[58] *See id.*
[59] *Reminder: HHSC Does Not Cover Vaccines or Drugs That Do Not Have FDA Approval or Emergency Use Authorization*, (Sept. 21, 2023) https://www.tmhp.com/news/2023-09-21-reminder-hhsc-does-not-cover-vaccines-or-drugs-do-not-have-fda-approval-or.
[60] 1 Tex. Admin. Code § 354.1941(a); Tex. Gov't Code § 531.0736(g).
[61] 1 Tex. Admin. Code § 354.1832.
[62] 1 Tex. Gov't Code § 531.0736(g).
[63] 1 Tex. Admin. Code § 354.1941.

cost effectiveness, and safety.[64] Based on the DUR Board's recommendation, HHSC will then decide whether to add a product to the PDL.[65]

## B. Quillivant's Texas State Medicaid Application

In early January 2013, Pfizer submitted Quillivant's application to the Texas VDP formulary.[66] On April 16, 2013, HHSC added Quillivant to the VDP formulary and, on January 31, 2014, the P&T Committee (the precursor to the DUR Board) recommended adding Quillivant to the PDL.[67] That recommendation was adopted by HHSC and took effect on July 14, 2014, with Quillivant maintaining its PDL status ever since.

## C. Texas Medicaid Fraud Enforcement Framework

Texas has its own statutes that govern the manufacture and distribution of drugs in the state.[68] However, the prohibited acts in the Texas Food, Drug, and Cosmetic Act ("TFDCA") mirror those in the federal FDCA, the operative definitions in the TFDCA refer to those in the FDCA, and Texas state law adopts by reference the entire FDCA as well as its implementing regulations relating to prescription drugs, including the provisions regarding new drug approval and CGMPs.[69]

---

[64] 1 Tex. Admin. Code § 354.1924(c)(2).
[65] 1 Tex. Admin. Code § 354.1832.
[66] *See* Exhibit A, Quillivant XR VDP Application. Quillivant's VDP application package, which Plaintiffs repeatedly reference and quote in the Petition, is attached as Exhibit A to this Memorandum pursuant to Texas Rules of Civil Procedure 59 and 91a.6. *See* Tex. R. Civ. P. 59 (providing that "written instruments, constituting, in whole or in part, the claim sued on, or the matter set up in defense, may be made a part of the pleadings by copies thereof . . . being attached or filed and referred to as such . . . and shall be deemed a part thereof for all purposes"); Tex. R. Civ. P. 91a.6 (providing that "the court . . . must decide the motion based solely on the pleading of the cause of action, *together with any pleading exhibits* permitted by Rule 59") (emphasis added).
[67] FAP ¶¶ 46, 78.
[68] *See* Tex. Health & Safety Code Ann. § 1.001.
[69] *See* 25 Tex. Admin. Code § 229.420.

In addition, the TMFPA imposes civil penalties for the submission of false claims for payment to Texas's Medicaid program. The TMFPA prohibits, in relevant part:

- Knowingly making or causing to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized.[70]

- Knowingly concealing or failing to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized.[71]

- Knowingly making or causing to be made a false statement or misrepresentation of material fact concerning: information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program.[72]

- Knowingly making or causing to be made a claim under the Medicaid program for ... a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate.[73]

The TMFPA is Texas's analogue to the Federal False Claims Act ("FCA"). While "[t]he TMFPA differs textually from the FCA, [] the Fifth Circuit and several federal district courts have considered TMFPA claims analogous to claims brought under the FCA."[74] As one Texas federal court described it, the two statutes differ textually but are "depend[ent] on the same operative facts and legal requirements."[75] Thus, FCA precedent provides guidance for applying the TMFPA.[76]

---

[70] Tex. Hum. Res. Code § 36.002(1).
[71] Tex. Hum. Res. Code § 36.002(2).
[72] Tex. Hum. Res. Code § 36.002(4)(B).
[73] Tex. Hum. Res. Code § 36.002(7)(C).
[74] *United States v. Dental Health Programs Inc.*, No. 3:18-cv-463, 2021 WL 3213709, at *7 (N.D. Tex. July 29, 2021); *see also Texas v. Caremark, Inc.*, 584 F.3d 655, 657 (5th Cir. 2009); *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 632-33 (S.D. Tex. 2016).
[75] *United States ex rel. Williams v. McKesson Corp.*, No. 3:12-cv-371, 2014 WL 3353247, at *4 (N.D. Tex. July 9, 2014); *United States ex rel. Babalola v. Sharma*, No. H-11-cv-4026, 2013 WL, 431821, at *2-5 (S.D. Tex. Feb. 1, 2013) (noting that that the relator brought unlawful acts counts under both the FCA and TMFPA, but only considered whether the relator's FCA claim sufficed to survive summary judgment); *United States ex rel. Rost v. Pfizer, Inc.*, 446 F. Supp. 2d 6, 12 n.13 (D. Mass. 2006) (considering FCA and TMFPA claims brought by a relator and primarily discussing the relator's FCA claim, noting only in a footnote that the relator brought a TMFPA claim, which "extend[s] liability in situations virtually identical to those contained in the federal FCA").
[76] *Babalola*, 2013 WL 431821, at *2-5; *Rost*, 446 F. Supp. 2d at 12 n.13.

- 14 -

## PROCEDURAL HISTORY

On September 30, 2020, the State of Texas Office of the Attorney General's Civil Medicaid Fraud Division served Pfizer with a Civil Investigative Demand ("CID") for the production of documents and other information pursuant to the TMFPA. Between November 2020 and March 2023, Pfizer cooperated fully with the investigation, including by producing more than 440,000 documents totaling more than *2.1 million pages* to the Attorney General's office.

On November 8, 2023, without seeking any clarification regarding the documents produced or interrogatory responses provided and without engaging in any discussion following the final document production on March 20, 2023, the State filed the Petition (alongside Relator, a former Tris employee who never worked for Pfizer), which Pfizer now moves to dismiss pursuant to Texas Rule of Civil Procedure 91a.[77]

## ARGUMENT

Texas Rules of Civil Procedure 45 and 47 require that pleadings "consist of a statement in plain and concise language of the plaintiff's cause of action" that is "sufficient to give [the defendant] fair notice of the claim involved."[78] The obligation to plead facts extends to each element of a cause of action.[79] Where a plaintiff's petition fails to plead facts that plausibly show any necessary element of the claim, the claim must be dismissed.[80]

---

[77] Defendant Tris has submitted its own Motion to Dismiss and incorporates by reference the arguments, authorities, and evidence in Pfizer's Memorandum of Law in Support of Motion to Dismiss Plaintiffs' First Amended Petition. *See* Defendant Tris Pharma, Inc.'s Motion to Dismiss Plaintiffs' First Amended Petition, *State of Texas ex. rel. Tarik Ahmed v. Pfizer Inc.*, No. 23-1031 (Tex. Dist. Ct. (Harrison Cnty.) Feb. 5, 2024).

[78] Tex. R. Civ. P. 45; Tex. R. Civ. P. 47.

[79] *See Zheng v. Vacation Network, Inc*., 468 S.W.3d 180, 184, 186 (Tex. App.—Houston [14th Dist.] 2015, pet. denied); *see also Salazar v. HEB Grocery Co.*, No. 4:16-cv-734, 2018 WL 1610942, at *3 (Tex. App.—San Antonio 2018, pet. denied, cert. denied) (holding "Salazar was required to plead facts, from which reasonable inferences could be drawn to support each element" of his claims to survive a Rule 91a motion).

[80] *See, e.g., Aguilar v. Morales*, 545 S.W.3d 670, 680 (Tex. App.—El Paso 2017, pet. denied).

To this end, Texas Rule of Civil Procedure 91a permits a party to a civil action to move for dismissal of "a cause of action on the grounds that it has no basis in law or fact."[81] Rule 91a, which was enacted by the Supreme Court of Texas in 2013 following a 2011 directive from the state legislature, furthers the overriding emphasis of the Texas Rules of Civil Procedure that cases should be resolved "with as great expedition and dispatch and at the least expense both to the litigants and to the state as may be practicable,"[82] by "allowing courts to dismiss meritless cases before parties engage in costly discovery."[83] In short, "[t]he purpose of Rule 91a . . . is to require the early and speedy dismissal of baseless claims."[84]

As the Texas courts have recognized, "[w]hile not identical, Rule 91a is analogous to [federal] Rule 12(b)(6)," and, therefore, the Texas courts "find case law interpreting Rule 12(b)(6) instructive."[85] Critically, among the well established principles that Rule 91a has adopted from the federal Rule 12(b) context is the admonishment that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss.[86] While this motion to dismiss addresses all of the causes of action in the Petition, a Rule 91a motion may be addressed to some or all of the causes of action stated in a complaint, and may seek both the outright dismissal or the narrowing of any claims to the extent they exceed any basis in fact or law.[87]

---

[81] Tex. R. Civ. P. 91a.1.
[82] Tex. R. Civ. P. 1.
[83] *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*, 595 S.W.3d 651, 656 (Tex. 2020).
[84] *In re Joel Kelley Interests, Inc.*, No. 5:19-cv-559, 2019 WL 2521725, at *1 (Tex. App.—Dallas 2019, no pet.).
[85] *GoDaddy.com, LLC v. Toups*, 429 S.W.3d 752, 754 (Tex. App.—Beaumont 2014).
[86] *Vasquez v. Legend Nat. Gas III, LP*, 492 S.W.3d 448, 451 (Tex. App. 2016)
[87] *See, e.g.*, *Dental Health Programs*, 2021 WL 3213709, at *10–13 (considering relator's TMFPA claims under which she alleged several distinct theories of liability and narrowing the scope of her causes of action to just those theories for which she sufficiently stated a TMFPA claim).

Under Rule 91a, a "cause of action has no basis in fact if no reasonable person could believe the facts pleaded," and a "cause of action has no basis in law if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought."[88]  Because "the availability of a remedy under facts alleged is a question of law,"[89] the Texas courts, interpreting Rule 91a over the last decade, have identified at least two situations in which a cause of action has no basis in law: (i) where the petition does not allege sufficient facts "to demonstrate a viable, legally cognizable right to relief," and (ii) where the plaintiffs "allege[] additional facts that, if true, bar recovery."[90]

Dismissal under Rule 91a is appropriate in this case because the Petition runs directly afoul of these guardrails for adequate pleading of a TMFPA claim.  Plaintiffs (1) fail to make certain allegations against Pfizer that are required to state a legally viable right to relief under the TMFPA and then, (2) in an effort to make those allegations, affirmatively plead away their case against Defendants and/or make allegations that no reasonable person could believe.

## I. PLAINTIFFS FAIL TO PLEAD THAT DEFENDANTS CAUSED A CLAIM TO BE MADE FOR AN "ADULTERATED" PRODUCT WITHIN THE MEANING OF SECTION 36.002(7)(C) OF THE TMFPA THAT RESULTED IN UNAUTHORIZED PAYMENTS BY THE STATE OF TEXAS.

Plaintiffs' entire case is premised on the claim that Quillivant distributed in Texas was adulterated.  Adulteration is a legal concept reflected in the FDCA, and incorporated into the TFDCA, that reflects one aspect of how a product can violate that statute.  There are many different ways a drug product can be adulterated under the FDCA.[91]  The theory of choice selected by

---

[88] Tex. R. Civ. P. 91a.1.
[89] *City of Dallas v. Sanchez*, 494 S.W.3d 722, 724 (Tex. 2016).
[90] *Guillory v. Seaton, LLC*, 470 S.W.3d 237, 240 (Tex. App.—Houston [14th Dist.] 2015, pet. denied).
[91] *See* 21 U.S.C. § 351.

Plaintiffs is that the Quillivant distributed in Texas was adulterated because it was manufactured in violation of CGMPs.[92] However, Plaintiffs fail to adequately allege their theory of choice, or any other adulteration theory. Without a viable adulteration claim, Plaintiffs' cause of action under Section 36.002(7)(C)—which prohibits a Medicaid claim for "a product that has been adulterated"—falls away, and with it so too do the claims for purportedly making false statements and failing to disclose information about the allegedly adulterated Quillivant.[93] Given the absence of any safety or efficacy concerns with Quillivant, the Petition goes to great pains to establish that even a drug that works exactly as intended can be adulterated if it was not manufactured in conformance with CGMPs.[94] But despite filing a 138-paragraph Petition, Plaintiffs fail to sufficiently allege the existence of any specific CGMP violation. Instead, the Petition resorts to threadbare and conclusory allegations—with blanket assertions that "Tris, under the direction of CEO Mehta, knowingly adulterated Quillivant and released it to Pfizer" and that "Pfizer, for [its] part, knew Tris was adulterating Quillivant"—while failing to allege facts sufficient to demonstrate that any specific CGMP regulation was indeed violated.[95] Plaintiffs then downplay the significance of FDA's involvement in pharmaceutical manufacturing oversight, making bald accusations that the State of Texas made unauthorized payments for an "adulterated" product while omitting the key fact that FDA explicitly permitted the distribution of numerous batches of Quillivant even while the agency was fully aware of the conduct alleged in the Petition.[96] This

---

[92] FAP ¶ 2.
[93] Tex. Hum. Res. Code § 36.002(1); § 36.002(2); § 36.002(4)(B).
[94] FAP ¶ 20 (citing *John D. Copanos & Sons, Inc. v. FDA*, 854 F.2d 510, 514 (D.C. Cir. 1988) for the proposition that drugs "produced in violation of . . . CGMP regulations" can be deemed adulterated "without the [FDA] having to show that they are actually contaminated").
[95] FAP ¶ 17.
[96] *See* U.S. Food & Drug Admin., URGENT: Important Prescribing Information Update (Mar. 22, 2018), https://www.fda.gov/media/112433/download (hereinafter "*Urgent*").

point is underscored by the fact that Quillivant remained on the PDL, and Texas Medicaid consistently paid for prescriptions of the product, despite the very public nature of many of the issues described in the Petition, including the FDA Warning Letter issued to Tris on March 26, 2018.[97] Plaintiffs sensationalize a mundane issue involving the method by which Quillivant was reconstituted prior to dissolution testing without identifying any CGMP requirement that were violated and thus have not met the requirements for pleading a TMFPA adulteration claim. Further Plaintiffs do not—and cannot—allege that Quillivant posed any safety or efficacy concerns.

## A.     Plaintiffs fail to plead that Defendants were responsible for a claim for "product that has been adulterated" under Section 36.002(7)(c).

To establish a viable claim for relief based on adulteration due to manufacturing practice violations, Plaintiffs must allege which CGMP regulations were violated and how Defendants' alleged conduct violated those regulations. They have not done so and, accordingly, the Petition should be dismissed in its entirety.

### 1.     Plaintiffs fail to plead adequately that any purported misconduct related to dissolution testing method changes violated CGMP regulations.

The crux of Plaintiffs' allegations is that Tris inappropriately modified the method by which it prepared the sample to conduct dissolution testing and failed to conduct proper investigations of out-of-specification dissolution testing results.[98] Despite devoting ten pages to detailing these allegations, Plaintiffs do not allege that any modifications to the dissolution testing

---

[97] U.S. Food & Drug Admin., *Warning Letter, Tris Pharma Inc.* (Mar. 26, 2018), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/tris-pharma-inc-534537-03262018 (hereinafter, "*Warning Letter*"). Notably, Plaintiffs attempt to rely on the Warning Letter to do the work of pleading an adulteration claim that they have been unable to do on their own. Not only do Plaintiffs fail to explain how the substance of the Warning Letter substantiates the claims they seek to make in the Petition, they also fail to support such an explanation with the facts that would allow Defendants to address those concerns, despite having access to all of the underlying materials.

[98] FAP ¶¶ 53-57, 72, 79-81, 83.

method by Tris or any subsequent actions by Defendants actually violated a CGMP regulation, which forecloses the adulteration theory on which Plaintiffs rely.

***Sample Preparation for Dissolution Testing.***  Dissolution testing is just one part of manufacturing oversight that is intended to ensure that Quillivant's active ingredient, methylphenidate, will be released as expected in a patient's body.[99]  Before the product can be tested, it first needs to be reconstituted.[100]  Reconstitution is the process by which Quillivant powder is mixed with water, both prior to being dispensed to a patient and prior to being tested for compliance with dissolution specifications.[101]

The primary allegation in this case is that Defendants improperly changed the "sample reconstitution/hydration" method (*i.e.*, the process for reconstituting Quillivant prior to performing dissolution testing).[102]  As alleged in the Petition, Tris discovered that the powder was not hydrating as expected when mixed with water, so it added sonication (*i.e.*, sound waves used to agitate and break up particles) and a 30-minute "hold time" to the sample preparation method (Method 6).[103]  This preparation method was intended to be used on release testing samples that had to be reconstituted prior to dissolution testing.[104]

Later, Tris discovered that sonication was also being used on *in-use* stability samples— those batches that had already been reconstituted and were being held in reconstituted form for later testing at specified intervals to demonstrate they remain stable for their labeled four-month

---

[99] FAP ¶ 50.
[100] FAP ¶ 51.
[101] *Id.*
[102] *Id.*
[103] *See* FAP ¶¶ 50-58
[104] *See id.*

shelf life.[105]  Sonication of those samples resulted in out-of-specification results because the sonic agitation of the molecules in the long-reconstituted (and hydrated) "in-use" samples that had already been held for a period of months in a reconstituted state inappropriately increased the release rate.[106]  This discovery resulted in the 2014 Field Alert Report ("FAR")—which the Petition incorrectly calls a "Field Action Report"—advising FDA of the out of specification ("OOS") dissolution testing results.[107]  The root cause of these OOS results was "confirmed" to be the sonication of an *in-use stability* sample, which, unlike the *release testing* samples on which the remainder of the Petition is based, was not supposed to be sonicated under Method 6.[108]  Tris subsequently revised the sample preparation method to clarify that samples reconstituted for the purpose of in-use stability testing should not be sonicated, and only samples reconstituted for release testing should be sonicated (Method 7).[109]

Tris made additional modifications to the sample preparation method for release testing, with the most notable being the addition of a "six-hour hold time" included in Method 10.[110]  This modification gave the reconstituted sample additional time to hydrate prior to testing.[111]  Although the instructions for reconstitution still directed a pharmacist to vigorously shake the solution for

---

[105] *See* Quillivant XR Label, *supra* note 1; *see Guidance for Industry: Q1A*, *supra* note 38 (describing in-use stability testing).

[106] FAP ¶¶ 65, 70.

[107] *See* FAP ¶ 70.

[108] There is no one-size-fits-all approach to stability testing: FDA guidance states that "[a]lthough specific methods are critical to determine product stability, [manufacturers] do not have to employ any specific technique."  U.S. Food & Drug Admin., *Expiration Dating and Stability Testing for Human Drug Products* (Nov. 7, 2014), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-technical-guides/expiration-dating-and-stability-testing-human-drug-products.  FDA generally recommends that stability testing be performed initially, then every three months for the first year, and then every six months for the second year. *Id.*  However, different drugs have different characteristics and periods of expiry, and thus FDA-approved stability testing protocols for different drugs will vary.

[109] FAP ¶¶ 72, 74.

[110] FAP ¶ 81.

[111] *See id.*

ten seconds before dispensing to a patient, there is a natural hold time built into the administration of Quillivant because, once it is reconstituted by the pharmacist for a patient, it is then administered only once daily, in the morning.[112] Patients or their caregivers are also instructed to shake the reconstituted product before each dose to ensure the even distribution of particles in the suspension,[113] but any doses administered the day after the product is reconstituted by the pharmacist (including the first dose in a bottle so long as it is not taken the same day the product is reconstituted) are ***not*** impacted by the dissolution testing method changes at issue because the product is fully hydrated by that point and would meet all dissolution specifications if tested at that time.[114]

Changing the sample preparation method for dissolution testing ***does not***, in and of itself, render a product adulterated. Indeed, Plaintiffs cite no CGMP regulation for the proposition that changing an aspect of a dissolution test method constitutes adulteration, which they need to do to properly plead adulteration based on CGMP violations. Nor could they, as no such regulation exists. Plaintiffs instead summarily claim that FDA and state regulations "require" that drug samples be "tested under FDA-required dissolution specifications."[115] However, the Petition cites no legal obligation in support of this proposition (because this is incorrect). To plead adulteration

---

[112] *See* Quillivant XR Label, *supra* note 1. Most prescriptions would be picked up the day or night before to administer the following morning.

[113] *See* Quillivant XR Label, *supra* note 1.

[114] *See* FAP ¶ 15. Plaintiffs attempt to suggest that the alleged issues relating to the initial hydration impacts later doses that require caregivers to "vigorously shake bottle for at least 10 seconds" prior to administering a dose of the medication. *Id.* ¶ 58. That instruction for later doses was never impacted by the addition of sonication or a hold time, which only was for the initial reconstitution of the product prior to testing of release batches. Further, the purpose of shaking before each dose is to ensure even distribution of particles in the suspension and is not relevant to the release of drug.

[115] FAP ¶ 50.

strictly based on manufacturing practice violations, Plaintiffs are obligated to identify at least one legally mandated manufacturing practice that has been violated.[116]

***CBE-30 Submission.*** Perhaps recognizing that they cannot plead a claim for adulteration based solely on changes to the dissolution test sample preparation method, Plaintiffs claim that Defendants rendered Quillivant adulterated by failing to appropriately report those same dissolution test method revisions to FDA.[117] Plaintiffs thus seek to establish that Defendants violated FDA regulations regarding post-approval changes to the manufacturing process by alleging that changes to the dissolution test method should have been reported through a Changes Being Effected in 30 Days ("CBE-30") submission to FDA.[118] But Plaintiffs' claim is wholly inconsistent with FDA's reporting scheme and unsupported by the facts as alleged. Moreover, such violations, even if true, do not render a drug adulterated.

As the Petition acknowledges, the proper reporting of post-approval changes (such as those to analytical test methods) for an approved drug is set out in regulations promulgated by FDA, which create three broad categories, each with their own reporting requirements.[119] "Major changes" are those "that ha[ve] a substantial potential to have an adverse effect on the identity, strength, quality, purity or potency of the drug product" as it relates to safety or efficacy and require FDA approval of a "prior-approval supplement" or "PAS" *before* the change is made.[120] "Moderate changes" are those that have only a "moderate" potential to impact the above-

---

[116] *See*, *e.g.*, *John D. Copanos & Sons*, 854 F.2d at 523 (holding that adulteration was established where FDA identified violations of specific CGMP regulations, including 21 C.F.R. § 211.160(b)(4), which governed the calibration of laboratory equipment "at suitable intervals in accordance with an established written program").
[117] *See* FAP ¶¶ 59, 127.
[118] FAP ¶¶ 12, 59.
[119] FAP ¶ 59.
[120] 21 C.F.R. § 314.70(b)(1).

referenced characteristics as they relate to the drug's safety or efficacy and can be implemented 30 days after submitting a CBE-30 supplement to FDA, so long as FDA does not object to the change in those 30 days.[121] Lastly, "minor changes" with only a "minimal potential" to impact the drug's above-referenced characteristics as they relate to safety or efficacy can be documented in the drug's next annual report, often long after the change has actually been implemented.[122] The determination of whether a post-approval change needs to be documented in a PAS, CBE-30, or annual report involves a detailed analysis of the change and the likelihood that it will negatively impact the safety or efficacy of a drug.[123]

The Petition alleges that, in order to change the dissolution testing method from Method 5 to Method 6, Defendants were required, but failed, to submit a CBE-30 before implementing the new method.[124] The basis for that allegation lies in the purportedly relevant fact that "relaxation of an acceptance criterion or deletion of a test" to comply with relevant FDA requirements is the type of change that requires a CBE-30.[125] But the Petition then pleads away the suggestion that there was any "relaxation of an acceptance criteri[a]" or "deletion of a test." By Plaintiffs' own admissions, dissolution testing was consistently performed throughout the relevant period.[126] And, importantly, the acceptance criteria, which reflect a range for the percentage of active ingredient

---

[121] 21 C.F.R. § 314.70(c).

[122] 21 C.F.R. § 314.70(d).

[123] 21 C.F.R. § 314.70. Manufacturers describe their proposed method for dissolution testing in the CMC section of the NDA (or DMF in the case of Quillivant). *See* 21 C.F.R. § 314.50(d). When CMC details are proprietary and contained within a DMF, and the DMF holder (here, Tris) wants to make a post-approval change to some aspect of a drug's chemistry, manufacturing, or controls, including a testing method, the DMF holder has to update the DMF with the new information and notify FDA about the change to the DMF. 21 C.F.R. § 314.70. The DMF holder must also inform the NDA holder (here, Pfizer) about the change so that the NDA holder can determine whether the change requires documentation in a PAS, a CBE-30, or annual report. *See* 21 C.F.R. § 314.70(a)(2).

[124] FAP ¶ 59.

[125] *Id.;* 21 C.F.R. § 314.70(c)(2)(iii).

[126] *See* ¶¶ FAP 83, 114 (making clear that while dissolution testing methods may have changed, Tris never stopped conducting such testing).

that must be released by specific time points after reconstitution of the product, remained the same.[127] The only thing that changed was the method for the "sample reconstitution/hydration" process.[128] Plaintiffs are simply wrong on the law and regulatory framework in alleging that Pfizer was obligated to file a CBE-30 with FDA before Tris implemented the alleged method revision.

But even assuming that Defendants should have submitted a CBE-30 describing the dissolution testing method changes, the Petition fails to allege how violating this requirement would have rendered Quillivant adulterated. The FDA regulation cited in support of this argument, 21 C.F.R. § 314.70, does not define any aspect of Current Good Manufacturing Practices. As noted above, to adequately plead that Quillivant was adulterated due to CGMP violations, Plaintiffs must identify at least one CGMP requirement that Defendants allegedly violated. It simply cannot be the case that a plaintiff is permitted to file a cause of action for adulteration predicated on the violation of a CGMP, and then survive a motion to dismiss by citing exclusively to alleged violations of notification obligations that *are not CGMPs*.

***Investigations of OOS Results***.  Plaintiffs also allege that Defendants preferred to implement test method changes rather than investigate why certain dissolution tests were generating OOS results, which somehow rendered Quillivant adulterated.[129] Defendants did investigate dissolution testing failures; the allegations in the Petition reference and describe the very investigations that Defendants conducted.[130] Most importantly, though, the Petition once again neglects to identify why Defendants' investigations failed to satisfy CGMPs. Moreover, the

---

[127] FAP ¶¶ 57, 61.  Specifically, Method 6 is alleged to have added only a requirement that the sample sit for thirty minutes following reconstitution, be sonicated for three minutes, and mixed gently for an additional minute.  There is no allegation that the acceptance criteria changed.
[128] FAP ¶ 51.
[129] FAP ¶ 84.
[130] FAP ¶¶ 70,80.

Petition does not describe in any way how the alleged investigational deficiencies undermined Quillivant's safety or efficacy.

The only details Plaintiffs provide regarding allegedly deficient investigations involve the March 2014 OOS dissolution testing result, which they allege "did not prompt Pfizer to press Tris" for a thorough investigation of "the underlying cause."[131]  For the reasons described above, Plaintiffs' argument is based on a misunderstanding of the facts and the law.[132]  When Tris learned that one of its analysts wrongfully "caus[ed] an increase in the rate of dissolution" while sonicating the batch held in reconstituted form for in-use stability testing,[133] Pfizer submitted a FAR promptly notifying FDA that the samples were sonicated "in error."[134]  The FAR clearly stated that the dissolution testing method would be further revised for clarity on that point.[135]  The FAR thus also put FDA on notice that sonication had been added to the dissolution testing method for testing release samples, and that the test method would be further clarified in the future.

Rather than supporting Plaintiffs' theory, the allegations instead demonstrate that Pfizer fully complied with its regulatory obligations.  FDA guidance instructs that manufacturers investigating OOS results should only proceed to an escalated, full-scale OOS investigation where the initial assessment does not indicate any "meaningful errors" were made in the analytical

---

[131] *See* FAP ¶ 73.  To be sure, Plaintiffs make other allegations about the nature of the investigations conducted by Tris, each of which are too conclusory or internally inconsistent to permit Defendants to respond.  For instance, Plaintiffs note that following the 2012 OOS results for dissolution testing, "Tris blamed the method of mixing the sample instead of conducting a proper manufacturing investigation," despite noting in the very next sentence that "Tris issued a Notice of Investigation for Quillivant" and identifying no purported shortcomings of that investigation.  FAP ¶¶ 53-54.

[132] *See supra* Factual and Legal Background, Section I.B.

[133] FAP ¶ 70.

[134] FAP ¶ 72.

[135] FAP ¶ 71.

method used to arrive at the data.[136] Put differently, if a manufacturer performs an initial assessment and determines that a laboratory error (*e.g.*, a technician misapplying the test method) caused the OOS result, the investigation need not proceed any further.[137] Plaintiffs thus criticize Tris, and by extension, Pfizer, for doing precisely what FDA guidance instructs.

The Petition admits that Pfizer again appropriately filed a FAR following OOS testing results in 2016, engaged in discussions with FDA about the proper course of action to investigate those results, and "agreed to commit to internally narrowing Quillivant's dissolution test specifications."[138] This FAR notification is significant for two reasons. First, it demonstrates that when made aware of problems that required reporting to FDA, Pfizer complied with its legal obligations to report. Second, it provided FDA with the opportunity to take action to prevent further distribution of the product, if the agency thought that step was appropriate. But FDA did not seek to enjoin further distribution of the product. Rather, Pfizer ultimately recalled certain impacted Quillivant batches after conducting investigations into dissolution testing results, and FDA permitted release of other potentially impacted batches (nearly double the number of batches Pfizer recalled) in the context of an ongoing shortage of ADHD medications.[139] Plaintiffs now claim that the OOS results were not properly investigated and somehow adulterated the very product that FDA continued to permit to be released to the market despite knowing of issues with dissolution testing. Further, Plaintiffs do not allege how the investigations into OOS results that

[136] *See* U.S. Food & Drug Admin., *Guidance for Industry Investigating Out-of-Specification (OOS) Test Results for Pharmaceutical Production* (May 2022), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/investigating-out-specification-oos-test-results-pharmaceutical-production-level-2-revision.
[137] *Id.*
[138] FAP ¶ 82.
[139] *See Urgent*, *supra* note 96.

they concede occurred actually violated any CGMP requirements, or that they rendered Quillivant in any way unsafe or ineffective.

2. Plaintiffs fail to allege that Defendants' conduct related to particle size testing violated CGMPs to render Quillivant adulterated.

In their relentless effort to attribute unsupported and unjustified motives to otherwise clearly legal actions, Plaintiffs also allege that Defendants sought FDA permission through submission of a PAS to remove particle size testing from Quillivant's battery of pre-release tests in order to avoid conducting investigations into particle size testing failures.[140] As a threshold matter, it cannot be the case that making a submission to FDA with a proposed change under the *most stringent* reporting framework, the PAS, and then making no changes to the testing methods for particle size while FDA considered that request, somehow rendered Quillivant adulterated. That is because there is nothing wrong with asking for FDA's permission to remove a testing requirement that was contemplated by Quillivant's DMF. On the contrary, the process as alleged—with Tris suggesting a change and Pfizer submitting a PAS to FDA[141]—is precisely the conduct that FDA expects.[142] Moreover, the request submitted in the PAS was particularly appropriate here because there is no generally applicable FDA requirement that particle size testing be conducted at all.[143] In fact, FDA has promulgated non-binding guidance stating that "for *some* new drug substances intended for use in solid or suspension drug products, particle size can have a significant effect" on drug performance and that "[i]n such instances, testing for particle size

---

[140] FAP ¶ 89.

[141] FAP ¶ 94.

[142] *See* U.S. Food & Drug Admin., *Guidance for Industry: Changes to an Approved NDA or ANDA* (Apr. 2004), https://www.fda.gov/files/drugs/published/Changes-to-an-Approved-NDA-or-ANDA.pdf.

[143] *See* 21 C.F.R. §§ 820.1–820.5.

distribution should be carried out."[144] By its own language, FDA guidance concedes that particle size testing will be appropriate only in "some" cases and, therefore, asking FDA to evaluate whether Quillivant was such a case—particularly where the DMF holder has stated that particle size testing is not necessary—does nothing to establish that Quillivant was adulterated.

Plaintiffs, perhaps cognizant of this hurdle, summarily allege that Tris recorded OOS results for particle size testing from 2014 to 2017 and failed "to properly conduct investigations into the root causes of the particle-size failures," which violated the law and rendered Quillivant adulterated.[145] Although manufacturers are required to conduct a "thorough[] investigation" following the receipt of OOS results that are not due to laboratory error, and such an investigation should "extend to other batches of the same drug product and other drug products that may have been associated with the specific failure or discrepancy," FDA mandates only that manufacturers produce a written record of the investigation that "include[s] the conclusions and follow-up."[146] Defendants complied with this requirement.

Other than offhandedly stating that Defendants failed to "properly conduct investigations" into purported particle size issues, Plaintiffs do not allege that Defendants failed to take any of the required steps described above.[147] Instead, the Petition reflects that Tris *did* investigate particle size testing failures, but asserts that Defendants are supposedly at fault because Tris did not find a "true root cause."[148] The Petition leaves unspoken *why* this renders Quillivant adulterated, since,

---

[144] International Conference on Harmonisation [sic]; Guidance on Q6A Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances, 65 Fed. Reg. 83,041 (Dec. 29, 2000) (emphasis added).
[145] FAP ¶ 98.
[146] 21 C.F.R. § 211.192
[147] FAP ¶¶ 55, 69, 76, 119.
[148] FAP ¶ 87.

as noted above, there is no explicit statutory or regulatory obligation requiring the identification of "true root cause" as part of an investigation, which makes good sense considering even the most thorough investigations can fail to identify a "true root cause." Accordingly, once again, Plaintiffs fail to meet the minimum burden of alleging how Defendants' conduct violated a specific CGMP requirement,[149] and leave the Defendants—and more importantly, the Court—without fair notice as to what obligation Defendants violated and how Defendants supposedly did so.

3. The Petition itself undermines Plaintiffs' theory that Defendants violated CGMPs in connection with Defendants' investigation into complaints regarding lack-of-effect.

Lastly, Plaintiffs allege that Defendants failed to investigate lack-of-effect complaints, and that failure rendered Quillivant adulterated. But again, Plaintiffs have not identified a single CGMP requirement with which Defendants failed to comply during their purportedly "improper" investigation, nor have Plaintiffs explained how the Defendants' investigation violated that regulation. This is with good reason. FDA anticipates that pharmaceutical manufacturers will receive complaints and, for this reason, FDA regulations outline protocols for handling such complaints.[150] CGMP regulations governing investigations related to "the possible failure of a drug product to meet any of its specifications" require that "lack-of-effect" complaints be reviewed by the manufacturer's quality control unit, and that this unit make a determination regarding whether an investigation is warranted.[151] Additionally, complaint handling procedures should contain "provisions for review to determine whether the Petition represents a serious and unexpected adverse drug experience which is required to be reported to [FDA]."[152] Neither of

---

[149] *John D. Copanos & Sons*, 854 F.2d at 514.
[150] 21 C.F.R. § 211.198(a).
[151] *Id.*
[152] *Id.*

- 30 -

those regulations—or any others for that matter—prescribe how a complaint investigation should be conducted.[153]

The Petition concedes that Defendants took all required steps when it acknowledges that Tris did in fact investigate lack-of-effect complaints and subsequently sent Pfizer a memorandum in May 2015 documenting the steps it had taken.[154] This investigation memorandum noted that relevant samples met the dissolution release specifications and that there were "no discrepancies noted in the manufacturing or packaging processes that would have resulted in the report of lack-of-effect."[155] Undeterred by the absence of any legal or factual basis for the allegation, Plaintiffs press full steam ahead by mischaracterizing that investigation as "improper[]" and thus in violation of manufacturing practice obligations because of Defendants' "inability to properly compare the consistency of the [Quillivant] batches referenced in the lack-of-effect claims."[156] It is entirely unclear what Plaintiffs mean by this allegation. Plaintiffs do not attempt to explain (i) what consistency comparison should have been done that was not conducted, (ii) what is contemplated by "consistency," or (iii) what information such testing would have provided. Further, the Petition points to no CGMP regulation that mandates consistency comparison testing—a concept with no defined meaning—in order for an investigation to be considered "proper" or sufficient. That failure occurs because no such regulation exists. The Petition thus fails to provide an adequate basis in law to support the claim that Quillivant was adulterated as a result of Defendants' investigations into lack-of-effect complaints.

---

[153] *See id.*
[154] FAP ¶ 101.
[155] *Id.*
[156] FAP ¶ 109.

It is striking that the Petition acknowledges and then ignores the import of FDA's awareness of these lack-of-effect complaints. The Petition acknowledges that FDA was aware of the lack-of-effect complaints and asked additional questions about them.[157] This awareness reflects both that Pfizer fulfilled its regulatory complaint reporting responsibilities in compliance with the law and that FDA did not see fit to request removal of the batches associated with the complaints because it was not actually concerned about the safety or efficacy of marketed batches that were subject to such complaints. Despite Plaintiffs' efforts to obfuscate, the fact remains that FDA continued to work with Defendants to resolve the issues that were properly reported[158] and to allow the product to remain on the market.

**B.** **Even if Quillivant had been "adulterated" based on a CGMP violation, reimbursement was still authorized under the TMFPA.**

Even if this Court were to find that Plaintiffs adequately alleged that Quillivant was "adulterated" (strictly speaking) based on a CGMP violation, which it should not, Plaintiffs have not sufficiently alleged that Texas Medicaid would not have authorized the payment of claims for Quillivant as a result. In other words, Plaintiffs do not allege that Texas Medicaid views every "foot fault" or failure to comply perfectly with CGMPs—especially related to complex and highly technical issues like those that would in theory have been implicated here if Plaintiffs had cited any—as material to its reimbursement decisions.

It is clear from both its text and historical alignment with other health care fraud statutory regimes (primarily the federal FCA) that the TMFPA is designed to detect and deter fraudulent conduct that could cause the State to expend taxpayer resources on medications for which it might

---

[157] FAP ¶ 100.
[158] FAP ¶ 82.

- 32 -

not otherwise pay. Indeed, Section 36.002(7) as a whole is squarely focused on claims for payment that are "unauthorized or greater-than-authorized" due to the seriousness of the conduct it seeks to proscribe,[159] including claims for services not "approved . . . by a treating physician" and products that are "substantially inadequate" when "compared to generally recognized standards . . . within the health care industry."[160] And the Petition states as much, alleging that Defendants' conduct "*resulted in* millions of dollars of ***unauthorized or greater-than-authorized reimbursements*.*"[161]

Pfizer submits to this Court that the TMFPA as a whole is not intended to reach conduct that is immaterial to Texas Medicaid's payment decision, including technical CGMP violations that do not impact a product's safety or efficacy.[162] To conclude that every claim for a drug product that was manufactured in a facility where a CGMP violation occurred is *unauthorized*— no matter how minor or technical the violation or its potential impact on safety or effectiveness— would lead to an absurd result.

Notably, the TMFPA's focus on conduct that is material to the payment decision mirrors the requirements of the federal FCA, on which it is modeled.[163] Indeed, courts have routinely dismissed cases where a "[r]elator does not sufficiently allege th[at] concealed [C]GMP violations were material" precisely because it would "turn the FCA into a tool with which a jury of six people could retroactively eliminate the value of FDA approval and effectively require that a product

---

[159] *See* FAP ¶ 128.
[160] Tex. Hum. Res. Code § 36.002(7)(C) § 36.002(7).
[161] *See* FAP ¶ 128 (outlining Plaintiff's claim under Tex. Hum. Res. Code § 36.002(7)(C)) (emphasis added).
[162] *United States ex rel. Yu v. Grifols USA, LLC*, No. 1:17-cv-2226, 2021 WL 5827047, at *12 (S.D.N.Y. Dec. 8, 2021), *aff'd*, No. 22-107, 2022 WL 7785044 (2d Cir. Oct. 14, 2022) ("Given that Relator alleges only speculative harms resulting from the alleged [C]GMP violations, the Court sees no basis in Relator's allegations to supplant [] FDA's decision-making with that of a court or jury.").
[163] *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016); ("The materiality standard is demanding. The False Claims Act is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations."); *Malouf v. State*, 656 S.W.3d 402, 407 (Tex. App.—El Paso 2022, pet. filed) (noting that the TMFPA is modeled on the FCA).

largely be withdrawn from the market even when FDA itself sees no reason to do so."[164]  Speaking directly to what the State is seeking to do in this case, that court went on to explain that there was a lack of materiality to technical CGMP compliance "because payment is conditioned on FDA approval, which has been granted and never withdrawn, rather than [C]GMP compliance."[165]  And while the State of Texas has inquired about more than mere FDA approval for Quillivant, it has never inquired about the conduct it was fully aware of and now alleges was fraudulent and thus cannot allege that the conduct would have affected the government's decision to pay for the product.[166]

Recognizing, and seeking to avoid, the absurdity that would result if every technical noncompliance with a federal regulation or guidance document could sustain a fraud claim, the U.S. Supreme Court has established guideposts for analyzing what conduct is likely to impact a payment decision (*i.e.*, whether it is material to the payment decision).[167]  Under this framework "[m]inor or insubstantial" violations of federal law or regulation are insufficient to sustain a fraudulent payments claim, and even the government's decision to "expressly designate[]" a provision as a condition of payment is "relevant to [the materiality analysis] but not dispositive."[168] A purely technical violation is not material even if "the Government would have the option to decline to pay if it knew of the defendant's noncompliance" and, instead, the government must show (or allege) that it "consistently refuses to pay claims in the mine run of cases based on" the violation alleged.[169]

---

[164] *Grifols USA, LLC*, 2021 WL 5827047, at *12 (quoting *D'Agostino v. ev3*, Inc., 845 F.3d 1, 8 (1st Cir. 2016)).
[165] *Id.* at 8.
[166] *Escobar*, 579 U.S. at 194 (2016) (explaining that the FCA targets fraud, rather than technical regulatory violations).
[167] *Id.* at 192-93.
[168] *Id.* at 190.
[169] *Id*. at 196.

These guideposts are instructive here, and Plaintiffs fail to heed their advice. To begin, Plaintiffs never allege that HHSC treated strict CGMP compliance as a condition of payment during the relevant time period.[170] Courts have consistently recognized that "compliance with [] CGMPs is not required for payment by Medicare and Medicaid."[171] Tellingly, the Petition also does not allege that HHSC has ever denied any claims based on purported violations of CGMP regulations.[172] Nor are there any reported cases where the State or a relator successfully brought TMFPA claims solely based on purported CGMP violations. Plaintiffs therefore certainly cannot allege that HHSC consistently refuses to pay claims in the "mine run of cases."[173] As courts have stated in the FCA context, allegations about the government's prior payment decisions are vital because they relieve the court from having to "opine in the abstract" about materiality.[174] Courts have thus repeatedly dismissed FCA claims that fail to plead facts about the government's prior payment decisions, as Plaintiffs have done here.[175]

Beyond failing to allege that Texas Medicaid requires strict compliance with CGMPs as a condition of payment, Plaintiffs cannot overcome the fact that Quillivant has continued to remain

[170] *Id.* at 196.

[171] *United States ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 702 (4th Cir. 2014) (dismissing FCA claims premised on CGMP violations involving packaging).

[172] *See United States ex rel. Schimelpfenig v. Dr. Reddy's Lab'ys Ltd.,* No. 11-cv-4607, 2017 WL 1133956, at *1 (E.D. Pa. Mar. 27, 2017) (dismissing FCA claims based on alleged violations of the Poison Prevention Packaging Act because, among other things, the relators did not allege that the government ever refused payment of any claim based on non-compliance with federal packaging requirements).

[173] *Escobar,* 579 U.S. at 196.

[174] *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1032 (D.C. Cir. 2017) (affirming the district court's grant of summary judgment on FCA claim for failure to establish materiality),

[175] *See United States ex rel. Scharff v. Camelot Counseling*, No. 13-cv-3791, 2016 WL 5416494, at *8 (S.D.N.Y. Sept. 28, 2016) (dismissing FCA claim and noting plaintiff's failure to plead facts about the government's prior payment decisions); *see also Knudsen v. Sprint Commc'ns. Co.*, No. C13-04476, 2016 WL 4548924, at *14 (N.D. Cal. Sept. 1, 2016) (finding complaint insufficiently alleged materiality "because it did not further allege that the government was unaware of the alleged . . . violations").

on the VDP formulary and Texas PDL from its initial permanent inclusion to today.[176] After officially adding Quillivant to its PDL in 2014, Texas Medicaid has never revisited that decision and has consistently paid for the product without any prior authorization, including after the Warning Letter was publicly released in March 2018.[177] This fact completely undercuts any suggestion that Texas Medicaid would not have reimbursed claims had it known about Quillivant's purported CGMP violations. That Texas Medicaid continued to pay for Quillivant despite knowledge of the purported issues with dissolution testing is hardly surprising given FDA's position on the subject: Despite receiving multiple FARs and notices regarding OOS results starting in 2014,[178] despite issuing 483 observations to Tris in 2017,[179] and despite issuing a DMF letter to Tris in 2017[180] and a Warning Letter to Tris in 2018,[181] FDA still permitted Quillivant to remain on the market. Even more, FDA explicitly allowed batches of Quillivant that potentially failed to meet their dissolution testing specifications to be released to the market in March 2018 with full knowledge of the allegations that Plaintiffs have used as the basis of their Petition,[182] which it would not have done if it had patient safety concerns with Quillivant.[183] FDA is the

---

[176] Texas Health & Human Servs., *Texas Preferred Drug List, Texas Medicaid PDL and PA Criteria* 136 (Jan. 25, 2024), https://www.txvendordrug.com/sites/default/files/docs/2024-0125-preferred-drug-list.pdf.

[177] *See* FAP ¶ 118.

[178] FAP ¶¶ 70, 82.

[179] FAP ¶¶ 44, 111.

[180] FAP ¶ 114.

[181]*See Warning Letter, supra* note 97.

[182] *See Urgent*, *supra* note 96 ("In order to alleviate the current drug shortage of Quillivant XR . . . , Pfizer is coordinating with the U.S. Food and Drug Administration (FDA) to help ensure availability of the drug. Accordingly, Pfizer is releasing eleven lots [] of Quillivant XR to address the current critical shortage.").

[183] *See* U.S. Food & Drug Admin., *Frequently Asked Questions (FAQs) about Drug Shortages* (Oct. 11, 2023), https://www.fda.gov/drugs/drug-shortages/frequently-asked-questions-about-drug-shortages ("FDA is responsible for ensuring that safe, effective drugs are available for U.S. patients. . . . FDA does everything possible to work with firms to address any potential risks to keep medically necessary products available while also ensuring there is not going to be harm to patients associated with the quality issues.").

country's primary regulator of drug products,[184] and one would expect Texas Medicaid to rely on FDA's assessment that even Quillivant that may have failed to meet its dissolution specifications should be distributed because the risk of patients lacking access to the drug far outweighed any potential problems caused by any theoretical dissolution testing anomalies.

The State of Texas cannot have it both ways. The Attorney General's office must not be allowed to second-guess Texas Medicaid's decision to pay for Quillivant in their quest to play "gotcha" with the world's largest pharmaceutical manufacturer, when both FDA and Texas Medicaid appear to have concluded that any alleged CGMP violation did not impact the safety or efficacy of Quillivant, or in any way deprive HHSC of the "essence of the bargain" such that any claim paid by Texas Medicaid for Quillivant was unauthorized.[185]

## II. PLAINTIFFS' CAUSES OF ACTION UNDER SECTIONS 36.002(1) AND 36.002(4)(B) REGARDING PFIZER'S ALLEGED FALSE STATEMENTS OR MISREPRESENTATIONS FAIL AS A MATTER OF LAW.

Plaintiffs' causes of action under both Texas Human Resources Code Section 36.002(1) and Section 36.002(4)(B) center on alleged false statements or misrepresentations by Pfizer during the VDP application process. First, Plaintiffs allege that Pfizer made a false statement or misrepresentation when it certified on the VDP application that Quillivant was not in violation of federal or state law.[186] Second, Plaintiffs allege that Pfizer made a false statement or misrepresentation when it committed to updating Texas Medicaid as to any change in Quillivant's

---

[184] *Cf. Dr. Reddy's Lab'ys Ltd.,* 2017 WL 1133956, at *1 (noting that "Plaintiffs' own pleadings reflect the existence of federal agencies equipped with the administrative power to address Defendants' statutory and regulatory violations," so allowing the plaintiffs sue based on the defendants' noncompliance with federal packaging requirements would bypass the regulatory scheme that was "established to address noncompliance with those regulations").

[185] *Escobar,* at 194 n.5.

[186] *See* FAP ¶¶ 124, 126.

"product status."[187]  These causes of action rely on the foundational assumption that Quillivant was adulterated and, thus, in violation of federal and state law.  But even setting aside the absence of an adequately pled adulteration claim, Plaintiffs' two causes of action concerning false statements or misrepresentations allegedly made by Pfizer in connection with the VDP application also fail for independent reasons: Pfizer did not make any false statements or misrepresentations in its January 2013 VDP application, and Pfizer complied with its obligation to update Texas Medicaid about changes in Quillivant's "product status."

## A.      **Plaintiffs fail to allege that Quillivant was adulterated, or otherwise in violation of federal or state law, at the time of Pfizer's VDP application.**

Plaintiffs' allegations concerning the VDP application present a clear problem of timing with which Plaintiffs wholly fail to grapple.  Plaintiffs allege that Pfizer made a false statement or misrepresentation when it certified in the VDP application that Quillivant "was not in violation of federal and state law."[188]  But Plaintiffs conveniently omit a key portion of this particular certification which states, in its entirety, "I certify that the information submitted is correct to the best of my knowledge and that this product is ***not now*** in violation of either Federal or State Law."[189]

Pfizer submitted the VDP application for Quillivant in January 2013.  The Petition, on its face, concedes that Pfizer did not know until late June 2013 that Tris was considering changing its dissolution test method;[190] did not know until September 2013 about any lack-of-effect

---

[187] *See id.*
[188] *See* FAP ¶¶ 124, 126.
[189] *See* Exhibit A (emphasis added).  Plaintiffs state, "Pfizer successfully campaigned to have Quillivant added to the Texas Medicaid Formulary in June 2013," FAP ¶ 46, and also conveniently omit that Pfizer submitted the application—which Plaintiffs quote directly in the Petition—in January 2013.  *See also* 1 Tex. Admin. Code §§ 354.1921(b), 354.1923(b).
[190] *See* FAP ¶ 64.  The Petition does allege, "As early as October 2012, Pfizer was aware that Quillivant was having difficulty meeting its FDA-mandated testing specifications," FAP ¶ 64, but does not—and cannot—allege that

- 38 -

complaints;[191] and could not have known until at least June 2014 that Quillivant was generating out-of-specification particle size testing results.[192] To be clear, none of these alleged facts or circumstances rendered Quillivant adulterated or otherwise "in violation of federal and state law" for the reasons explained in the preceding section. But even if any one of them caused Quillivant to be in violation of federal or state law, the facts as alleged do not permit a reasonable person to believe that Pfizer knew Quillivant was in violation of federal or state law in January 2013 when the VDP application was submitted.[193]

**B.      Plaintiffs fail to allege that Pfizer "falsely certified" that it would update Texas Medicaid as to any change in "product status."**

Plaintiffs' second theory—that Pfizer falsely certified in its VDP application that it would update Texas Medicaid as to any change in Quillivant's "product status" —fares no better.[194] As a condition of participating in the VDP formulary, pharmaceutical manufacturers are required to "update [Texas Medicaid] with changes to formulation, product status, or availability." [195] Consistent with this requirement, pharmaceutical manufacturers must certify in the VDP application that the manufacturer will "inform [HHSC], in writing, of any changes in formulation, product status, price or availability as herein describe[d]."[196]

---

encountering "difficulty," while ultimately meeting the testing specifications, renders a product adulterated or otherwise in violation of federal or state law.

[191] *See* FAP ¶ 99.

[192] *See* FAP ¶ 87. Additionally, with respect to particle size testing issues, Plaintiffs allege that Tris discovered problems related to particle size testing between "2014 to at least 2016," well after Pfizer submitted the VDP application. *See* FAP ¶ 98.

[193] As previously noted, while Plaintiffs state, "Pfizer successfully campaigned to have Quillivant added to the Texas Medicaid Formulary in June 2013," FAP ¶ 46, it is clear from the face of the application that Pfizer submitted it in January 2013. *See* Exhibit A.

[194] *See* FAP ¶ 125.

[195] 1 Tex. Admin. Code § 354.1921(c)(2).

[196] *See* Exhibit A (emphasis added). The Petition notably omits the qualifier at the end of the certification, which was present in the form as of January 2013 and expressly limited Pfizer's disclosure obligations to changes affecting information *included in the VDP submission*. *Id.*

As a threshold matter, neither the Texas law requiring manufacturers to report changes in a drug's "product status" nor the VDP application define this term.[197] Whatever "product status" means, though, it does not include changes to the method of sample preparation in advance of dissolution release testing or the occurrence of out-of-specification results for certain in-use stability batches. Indeed, HHSC's own use of the term belies any such interpretation. For example, in the context of drug shortages, HHSC's inquiry about "product status change" asks whether "the manufacturer introduced [the] same drug under a different NDC [National Drug Code] or [whether] another manufacturer re-patent[ed] it with different NDC and packing, etc."[198] FDA's usage of "product status" is similar and equally instructive: in its 2019 Investigations Operations Manual, FDA uses the term "product status" to refer to a drug's branding and approval status.[199] Evidently, neither agency uses the term "product status" to refer to compliance (or lack thereof) with post-manufacturing controls like dissolution testing methods.

Plaintiffs' theory that Pfizer violated purported disclosure obligations is further undercut by the language in Pfizer's VDP application.[200] While Plaintiffs repeat multiple times that Pfizer certified on the VDP application that it "agree[d] to update VDP of any changes" in Quillivant's "product status"[201] they conveniently fail to mention that, in fact, the VDP certification required Pfizer to notify Texas Medicaid of changes to Quillivant's product status only "as *herein*

---

[197] 1 Tex. Admin. Code § 354.1921(c)(2) (requiring manufacturers to "update [Texas Medicaid] with changes to formulation, product status, or availability" and affirm that they will do so on their VDP formulary application).

[198] *See* Texas Health & Human Servs., *Form 1315, Drug Shortage Notification*, https://www.hhs.texas.gov/regulations/forms/1000-1999/form-1315-drug-shortage-notification, (last visited Jan. 28, 2024).

[199] FDA Investigations Operations Manual, Chp. 5.5.5.3 - *Drug Status Questions* ("If you have questions about misbranding, new drug status, API/finished drug product status, drug/cosmetic, drug/food (dietary supplement) status, or compounded drugs, contact the Office of Unapproved Drugs and Labeling Compliance[.]").

[200] *See* FAP ¶¶ 124, 126.

[201] *See* FAP ¶ 46.

described."[202] By its terms, then, "product status" refers to information that was included *in Quillivant's VDP application*, which did not address post-manufacturing controls like dissolution testing. Indeed, the State has previously taken the position that the VDP certification's disclosure requirement is limited to changes "pertaining to the [] points specified in the application."[203]

To be clear, Pfizer's VDP application consisted of (i) a completed VDP formulary questionnaire, (ii) a letter from FDA approving Pfizer's NDA for Quillivant, and (iii) a letter in which Pfizer committed to providing five million dollars of product liability protection to defend Texas against claims or lawsuits concerning Quillivant.[204] Pfizer's responses to the VDP formulary questionnaire included information about Quillivant's National Drug Code number, color and flavor, DEA schedule, packaging, recommended daily dosage of the drug and available strengths, recommendation for duration of usage, shelf-life, ingredients, and pricing information.[205] The questionnaire *does not* request any information that would be included in the CMC section of the NDA—or in the DMF in the case of Quillivant—such as the methods for post-manufacturing release controls like dissolution testing. Instead, the correspondence with FDA regarding Quillivant's NDA included proposed carton and container labels for Quillivant with

---

[202] *See* Exhibit A (emphasis added).

[203] *See* Pls.' Fourth Am. Pet., *United States of America ex rel. Allen Jones v. Janssen Pharma. Prods., LP*, No. D-1-GV-04-001288 (Tex. Dist. Ct. (Travis Cnty.) Apr. 8, 2011), Dkt. No. 439 ("In approving VDP applications, HHSC expressly provides that manufacturers are responsible for submitting notification of changes pertaining to the 16 points specified in the application no later than the date such revisions are scheduled to occur. Accordingly, manufacturers owe a continuing duty to Texas Medicaid to supplement information provided with their VDP application after its initial submission to the VDP, including materials provided to physicians."); Notice of Removal, *State of Texas ex. Rel. Layne D. Foote,* No. 1:15-cv-00102-RP, (W.D. Tex. Feb. 4, 2015), ECF No. 1, (attaching Plaintiffs' First Amended Petition, which noted that for Texas' VDP formulary, "the applications state that manufacturers are responsible 'for submitting notification of any changes pertaining to any of the [information required by the application] not later than the date such revisions are scheduled to occur.'") (brackets included in original).

[204] *See* FAP ¶ 46 (referencing the VDP application); *see* Exhibit A.

[205] *See* Exhibit A. When a pharmaceutical manufacturer applies for its drug to be added to the VDP formulary, HHSC requests information about "the recommended daily dosages, formulation of the drug, FDA approval letters, and copies of the package inserts and materials for physicians." FAP ¶ 32.

- 41 -

usage and dosage information, reconstitution instructions for pharmacists, and warnings and precautions related to potential side effects.[206] Pfizer's VDP application included no information whatsoever about Quillivant's dissolution testing, particle size testing, or patient complaints.[207]

Plaintiffs' own allegations defeat their theory that the VDP application itself contained a single false statement or misrepresentation by Pfizer. Their causes of action based on Pfizer's certifications in the VDP application under sections 36.002(1) and 36.002(4)(B) should be dismissed swiftly and with prejudice.

## III. PLAINTIFFS FAIL TO PLEAD THAT PFIZER CONCEALED OR FAILED TO DISCLOSE INFORMATION IN VIOLATION OF 36.002(2).

Plaintiffs' cause of action under Section 36.002(2), which focuses on Pfizer's alleged concealment of information about Quillivant's post-manufacturing controls in connection with the VDP formulary or PDL approval processes, has no basis in law or fact. To begin, Plaintiffs cite no Texas law or regulation to support their allegation that Pfizer was obligated to disclose information about post-manufacturing controls such as dissolution testing, investigations, and complaint reporting in connection with the VDP or submissions to the P&T Committee and its successor, the DUR Board—which is unsurprising because none exists.[208] This omission alone dooms Plaintiffs' theory of liability for purported non-disclosures in the context of Quillivant's VDP and PDL listings. Additionally, Plaintiffs do not sufficiently allege facts demonstrating that any issues with dissolution testing compromised Quillivant's safety or efficacy such that Pfizer

---

[206] *See* Exhibit A.
[207] *See* FAP ¶ 46.
[208] *See* Texas Drug Utilization Review Board Handbook, A-2 Bylaws, A-2.3. Preferred Drug List (defining the PDL as a "[l]ist of covered outpatient drugs reviewed by Board for their efficaciousness, clinical significance, cost-effectiveness, and safety for patients and recommended as either preferred or non-preferred").

was required to disclose this information to the P&T Committee or DUR Board in connection with their decision to list Quillivant on the PDL.[209]

A. **Plaintiffs cite no legal requirement that obligated Pfizer to disclose information related to post-manufacturing controls as part of the VDP formulary or PDL approval processes.**

The VDP formulary and PDL approval processes focus primarily on a drug's safety and efficacy.[210]  As discussed in Factual and Legal Background, Section II, the VDP formulary application does not require any information about post-manufacturing controls like dissolution testing.  After an application is submitted, HHSC will add the drug to the VDP formulary based on a determination of "need," which involves consideration of (i) whether adding the drug to the VDP formulary will expand the arsenal of treatment tools available to Texas physicians; (ii) the predominant use of the drug in an outpatient setting; and (iii) the cost of the drug.[211]  HHSC's approval of a pharmaceutical manufacturer's VDP application serves as the "authorization" of payment through the VDP formulary; there is no separate statute or regulation providing specific considerations to be used by HHSC when approving individual reimbursement claims.[212] Plaintiffs fail to point to any requirement on the VDP application itself, or any other legal requirement, obligating Pfizer to disclose issues related to dissolution testing, particle size testing, or lack-of-effect complaints in the VDP formulary process.  Nor do they allege that such

---

[209] *See* 1 Tex. Admin. Code § 354.1924(c)(2); *see also* Texas Drug Utilization Review Board Handbook, A-5 Documents ("The board recommends drugs and drug classes for inclusion to the PDL based on clinical, financial, and safety at each board meeting.").
[210] *See* FAP ¶¶ 32, 37.
[211] 1 Tex. Admin. Code § 354.1923.
[212] *Id.*

information would have affected the factors HHSC considered when determining the "need" to add Quillivant to the VDP formulary.[213]

Likewise, Plaintiffs cite no legal requirement that obligated Pfizer to disclose purported issues related to post-manufacturing controls during the PDL process. Once HHSC adds a drug to the VDP formulary, the DUR Board (previously the P&T Committee) develops recommendations for Texas's PDL based on a product's safety, efficacy, and cost effectiveness.[214] HHSC ultimately decides which drugs are placed on the PDL based on the DUR Board's recommendations and FDA's assessment of clinical efficacy and safety.[215] During the PDL application process, drug manufacturers present information to the DUR Board in oral meetings and through paper submissions, but there is no standard-form questionnaire and no statutory or regulatory requirement mandating that drug manufacturers provide specific, defined information.[216] Thus, despite Plaintiffs' indignation that "Pfizer had the audacity to provide a presentation to the Texas Medicaid DUR Board [] to maintain Quillivant's preferred status on the PDL" after Tris received negative feedback from FDA concerning dissolution testing, the Petition cites no "obligation"— no contractual provision, statute, or regulation—to disclose information about post-manufacturing controls—or CGMP compliance more broadly—to the DUR Board in connection with seeking or maintaining PDL status.[217]

---

[213] *Id.*

[214] *See* FAP ¶ 37.

[215] *See* 1 Tex. Admin. Code § 354.1924(c)(2)

[216] Texas Administrative Code § 354.1941(d) states that "[t]he DUR Board or its designee must present a summary of any clinical efficacy and safety information or analyses regarding a drug under consideration for a preferred drug list that is provided to the DUR Board by a private entity that has contracted with HHSC to provide the information." 1 Tex. Admin. Code § 354.1923. It does not define *what* private entities must present in terms of clinical efficacy of safety information. *Id.*

[217] As defined in the TMFPA, "obligation" means a "duty, whether or not fixed," that arises from four distinct sources: "(A) an express or implied contractual, grantor-grantee, or licensor-licensee relationship; (B) a fee-based or similar

- 44 -

**B. Plaintiffs do not allege that any purported issues with post-manufacturing controls impacted the safety or efficacy of Quillivant such that Pfizer was required to disclose this information to the P&T Committee or DUR Board.**

As Plaintiffs described, the P&T Committee adds products to the PDL "based on their efficaciousness, clinical significance, cost effectiveness, and safety."[218] But across Plaintiffs' 41-page Petition, they do not sufficiently allege facts to support the inference that the purported issues concerning dissolution testing had any impact whatsoever on patient safety or the overall efficacy of the product.[219]

Indeed, FDA's actions undercut any such inference.[220] After the agency was on notice of the very same dissolution testing issues Plaintiffs malign, FDA did not seek to enjoin further distribution of the product.[221] Rather, Pfizer voluntarily recalled certain impacted Quillivant batches, and FDA permitted release of other impacted batches in the context of an ongoing shortage of ADHD medications.[222] Given FDA's permission to distribute potentially impacted batches,[223] Pfizer had no reason to believe that Quillivant's "clinical efficacy [or] safety" was compromised such that disclosure to the P&T Committee and DUR Board would be required.[224]

---

relationship; (C) a statute or regulation; or (D) the retention of any overpayment." Tex. Hum. Res. Code § 36.001(7-a)(D).

[218] FAP ¶ 77.

[219] *See* 1 Tex. Admin. Code § 354.1924(c)(2) ("In developing its recommendations for the preferred drug lists, the board shall consider the *clinical efficacy, safety,* and cost-effectiveness of and any program benefit associated with a product.") (emphasis added).

[220] *See supra* p. 27.

[221] *Id.*

[222] *See Warning Letter, supra* note 97; *Urgent, supra* note 96.

[223] *See FAQs, supra* note 183 (noting that "[r]egulatory discretion may be employed for a drug to be distributed to address shortages after additional controls are implemented to mitigate significant risk to patients as needed" but only after "ensuring there is not going to be harm to patients").

[224] *Id.*

FDA's actions are particularly noteworthy because Texas Medicaid considers FDA's analysis of clinical efficacy in determining whether to list a drug on the PDL.[225]  Given HHSC's deference to FDA, Quillivant's continuous status as an FDA-approved drug, and FDA's participation in Quillivant drug release decisions in 2018, it is unsurprising that Texas Medicaid never considered removing Quillivant from the PDL since it was added nearly a decade ago despite the very public nature of many of the issues described in the Petition.[226]  This is despite the fact that Texas would have had access to the recall and release notices, which expressly stated that the released lots "may not meet dissolution testing specifications."[227]

Plaintiffs' Petition is devoid of any factual allegations supporting a conclusion that the alleged manufacturing process control concerns with Quillivant posed safety or efficacy concerns such that Pfizer would have been obligated to report such issues to the P&T Committee or DUR Board.  Plaintiffs' attempt to have it both ways, lobbing unfounded accusations at Pfizer while still facilitating its citizens' ready access to Quillivant, should be rejected.  The Court should therefore dismiss Plaintiffs' claim under Section 36.002(2).

## IV.    PLAINTIFFS' ALLEGATIONS FAIL TO SATISFY THE TMFPA'S SCIENTER REQUIREMENT

Even if Plaintiffs could plead that certain batches of Quillivant were adulterated, or that Pfizer made a single material false statement, misrepresentation, or non-disclosure to HHSC,

---

[225] *See* 1 Tex. Admin. Code § 354.1924(c)(2) (noting that one of the factors considered by HHSC in ultimately determining whether to add a drug to the PDL is the "clinical efficacy of the drug, consistent with the determination of the Food and Drug Administration" and the DUR Board's recommendation).

[226] *See Warning Letter, supra* note 97;  *Urgent, supra* note 96.

[227] *See Urgent*, *supra* note 96.

- 46 -

Plaintiffs must allege facts sufficient to support a plausible inference that Pfizer acted with a "culpable mental state."[228]  Plaintiffs fail to do so here.

Under the TMFPA, a person acts "knowingly" with respect to information if the person (i) "has knowledge of the information," (ii) "acts with conscious indifference to the truth or falsity of the information," or (iii) "acts in reckless disregard of the truth or falsity of the information."[229] The TMFPA does not define "conscious indifference" or "reckless disregard," but the Texas Supreme Court has said that these terms "require proof that a party knew the relevant facts but did not care about the result."[230]  The definition of "knowingly" under the TMFPA thus closely tracks the FCA's scienter requirement, both in statutory definition and in courts' application of the standard.[231]  As the TMFPA's plain language makes clear, good-faith omissions, mistakes, or negligence—even if sufficient to support a reasonable inference that the claim was false—are insufficient to state a TMFPA claim.[232]  And for good reason: as courts have explained in the analogous FCA context, the inclusion of "knowingly" signifies that the statute "is not an

---

[228] Tex. Hum. Res. Code § 36.0011(a); *Chapman v. Paul R. Wilson, Jr., D.D.S., Inc.*, 826 S.W.2d 214, 219 (Tex. App.—Austin 1992, writ denied) (noting, in the context of a different statute, that a "'[k]nowing' action is not the equivalent of negligent action."); *see also United States ex rel. Jacobs v. Walgreen Co.*, No. 21-20463, 2022 WL 613160, at *1 (5th Cir. Mar. 2, 2022) ("Our precedent is clear: 'th[e] mens rea requirement [of an FCA claim] is not met by mere negligence or even gross negligence.'") (citation omitted).
[229] Tex. Hum. Res. Code § 36.0011(a).
[230] *See Malouf*, 656 S.W.3d at 412 (quoting *City of San Antonio v. Hartman*, 201 S.W.3d 667, 672 n.19 (Tex. 2006)); *see also Tarrant Cty. v. Bonner*, 574 S.W.3d 893, 901 (Tex. 2019) ("Conscious indifference denotes a decision . . . to not care about the consequences of the act which may ultimately lead to that harm.").
[231] *See United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749–50 (2023) ("The FCA defines the term 'knowingly' as encompassing three mental states: First, that the person has actual knowledge of the information. Second, that the person acts in deliberate ignorance of the truth or falsity of the information.  And, third, that the person acts in reckless disregard of the truth or falsity of the information.") (cleaned up); *Dental Health Programs Inc.*, 2021 WL 3213709, at *14 (analogizing the TMFPA to the FCA).
[232] Tex. Hum. Res. Code § 36.0011(a).

appropriate vehicle for policing technical compliance with administrative regulations" as the statute's goal—like the TMFPA's—is "fraud prevention."[233]

Here, Plaintiffs must plead specific facts supporting a plausible inference that Pfizer "knew" Quillivant was adulterated, or that Pfizer "knew" certain information submitted to (or withheld from) HHSC was false or misleading, or, at a minimum, that Pfizer acted with conscious indifference or reckless disregard of these alleged facts.[234] Plaintiffs' inconsistent efforts to paint Pfizer as having a culpable mental state fall flat.

As discussed *supra* Argument, Section II, Plaintiffs do not—and cannot—allege that Pfizer "knew" Quillivant was adulterated in January 2013 when the VDP application was submitted.[235] At best, the Petition is inconsistent with respect to allegations of Pfizer's mental state *after* the VDP application process. The Petition alleges that Pfizer may have been aware of certain issues related to dissolution testing, while at other times explicitly stating that Pfizer lacked access to the same relevant information.[236] Similarly, the Petition alleges that Tris misled Pfizer and withheld information about the dissolution testing method revisions and those changes' potential effect on investigations involving lack-of-effect complaints[237] and particle size testing failures.[238] The

---

[233] *United States ex rel. Gudur v. Deloitte Consulting LLP*, 512 F. Supp. 2d 920, 931 (S.D. Tex. 2007) (quoting *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999)).

[234] *Dental Health Programs Inc*., 2021 WL 3213709, at *8-10 (dismissing relator's false certification claim based on incorrect information the defendant included in a submission to HHSC).

[235] As previously noted, Plaintiffs state, "Pfizer successfully campaigned to have Quillivant added to the Texas Medicaid Formulary in June 2013," FAP ¶ 46, but Pfizer submitted the application in January 2013.

[236] *Compare* FAP ¶ 64 (alleging that Pfizer "was aware that Quillivant was having difficulty meeting its FDA-mandated specification") *with* FAP ¶ 90 (stating that Pfizer did not know about dissolution testing issues in 2014).

[237] *See* FAP ¶ 101 ("Tris's Senior Manager of Compliance sent Pfizer a memo addressing the steps Tris had taken to investigate lack of effect complaints concerning Quillivant. Among other things, the memo assured Pfizer that Tris had tested relevant samples for dissolution and the samples had met release specifications. The memo concluded there 'were no discrepancies noted in the manufacturing or packaging processes that would have resulted in the report of a lack of effect.'")

[238] *See* FAP ¶¶ 90, 93-94.

Petition also repeatedly acknowledges that Tris (not Pfizer) received communications from FDA on the dissolution testing changes that were contained in the DMF filing—not the NDA submission that Pfizer submitted.[239] And Plaintiffs concede that when Pfizer learned of Quillivant's out-of-specification dissolution test results, Pfizer filed multiple FARs to alert FDA.[240]

What is clear from the Petition is that when Pfizer knew about the issues with respect to OOS dissolution results, it immediately notified FDA.[241] The Petition admits that in December 2016, Pfizer notified FDA of the dissolution testing issues and that "Pfizer agreed to commit to internally narrowing Quillivant's dissolution specifications."[242] It also details FDA's involvement in addressing dissolution testing issues from 2017 through 2018, and the fact that Tris—not Pfizer— received Form 483 Inspection Observations, a DMF Deficiency Letter, and a Warning Letter.[243] Conveniently, though, the Petition fails to provide important context including that Pfizer recalled certain impacted Quillivant batches, and that FDA permitted release of other batches with full knowledge that those batches may not have met their dissolution testing specifications.[244] FDA's involvement is significant. It demonstrates that Pfizer proactively engaged with its primary regulator and complied with its legal obligations as soon as it was made aware of problems that required reporting to FDA. In other words, once Pfizer knew the relevant facts, the Company clearly "cared about the result"[245] and took steps to fix identified problems and do the right thing.

---

[239] *See* FAP ¶¶ 111, 114.
[240] *See* FAP ¶ 82.
[241] *Id.*
[242] *Id.*
[243] *See* FAP ¶¶ 111-119.
[244] *See* FAP ¶ 110; *Urgent, supra* note 96.
[245] *See Malouf*, 656 S.W.3d at 412; *see also Bonner*, 574 S.W.3d at 901.

Such behavior is wholly inconsistent with the idea of "conscious indifference" or "reckless disregard."

Importantly, the notifications provided FDA with the opportunity to take action to prevent further distribution of the product if the agency thought that step was appropriate. FDA did not seek to enjoin further distribution of the product, but rather permitted batches to be released to address a drug shortage around the same time the agency issued its Warning Letter to Tris.[246] This decision understandably led Pfizer to believe that there was no impact to the safety and efficacy of the product that would undermine payors' willingness to pay for the product or otherwise cause the submission of false claims.[247] It follows that Pfizer also reasonably believed—based on the enforcement discretion decisions of its primary regulator—that there would be no need to update Texas Medicaid under the VDP formulary rules and regulations.

These reasonable, subjective beliefs foreclose any notion that Pfizer "knowingly" violated the TMFPA. As the Supreme Court recently explained when interpreting the FCA's scienter standard, a person does not "knowingly" violate the FCA where they reasonably believe (even mistakenly) that they have not submitted a false claim.[248] That is because the "knowingly" scienter requirement "track[s] traditional common-law fraud, which ordinarily 'depends on a subjective test' and the defendant's 'culpable state of mind.'"[249] Plaintiffs fail to plead facts sufficient to support a plausible inference that Pfizer acted with actual knowledge, "conscious indifference," or "reckless disregard" that Quillivant was adulterated when Pfizer sought placement for Quillivant

---

[246] *See Warning Letter, supra* note 97; *Urgent, supra* note 96.
[247] *See FAQs, supra* note 183.
[248] *See Schutte*, 598 U.S. at 752.
[249] *Id.*

on the Texas Medicaid formulary and PDL or anytime thereafter.[250] Plaintiffs' causes of action therefore fail to satisfy the TMFPA's scienter requirement and the Petition should be dismissed in its entirety pursuant to Rule 91a.

## CONCLUSION

For the foregoing reasons, Pfizer prays that this Court grant its Rule 91a Motion to Dismiss, dismiss Plaintiffs' claims with prejudice, and grant any such other relief to which Pfizer may be justly entitled.

---

[250] *See* Tex. Hum. Res. Code § 36.0011(a).

February 5, 2024                                    Respectfully submitted,


                                    **THE VAL JONES LAW FIRM**
                                    By: */s/ Val Jones*
                                    George Valton ("Val") Jones
                                    109 West Austin St.
                                    Marshall, TX  75670-3340
                                    State Bar No. 10888050
                                    val@valjoneslaw.com
                                    (903) 927-2220

                                    **FOLEY & LARDNER LLP**
                                    Edward D. ("Ed") Burbach
                                    State Bar No. 03355250
                                    600 Congress Avenue, Suite 2900
                                    Austin, Texas 78701
                                    eburbach@foley.com
                                    (512) 542-7070 / (512) 542-7100 (fax)

                                    **ROPES & GRAY LLP**
                                    Samantha Barrett Badlam
                                    (admitted *pro hac vice*)
                                    2099 Pennsylvania Ave., N.W.
                                    Washington, DC 20006-6807
                                    samantha.badlam@ropesgray.com
                                    (202) 508-4734

                                    **COUNSEL FOR DEFENDANT PFIZER INC.**

# CERTIFICATE OF SERVICE

By my signature below, I hereby certify that a true and correct copy of the foregoing was served on all counsel of record via fileandservetexas.com in accordance with the Texas Rules of Civil Procedure on this 5th day of February, 2024.

Jason T. Brown
111 Town Square Place, Suite 400
Jersey City, NJ 07310
Fax: (855) 582-5297
Email: jtb@jtblawgroup.com

Patrick S. Almonrode
111 Town Square Place, Suite 400
Jersey City, NJ 07310
Fax: (855) 582-5297
Email: patalmonrode@jtblawgroup.com

E. Glenn Thames, Jr.
102 North College, Suite 900
Tyler, TX 75702
Fax: (903) 593-0846
Email: glennthames@potterminton.com

Michael E. Jones
102 North College, Suite 900
Tyler, TX 75702
Fax: (903) 593-0846
Email: mikejones@potterminton.com

Jonathan D. Bonilla
Assistant Attorney General
The State of Texas
Office of the Attorney General
Civil Medicaid Fraud Division
PO Box 12548, Capitol Station
Austin, TX 78711
Fax: (512) 320-0667
Email: Jonathan.Bonilla@oag.texas.gov

Jessica L. Weltge
Assistant Attorney General
The State of Texas
Office of the Attorney General
Civil Medicaid Fraud Division
PO Box 12548, Capitol Station
Austin, TX 78711
Fax: (512) 320-0667
Email: Jessica.Weltge@oag.texas.gov

Jordan Underhill
Assistant Attorney General
The State of Texas
Office of the Attorney General
Civil Medicaid Fraud Division
PO Box 12548, Capitol Station
Austin, TX 78711
Fax: (512) 320-0667
Email: Jordan.Underhill@oag.texas.gov

Barrett Reid Howell
Texas State Bar. No. 24032311
300 Crescent Court
Suite 200
Dallas, TX 75201
Fax: 972.534.1297
barrett.howell@blankrome.com

John F. Hundley
1909 K Street, NW, 12th Floor
Washington, DC 20006-1157
Fax: (202) 661-2299
hundleyj@ballardspahr.com

Harry "Gil" Gillam, Jr.
303 S. Washington Ave.
Marshall, Texas 75670
gil@gillamsmithlaw.com

Tom Gorham
303 S. Washington Ave.
Marshall, Texas 75670
tom@gillamsmithlaw.com

Christopher A. Hatfield
1909 K Street, NW, 12th Floor
Washington, DC 20006-1157
Fax: (202) 661-2299
hatfieldc@ballardspahr.com

*/s/ Val Jones*
George Valton ("Val") Jones

**APPENDIX D**

Relevant Court Orders

TRAP 28.3(e)(2)(B)

Filed 6/13/2024 10:41 AM
Sherry Griffis
District Clerk
Harrison County, Texas

Lori Hightower

Deputy

CAUSE NO. 23-1031

| | | |
|---|---|---|
| THE STATE OF TEXAS *ex rel.* TARIK AHMED | § § § | IN THE DISTRICT COURT |
| *Plaintiffs*, | § § | |
| v. | § § § | 71ST JUDICIAL DISTRICT |
| PFIZER, INC., TRIS PHARMA, INC., and KETAN MEHTA, | § § § | |
| *Defendants*. | § § | HARRISON COUNTY, TEXAS |

## ORDER DENYING DEFENDANT PFIZER INC.'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED PEITION

CAME ON THIS DAY to be heard in the above-numbered and styled cause *Defendant Pfizer Inc.'s Motion to Dismiss Plaintiffs' First Amended Petition* and Plaintiffs' *Response*. The Court, having considered said Motion is of the opinion that it should be DENIED in all respects. It is therefore:

ORDERED *Defendant Pfizer Inc.'s Motion to Dismiss Plaintiffs' First Amended Petition* is DENIED in all respects.

SIGNED this _____13_____ day of _____June_____, 2024.

_____
HONORABLE JUDGE BRAD MORIN

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Janice Garrett on behalf of Jonathan Bonilla
Bar No. 24073939
Janice.Garrett@oag.texas.gov
Envelope ID: 88386608
Filing Code Description: Order
Filing Description: ORDER DENYING DEFENDANT PFIZER INC.'S MOTION TO DISMISS PLAINITFFS' FIRST AMENDED PETITION
Status as of 6/13/2024 10:42 AM CST

Associated Case Party: PFIZER INC.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Edward D. Burbach | 3355250 | eburbach@foley.com | 6/3/2024 4:31:34 PM | SENT |

Associated Case Party: THE STATE OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jonathan D.Bonilla | | Jonathan.Bonilla@oag.texas.gov | 6/3/2024 4:31:34 PM | SENT |
| Jordan Underhill | | Jordan.Underhill@oag.texas.gov | 6/3/2024 4:31:34 PM | SENT |
| Jessica Weltge | | jessica.weltge@oag.texas.gov | 6/3/2024 4:31:34 PM | SENT |

Associated Case Party: TARIK AHMED

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason T.Brown | | jtb@jtblawgroup.com | 6/3/2024 4:31:34 PM | SENT |
| Patrick S.Almonrode | | patalmonrode@jtblawgroup.com | 6/3/2024 4:31:34 PM | SENT |
| Michael E.Jones | | mikejones@potterminton.com | 6/3/2024 4:31:34 PM | SENT |
| E. GlennThames | | glennthames@potterminton.com | 6/3/2024 4:31:34 PM | SENT |

Associated Case Party: TRIS PHARMA, INC.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Harry L.Gillam | | gil@gillamsmithlaw.com | 6/3/2024 4:31:34 PM | SENT |
| Tom Gorham | | tom@gillamsmithlaw.com | 6/3/2024 4:31:34 PM | SENT |
| Barrett ReidHowell | | barrett.howell@blankrome.com | 6/3/2024 4:31:34 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Janice Garrett on behalf of Jonathan Bonilla
Bar No. 24073939
Janice.Garrett@oag.texas.gov
Envelope ID: 88386608
Filing Code Description: Order
Filing Description: ORDER DENYING DEFENDANT PFIZER INC.'S MOTION TO DISMISS PLAINITFFS' FIRST AMENDED PETITION
Status as of 6/13/2024 10:42 AM CST

Associated Case Party: TRIS PHARMA, INC.

| | | | | |
|---|---|---|---|---|
| Barrett ReidHowell | | barrett.howell@blankrome.com | 6/3/2024 4:31:34 PM | SENT |
| John F.Hundley | | hundleyj@ballardspahr.com | 6/3/2024 4:31:34 PM | SENT |
| Christopher Hatfield | | hatfieldc@ballardspahr.com | 6/3/2024 4:31:34 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Diana Arias | | diana@gillamsmithlaw.com | 6/3/2024 4:31:34 PM | SENT |
| Olivia Arias | | olivia@gillamsmithlaw.com | 6/3/2024 4:31:34 PM | SENT |
| Rosa Ferguson | | rosa@gillamsmithlaw.com | 6/3/2024 4:31:34 PM | SENT |
| Stefan Schropp | | Stefan.Schropp@ropesgray.com | 6/3/2024 4:31:34 PM | SENT |
| Deanna Foster | | Deanna.Foster@ropesgray.com | 6/3/2024 4:31:34 PM | SENT |
| Samantha Barrett | | Samantha.Badlam@ropesgray.com | 6/3/2024 4:31:34 PM | SENT |
| Ed Burbach | | eburbach@foley.com | 6/3/2024 4:31:34 PM | SENT |
| Val Jones | | val@valjoneslaw.com | 6/3/2024 4:31:34 PM | SENT |
| McKellar Karr | | mckellar@gillamsmithlaw.com | 6/3/2024 4:31:34 PM | SENT |
| Litigation Administrative | | LitigationLegalAdministrativeAssistantsDC@ballardspahr.com | 6/3/2024 4:31:34 PM | SENT |
| Jessica Weltge | | jessica.weltge@oag.tx.gov | 6/3/2024 4:31:34 PM | ERROR |
| Docket Clerk | | DocketClerk_DC@ballardspahr.com | 6/3/2024 4:31:34 PM | ERROR |
| Pfizer Case Team | | QXRTXQuiTamAssociates&Paralegals@ropesgray.com | 6/3/2024 4:31:34 PM | ERROR |
| Lit Docket MCO | | LitDocketInformationGovernance@ropesgray.com | 6/3/2024 4:31:34 PM | SENT |

Associated Case Party: KETAN MEHTA

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Harry L.Gillam | | gil@gillamsmithlaw.com | 6/3/2024 4:31:34 PM | SENT |
| Tom Gorham | | tom@gillamsmithlaw.com | 6/3/2024 4:31:34 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Janice Garrett on behalf of Jonathan Bonilla
Bar No. 24073939
Janice.Garrett@oag.texas.gov
Envelope ID: 88386608
Filing Code Description: Order
Filing Description: ORDER DENYING DEFENDANT PFIZER INC.'S MOTION TO DISMISS PLAINITFFS' FIRST AMENDED PETITION
Status as of 6/13/2024 10:42 AM CST

Associated Case Party: KETAN MEHTA

| Tom Gorham | | tom@gillamsmithlaw.com | 6/3/2024 4:31:34 PM | SENT |
|---|---|---|---|---|
| Barrett ReidHowell | | barrett.howell@blankrome.com | 6/3/2024 4:31:34 PM | SENT |
| John F.Hundley | | hundleyj@ballardspahr.com | 6/3/2024 4:31:34 PM | SENT |
| Christopher Hatfield | | hatfieldc@ballardspahr.com | 6/3/2024 4:31:34 PM | SENT |

Filed 6/13/2024 10:43 AM
Sherry Griffis
District Clerk
Harrison County, Texas

Lori Hightower
Deputy

CAUSE NO. 23-1031

| | | |
|---|---|---|
| THE STATE OF TEXAS<br>*ex rel.* TARIK AHMED | §<br>§<br>§ | IN THE DISTRICT COURT |
| *Plaintiffs,* | §<br>§ | |
| | § | |
| v. | § | 71ST JUDICIAL DISTRICT |
| | § | |
| PFIZER, INC., TRIS PHARMA, INC.,<br>and KETAN MEHTA, | §<br>§ | |
| | § | |
| *Defendants.* | § | HARRISON COUNTY, TEXAS |

## ORDER DENYING DEFENDANT TRIS PHARMA, INC.'S MOTION TO DISMISS

CAME ON THIS DAY to be heard in the above-numbered and styled cause *Defendant Tris Pharma, Inc.'s Motion to Dismiss* and Plaintiffs' *Response.* The Court, having considered said Motion is of the opinion that it should be DENIED in all respects. It is therefore:

ORDERED *Defendant Tris Pharma, Inc.'s Motion to Dismiss* is DENIED in all respects.

SIGNED this ____13____ day of _____June_____, 2024.

_____
HONORABLE JUDGE BRAD MORIN

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Janice Garrett on behalf of Jonathan Bonilla
Bar No. 24073939
Janice.Garrett@oag.texas.gov
Envelope ID: 88388874
Filing Code Description: Order
Filing Description: ORDER DENYING DEFENDANT TRIS PHARMA, INC.'S MOTION TO DISMISS
Status as of 6/13/2024 10:45 AM CST

Associated Case Party: PFIZER INC.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Edward D. Burbach | 3355250 | eburbach@foley.com | 6/3/2024 4:55:50 PM | SENT |

Associated Case Party: THE STATE OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jonathan D.Bonilla | | Jonathan.Bonilla@oag.texas.gov | 6/3/2024 4:55:50 PM | SENT |
| Jordan Underhill | | Jordan.Underhill@oag.texas.gov | 6/3/2024 4:55:50 PM | SENT |
| Jessica Weltge | | jessica.weltge@oag.texas.gov | 6/3/2024 4:55:50 PM | SENT |

Associated Case Party: TARIK AHMED

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason T.Brown | | jtb@jtblawgroup.com | 6/3/2024 4:55:50 PM | SENT |
| Patrick S.Almonrode | | patalmonrode@jtblawgroup.com | 6/3/2024 4:55:50 PM | SENT |
| Michael E.Jones | | mikejones@potterminton.com | 6/3/2024 4:55:50 PM | SENT |
| E. GlennThames | | glennthames@potterminton.com | 6/3/2024 4:55:50 PM | SENT |

Associated Case Party: TRIS PHARMA, INC.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Harry L.Gillam | | gil@gillamsmithlaw.com | 6/3/2024 4:55:50 PM | SENT |
| Tom Gorham | | tom@gillamsmithlaw.com | 6/3/2024 4:55:50 PM | SENT |
| Barrett ReidHowell | | barrett.howell@blankrome.com | 6/3/2024 4:55:50 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Janice Garrett on behalf of Jonathan Bonilla
Bar No. 24073939
Janice.Garrett@oag.texas.gov
Envelope ID: 88388874
Filing Code Description: Order
Filing Description: ORDER DENYING DEFENDANT TRIS PHARMA, INC.'S MOTION TO DISMISS
Status as of 6/13/2024 10:45 AM CST

Associated Case Party: TRIS PHARMA, INC.

| | | | | |
|---|---|---|---|---|
| Barrett ReidHowell | | barrett.howell@blankrome.com | 6/3/2024 4:55:50 PM | SENT |
| John F.Hundley | | hundleyj@ballardspahr.com | 6/3/2024 4:55:50 PM | SENT |
| Christopher Hatfield | | hatfieldc@ballardspahr.com | 6/3/2024 4:55:50 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Diana Arias | | diana@gillamsmithlaw.com | 6/3/2024 4:55:50 PM | SENT |
| Olivia Arias | | olivia@gillamsmithlaw.com | 6/3/2024 4:55:50 PM | SENT |
| Rosa Ferguson | | rosa@gillamsmithlaw.com | 6/3/2024 4:55:50 PM | SENT |
| Stefan Schropp | | Stefan.Schropp@ropesgray.com | 6/3/2024 4:55:50 PM | SENT |
| Deanna Foster | | Deanna.Foster@ropesgray.com | 6/3/2024 4:55:50 PM | SENT |
| Samantha Barrett | | Samantha.Badlam@ropesgray.com | 6/3/2024 4:55:50 PM | SENT |
| Ed Burbach | | eburbach@foley.com | 6/3/2024 4:55:50 PM | SENT |
| Val Jones | | val@valjoneslaw.com | 6/3/2024 4:55:50 PM | SENT |
| McKellar Karr | | mckellar@gillamsmithlaw.com | 6/3/2024 4:55:50 PM | SENT |
| Litigation Administrative | | LitigationLegalAdministrativeAssistantsDC@ballardspahr.com | 6/3/2024 4:55:50 PM | SENT |
| Jessica Weltge | | jessica.weltge@oag.tx.gov | 6/3/2024 4:55:50 PM | ERROR |
| Docket Clerk | | DocketClerk_DC@ballardspahr.com | 6/3/2024 4:55:50 PM | ERROR |
| Pfizer Case Team | | QXRTXQuiTamAssociates&Paralegals@ropesgray.com | 6/3/2024 4:55:50 PM | ERROR |
| Lit Docket MCO | | LitDocketInformationGovernance@ropesgray.com | 6/3/2024 4:55:50 PM | SENT |

Associated Case Party: KETAN MEHTA

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Harry L.Gillam | | gil@gillamsmithlaw.com | 6/3/2024 4:55:50 PM | SENT |
| Tom Gorham | | tom@gillamsmithlaw.com | 6/3/2024 4:55:50 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Janice Garrett on behalf of Jonathan Bonilla
Bar No. 24073939
Janice.Garrett@oag.texas.gov
Envelope ID: 88388874
Filing Code Description: Order
Filing Description: ORDER DENYING DEFENDANT TRIS PHARMA, INC.'S MOTION TO DISMISS
Status as of 6/13/2024 10:45 AM CST

Associated Case Party: KETAN MEHTA

| Tom Gorham | | tom@gillamsmithlaw.com | 6/3/2024 4:55:50 PM | SENT |
|---|---|---|---|---|
| Barrett ReidHowell | | barrett.howell@blankrome.com | 6/3/2024 4:55:50 PM | SENT |
| John F.Hundley | | hundleyj@ballardspahr.com | 6/3/2024 4:55:50 PM | SENT |
| Christopher Hatfield | | hatfieldc@ballardspahr.com | 6/3/2024 4:55:50 PM | SENT |

Filed 8/12/2024 2:25 PM
Sherry Griffis
District Clerk
Harrison County, Texas

Marcia Bayer
Deputy

CAUSE NO. 23-1031

| | | |
|---|---|---|
| THE STATE OF TEXAS *ex rel.* TARIK AHMED, | § § § § | IN THE DISTRICT COURT |
| *Plaintiffs*, | § § | |
| v. | § § | 71ST JUDICIAL DISTRICT |
| PFIZER INC., TRIS PHARMA, INC., and KETAN MEHTA, | § § § | |
| *Defendants*. | § § | HARRISON COUNTY, TEXAS |

## ORDER DENYING DEFENDANTS PFIZER INC. AND TRIS PHARMA, INC.'S JOINT MOTION FOR RECONSIDERATION OR CLARIFICATION AND REQUEST FOR HEARING

CAME ON THIS DAY to be heard in the above-numbered and styled cause *Defendants Pfizer Inc. and Tris Pharma, Inc.'s Joint Motion for Reconsideration or Clarification and Request for Hearing.* The Court, having considered said Motion is of the opinion that it should be DENIED in all respects. It is therefore:

ORDERED *Defendants Pfizer Inc. and Tris Pharma, Inc.'s Joint Motion for Reconsideration or Clarification and Request for Hearing* is DENIED in all respects.

SIGNED this ___12___ day of _____Aug_____, 2024

HONORABLE JUDGE BRAD MORIN

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Janice Garrett on behalf of Jonathan Bonilla
Bar No. 24073939
Janice.Garrett@oag.texas.gov
Envelope ID: 90263044
Filing Code Description: ORDER
Filing Description: ORDER DENYING DEFENDANTS PFIZER INC. AND TRIS PHARMA, INC.'S JOINT MOTION FOR RECONSIDERATION OR CLARIFICATION AND REQUEST FOR HEARING
Status as of 8/14/2024 8:39 AM CST

Associated Case Party: PFIZER INC.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Edward Burbach | 3355250 | eburbach@foley.com | 7/28/2024 2:25:47 PM | SENT |

Associated Case Party: THE STATE OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mary JoToupin | | maryjo.toupin@oag.texas.gov | 7/28/2024 2:25:47 PM | SENT |
| Janice Garrett | | Janice.Garrett@oag.texas.gov | 7/28/2024 2:25:47 PM | SENT |
| Jonathan D.Bonilla | | Jonathan.Bonilla@oag.texas.gov | 7/28/2024 2:25:47 PM | SENT |
| Jordan Underhill | | Jordan.Underhill@oag.texas.gov | 7/28/2024 2:25:47 PM | SENT |
| Brittany Peters | | Brittany.Peters@oag.texas.gov | 7/28/2024 2:25:47 PM | SENT |
| Vivian Egbu | | vivian.egbu@oag.texas.gov | 7/28/2024 2:25:47 PM | SENT |

Associated Case Party: TARIK AHMED

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason T.Brown | | jtb@jtblawgroup.com | 7/28/2024 2:25:47 PM | SENT |
| Patrick S.Almonrode | | patalmonrode@jtblawgroup.com | 7/28/2024 2:25:47 PM | SENT |
| Michael E.Jones | | mikejones@potterminton.com | 7/28/2024 2:25:47 PM | SENT |
| E. GlennThames | | glennthames@potterminton.com | 7/28/2024 2:25:47 PM | SENT |

Case Contacts

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Janice Garrett on behalf of Jonathan Bonilla
Bar No. 24073939
Janice.Garrett@oag.texas.gov
Envelope ID: 90263044
Filing Code Description: ORDER
Filing Description: ORDER DENYING DEFENDANTS PFIZER INC. AND TRIS PHARMA, INC.'S JOINT MOTION FOR RECONSIDERATION OR CLARIFICATION AND REQUEST FOR HEARING
Status as of 8/14/2024 8:39 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Samantha Barrett | | Samantha.Badlam@ropesgray.com | 7/28/2024 2:25:47 PM | SENT |
| Val Jones | | val@valjoneslaw.com | 7/28/2024 2:25:47 PM | SENT |

Associated Case Party: KETAN MEHTA

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Harry L.Gillam | | gil@gillamsmithlaw.com | 7/28/2024 2:25:47 PM | SENT |
| Tom Gorham | | tom@gillamsmithlaw.com | 7/28/2024 2:25:47 PM | SENT |
| Barrett ReidHowell | | barrett.howell@blankrome.com | 7/28/2024 2:25:47 PM | SENT |
| John F.Hundley | | hundleyj@ballardspahr.com | 7/28/2024 2:25:47 PM | SENT |
| Christopher Hatfield | | hatfieldc@ballardspahr.com | 7/28/2024 2:25:47 PM | SENT |